HENRY IVAN COGSWELL
NAME

F-34504
PRISON NUMBER

CSATF/State Prison @ Corcoran
CURRENT ADDRESS OR PLACE OF CONFINEMENT

P.O. BOX 5242; Corcoran CA. 93212
CITY, STATE, ZIP CODE



FILED

JUL 1 1 2011

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

2281    1983
FILING FEE PAID
Yes ___ No ___
IFP MOTION FILED
Yes ___ No ___
COPIES SENT TO
Court ✓  ProSe

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

HENRY IVAN COGSWELL,
(FULL NAME OF PETITIONER)

PETITIONER

v.

KATHLEEN ALLISON,
(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE
CALIFORNIA DEPARTMENT OF CORRECTIONS])

RESPONDENT
and

KAMALA D. HARRIS,
The Attorney General of the State of
California, Additional Respondent.

Civil No '11 CV 1559 MMA WVG
(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

PETITION FOR WRIT OF HABEAS CORPUS

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1. Name and location of the court that entered the judgment of conviction under attack:
   SAN DIEGO COUNTY SUPERIOR COURT

2. Date of judgment of conviction: FEBRUARY 15, 2006

3. Trial court case number of the judgment of conviction being challenged:
   SCN201693

4. Length of sentence:
   105 years to life

CIV 68 (Rev. Jan. 2006)

CR

cv

5. Sentence start date and projected release date: July 14, 2006; And 105 years To Life

6. Offense(s) for which you were convicted or pleaded guilty (all counts): California Penal Code sections, 261, subd. (a)(2); 289, subd. (a)(1); 288a, subd.(c)(2); 667.61, subd. (a),(c); 667.71, subd. (a); 667, subd. (b)-(i), §(a)(1); 667.5, subd. (a); 667.6, subd. (a).

7. What was your plea? (CHECK ONE)

   (a) Not guilty        ☒
   (b) Guilty            ☐
   (c) Nolo contendere   ☐

8. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)
   (a) Jury              ☒
   (b) Judge only        ☐

9. Did you testify at the trial?

   ☐ Yes  ☒ No

## DIRECT APPEAL

10. Did you appeal from the judgment of conviction in the **California Court of Appeal**?
    ☒ Yes  ☐ No

11. If you appealed in the **California Court of Appeal**, answer the following:
    (a) Result: Conviction "REVERSED", but later Affirmed.
    (b) Date of result (if known): October 31, 2007 (reversed), Aug. 12, 2010 - -(Affirmed)-
    (c) Case number and citation (if known): D049038
    (d) Names of Judges participating in case (if known):
        P.J. BENKE, J. HALLER, and J. AARON
    (e) Grounds raised on direct appeal: Violation of Right to Confrontation; Trial Court Errored in Finding Ms. B Unavailable For Trial and Admitting her Preliminary Hearing Testimony; The Admission of other crimes Evidence violated Right to Due Process; Juror Misconduct; Cumulative Errors violated Const. Rights.

12. If you sought further direct review of the decision on appeal by the **California Supreme Court** (e.g., a Petition for Review), please answer the following:
    (a) Result: Ultimately affirmed Judgment of conviction.
    (b) Date of result (if known): December 1, 2010
    (c) Case number and citation (if known): S158898

    (d) Grounds raised: SAME AS ABOVE, (grounds raised on direct Appeal.)

CIV 68 (Rev. Jan. 2006)

cv

13. If you filed a petition for certiorari in the **United States Supreme Court**, please answer the following with respect to that petition:

   (a) Result: Certiorari Denied

   (b) Date of result (if known): June 6, 2011

   (c) Case number and citation (if known): 10-9189

   (d) Grounds raised: Violation of Constitutional Right of Confrontation; Violation of Constitutional Right of Due Process due to the Admission of Propensity Evidence; Juror Misconduct; Cumulative Errors violated Rights to a Fair trial and Due Process.

## COLLATERAL REVIEW IN STATE COURT

14. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Superior Court**?

   XX Yes ☐ No

15. If your answer to #14 was "Yes," give the following information:

   (a) <u>California Superior Court</u> Case Number (if known): HCN1157 (SCN201693)

   (b) Nature of proceeding: Habeas Corpus Petition

   (c) Grounds raised: Violation of Confrontation Right; General intent crime requires that the defendant intentionally does the act the law declares to be crime (argument), Penal Code § 220 is specific intent crime, whereas P.C. section 289 is a general intent offense.

   (d) Did you receive an evidentiary hearing on your petition, application or motion?
   ☐ Yes XX No

   (e) Result: DENIED

   (f) Date of result (if known): MARCH 4, 2011

16. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Court of Appeal**?

   ☐ Yes XX No

CIV 68 (Rev. Jan. 2006)

17.  If your answer to #16 was "Yes," give the following information:

   (a)  **California Court of Appeal** Case Number (if known):

   (b)  Nature of proceeding:

   (c)  Names of Judges participating in case (if known)

   (d)  Grounds raised:                                   N/A

   (e)  Did you receive an evidentiary hearing on your petition, application or motion?
       ☐ Yes ☐ No

   (f)  Result:

   (g)  Date of result (if known):                  N/A

18.  Other than a direct appeal from the judgment of conviction and sentence, have you
previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas
Corpus) with respect to this judgment in the **California Supreme Court**?
☐ Yes ☒ No

19.  If your answer to #18 was "Yes," give the following information:

   (a)  **California Supreme Court** Case Number (if known):

   (b)  Nature of proceeding:

   (c)  Grounds raised:

N/A

   (d)  Did you receive an evidentiary hearing on your petition, application or motion?
       ☐ Yes ☒ No

   (e)  Result:

   (f)  Date of result (if known):

N/A

CIV 68 (Rev. Jan. 2006)

cv

20. If you did *not* file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the <u>**California Supreme Court**</u>, containing the grounds raised in this federal Petition, explain briefly why you did not:

N/A

## COLLATERAL REVIEW IN FEDERAL COURT

21. Is this your **first** federal petition for writ of habeas corpus challenging this conviction?

    ☒ Yes ☐ No      (IF "YES" SKIP TO #22)

(a) If no, in what federal court was the prior action filed?

(i) What was the prior case number?

(ii) Was the prior action (CHECK ONE):

        Denied on the merits? ☐

        Dismissed for procedural reasons? ☐

(iii) Date of decision:

(b) Were any of the issues in this current petition also raised in the prior federal petition?

    ☐ Yes ☐ No

(c) If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?

    ☐ Yes ☐ No

---

**CAUTION:**

- <u>**Exhaustion of State Court Remedies:**</u> In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court. This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present *all* other grounds to the California Supreme Court before raising them in your federal Petition.

- <u>**Single Petition:**</u> If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.

- <u>**Factual Specificity:**</u> You must state facts, not conclusions, in support of your grounds. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do. A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

---

CIV 68 (Rev. Jan. 2006)

cv

## GROUNDS FOR RELIEF

22. State *concisely* every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States. Summarize *briefly* the facts supporting each ground. (e.g. what happened during the state proceedings that you contend resulted in a violation of the constitution, law or treaties of the United States.)  If necessary, you may attach pages stating additional grounds and/or facts supporting each ground.

(a) GROUND ONE: PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO CONFRONT WITNESSES AGAINST HIM WAS VIOLATED BY THE STATE COURT'S ERRONEOUS RULING THAT DUE DILIGENCE TO SECURE THE PRESENCE OF Ms. B. FOR TRIAL WAS DEMONSTRATED, AND ADMITTING HER PRELIMINARY HEARING TESTIMONY AS THE PRIMARY EVIDENCE WAS ERROR.

Supporting FACTS:

[ SEE pp. 11-36 of PETITION FOR WRIT OF HABEAS CORPUS ATTACHED. DUE TO LIMITED SPACE. ]

Did you raise GROUND ONE in the California Supreme Court?

☒ Yes ☐ No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): Petition For Review.

(2) Case number or citation: S158898

(3) Result (attach a copy of the court's opinion or order if available): Judgment of Conviction Affirmed.

(b) **GROUND TWO**: THE ADMISSION OF OTHER CRIMES EVIDENCE UNDER EVIDENCE CODE SECTION 1108 VIOLATED PETITIONER'S RIGHT TO DUE PROCESS BECAUSE IT PERMITTED EVIDENCE OF "UNCHARGED SEXUAL OFFENSE TO BE USED TO SHOW PETITIONER'S DISPOSITION".

Supporting FACTS:

[ SEE pp. 37-47 of Petition For Writ of Habeas Corpus due to limited space ]

**Did you raise GROUND TWO in the California Supreme Court?**

☒ Yes ☐ No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): Petition for review.

(2) Case number or citation: S186590

(3) Result (attach a copy of the court's opinion or order if available): Review denied.

(c) **GROUND THREE:** PETITIONER'S TRIAL WAS PREJUD-ICIALLY INFECTED BY WITNESS AND JUROR MISCONDUCT WHICH VIOLATED HIS SIXTH AMENDMENT JURY TRIAL RIGHT. REVERSAL IS REQUIRED.

**Supporting FACTS:**

[ SEE PP. 47-62 OF PETITION FOR WRIT OF HABEAS CORPUS ]

**Did you raise GROUND THREE in the California Supreme Court?**

☒ Yes ☐ No.

If yes, answer the following:

(1)  Nature of proceeding (i.e., petition for review, habeas petition): Petition for Review.

(2)  Case number or citation: S186590

(3)  Result (attach a copy of the court's opinion or order if available): Review denied.

(d)   **GROUND FOUR**: THE CUMULATIVE ERRORS UNDERMINED THE FUNDAMENTAL FAIRNESS OF PETITIONER'S TRIAL IN VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS, MANDATING REVERSAL.

Supporting FACTS:

[ SEE pp. 62 - 63 of PETITION FOR WRIT OF HABEAS CORPUS ]

**Did you raise GROUND FOUR in the California Supreme Court?**

XX Yes ☐ No.

If yes, answer the following:

(1)   Nature of proceeding (i.e., petition for review, habeas petition): ON APPEAL

(2)   Case number or citation:   S186590; see also   D049038

(3)   Result (attach a copy of the court's opinion or order if available): Denied

CIV 68 (Rev. Jan. 2006)

cv

**23.** Do you have any petition or appeal **now pending** in any court, either state or federal, pertaining to the judgment under attack?
XX Yes ☐ No

**24.** If your answer to #23 is "Yes," give the following information: → "COPY ATTACHED"
(a) Name of Court: San Diego Superior Court, North County Division.
(b) Case Number: Pending (awaiting issuance of case number)
(c) Date action filed: July 7, 2011
(d) Nature of proceeding: PETITION FOR WRIT OF HABEAS CORPUS.

(e) Name(s) of judges (if known): UNKNOWN
(f) Grounds raised: Petitioner's sentenced of 105 years to life constitutes Cruel and Unusual Punishment; Denial of Constitutional Right to a fair trial and Due Process of law when jury heard prejudicial information about Past Drug arrest; Ineffective Assistance of Counsel; cumulative errors denied Petition of Fair trial.
(g) Did you receive an evidentiary hearing on your petition, application or motion?
☐ Yes XX No

**25.** Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing ........ Oliver Patrick Cleary (Attorney) 108 West "F" Street, ste., 411 San Diego, CA. 92101-6036
(b) At arraignment and plea ....... —
(c) At trial .................. Oliver Patrick [same as above]
(d) At sentencing ............. Oliver Patrick [same as above]
(e) On appeal ................ Patricia A. Scott (Bar No. 165184) P.O. Box 12876 Prescott, Arizona 86304
(f) In any post-conviction proceeding. N/A
(g) On appeal from any adverse ruling in a post-conviction proceeding: N/A

CIV 68 (Rev. Jan. 2006)                    -10-                    cv

26. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
    ☐ Yes   ☐ No

27. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
    ☐ Yes   ☒ No

    (a)  If so, give name and location of court that imposed sentence to be served in the future:
                                              N/A

    (b)  Give date and length of the future sentence:
                                              N/A

    (c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
         ☐ Yes   ☐ No
                                              N/A

28. Consent to Magistrate Judge Jurisdiction

    In order to insure the just, speedy and inexpensive determination of Section 2254 habeas cases filed in this district, the parties may waive their right to proceed before a district judge and consent to magistrate judge jurisdiction. Upon consent of all the parties under 28 U.S.C. § 636(c) to such jurisdiction, the magistrate judge will conduct all proceedings including the entry of final judgment. The parties are free to withhold consent without adverse substantive consequences.

    The Court encourages parties to consent to a magistrate judge as it will likely result in an earlier resolution of this matter. If you request that a district judge be designated to decide dispositive matters, a magistrate judge will nevertheless hear and decide all non-dispositive matters and will hear and issue a recommendation to the district judge as to all dispositive matters.

    You may consent to have a magistrate judge conduct any and all further proceedings in this case, including the entry of final judgment, by indicating your consent below.

Choose only one of the following:

☒ Plaintiff consents to magistrate judge jurisdiction as set forth above.      **OR**      ☐ Plaintiff requests that a district judge be designated to decide dispositive matters and trial in this case.

29. Date you are mailing (or handing to a correctional officer) this Petition to this court:

    July 7, 2011

CIV 68 (Rev. Jan. 2006)

cv

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____N/A_____

SIGNATURE OF ATTORNEY (IF ANY)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

_____July  7,  2011_____      _____

(DATE)                                    SIGNATURE OF PETITIONER

CIV 68 (Rev. Jan. 2006)

-12-                                          cv

HENRY I. COGSWELL
CDCR#, F-34504
CSATF/State Prison @ Corcoran
P.O. Box 5242
Corcoran CA. 93212


IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA.....


| | |
|---|---|
| HENRY IVAN COGSWELL,<br>　　　　　　Petitioner<br><br>　　　v.<br><br>KATHLEEN ALLISON,(warden).<br>　　　　　　Respondent<br>　　　and<br>Kamala D. Harris<br>The Attorney General of the<br>State of California, Additi-<br>onal Respondent. | Case No._____<br><br><br>PETITION FOR WRIT OF HABEAS<br>　　　　CORPUS<br><br>Per 28 U.S.C. § 2254,<br>By a Person in State Custody. |

TO: THE HONORABLE PRESIDING CHIEF JUDGE AND THE MAGISTRATES OF THE
    UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF CALIFORNIA:

   Comes Now, Henry Ivan Cogswell, hereinafter referred to as Petition-
er, complains of the Respondents Kathleen Allison (Warden as above desig-
nated) and Kamala D. Harris (Attorney General of California), and for le-
gal cause of action.

   (a) That petitioner is confined, detained, imprisoned and restrain-
ed of his liberty in violation of the constitution, laws, and treities
of the United States which will hereafter be set forth.

   (b) This honorable court has jurisdiction herein pursuant to the

1.

essential provisions of Title 28 U.S.C. Section 2254; including the 6th, 5th, and 14th Amendments of the United States Constitution.

(c) This Petition for Writ of Habeas Corpus is brought by petitioner following:

**1)** On July 14, 2006 petitioner filed a timely notice of appeal,(2 CT. 338).

**2)** On October 31, 2007 the Court of Appeal issued its original opinion on the cause reversing the judgment of conviction.

**3)** On February 13, 2008, the California Supreme Court issued an order granting review on the cause upon the petition by the Attorney General.

**4)** On April 1, 2010 the California Supreme Court issued its opinion reversing the decision of the Court of Appeal and remanding the matter to the Appellate court to issue a decision as to the remaining issues raised by petitioner in his initial appeal.

**5)** On August 12, 2010 the Court of Appeal issued its Opinion on Remand affirming the judgment in full.

**6)** Petitioner filed a petition for Review in the California Supreme Court that was denied on December 1, 2010.

**7)** Petitioner then filed a petition for Writ of Certiorari in the United States Supreme Court on February 20, 2011. On April 7, 2011, the United States Supreme Court requested a response to the petition.

**8)** On June 6, 2011 the United State Supreme Court denied Certiorari.

Petitioner's judgment of conviction is no longer on Appeal before the State Court, and Petitioner has fully exhausted his State remedies.

## STATEMENT OF THE CASE

In a preliminary hearing held on November 17, 2004 Lorene B. testified that -during the week of June 9, 2004 she was in California on vacation from Colorado. She visited friends who lived in Riverside, as well as her best friend, Crystal Ginther, who lived in Riverside, as well as her best friend, Crystal Ginther, who lived in San Diego.(4 RT. 208, 225-226). Lorene knew that Ginther once had a relationship with petitioner, that he was the father of her children, and that they were no longer romantica-lly involved.[1] (4 RT. 205, 226). Lorene had known petitioner for two years. (4 RT. 272) Petitioner and Lorene are deaf and communicate by sign language.(4 RT. 210-211).

On June 9, 2004 petitioner was living with his sister, Henrietta, in San Diego county.(4 RT. 204, 226-227). Late that afternoon, Lorene and her sister went to the apartment to visit Henrietta, and found petitioner the-re alone.(4 RT. 202-203, 205-206, 226). They spoke briefly and returned tp Riverside.(4 RT. 203, 227) Later that evening, Lorene began receiving "instant messages" from petitioner begging her to return to his apartment that night to speak about his children.(4 RT. 203-205, 229). Believing the matter was urgent, Lorene returned to the apartment alone at about midnight.(4 RT. 205-206, 231).

When she arrived, she parked and exited the car. Upon seeing petitio-ner walking toward her she flagged him over.(4 RT. 206-207). He approached, kissed Lorene on the mouth, and pushed her against the car.(4 RT. 207-208, 231). He told her he wanted to talk with her in private and to get into the

[1]   Petitioner was convicted of raping Ginther in 1997.(5 RT. 317-318). Af-ter the conviction, Ginther contacted the District Attorney and recanted. (5 RT. 320-321). She testified adout the incident at the instant trial, although she did not recall any details about it.(5 RT. 305-306).

car. (4 RT. 208, 233). Lorene entered the car on the driver's side and petitioner took the front passenger seat.(4 RT. 209, 233-234). Feeling uncomfortable, she opened the car door and ask petitioner what he wanted to talk about.(4 RT. 209, 234). Petitioner jumped on Lorene, adjusting t-he car seat into a flat position.(4 RT 209). He put his hand down the front of her pants and tried to remove them, bit her breast, and kissed her face and neck.(4 RT. 210, 235-236).

Petitioner then removed his clothes, and told Lorene to do the same. (4 RT. 211-213). Lorene was frightened and believed if she did as he ask-ed, he would calm down.(4 RT. 212). She removed her clothing and he pull-ed her on top of him and had sex with her. He also digitally penetrated her.(4 RT 212-214). Lorene moved to the back seat and told petitioner she needed to use the bathroom.(4 RT. 214-215, 245). Petitioner told her to orally copulate him.(4 RT. 215) As she complied, **"he fell asleep'** but awakened when she gathered her clothing to leave.(4 RT. 216-217). He pull-ed her on top of him and caused her to pass out as he had sex with her. (4 RT. 217-218).

Lorene awoke after daylight.(4 RT. 218). They drove to the bank and to  buy gas, and then back to the apartment and parked.(4 RT. 220-221). They got into the back seat where petitioner pushed Lorene down and had intercourse with her, ejaculating on the car seat.(4 RT. 223-224, 253). Petitioner told her he loved her.(4RT. 224). She responded that she loved him too and left.(4 RT. 224, 255).

In a refiled information issued nearly one year later on October 18, 2005, petitioner was charged with five counts committed against Lorene, including three counts of forcible rape, pursuant to Penal Code section 261, subdivision (a)(2), one count of forcible rape by use of a foreign object within the meaning of section 289, subdivision (a)(1), and one co-

unt of oral copulation under section 288a, subdivision (c)(2). As to all counts, it was further charged that petitioner suffered a prior conviction for rape pursuant to section 667.61, subdivisions (a), (c), and section 667.71, subdivision (a), and that petitioner suffered a prior serious felony conviction and previously served a prison term pursuant to section 667, subdivisions (b) through (i), section (a)(1), section 667.5, subdivision (a), and section 667.6, subdivision (a).(1 CT. 1-7; 2 CT. 340). At the  arraignment on that date, petitioner pled not guilty and denied the allegations, and trial was calendared for December 20, 2005.(2 CT. 340).

On November 2, 2005 the District Attorney filed a petition in the San Diego Superior Court requesting an order to secure the attendance of Lorene for trial on December 21, 2005 within the meaning of the Uniform Act. The petition was granted and a judicial certificate addressed to the Denver county district Court to hold proceedings and compel Lorene to appear in San Diego Superior Court was issued.(1 CT. 19-24). Linda Ryder, a paralegal with the District Attorney's office prepared an interstate compact package which included the judicial certificate, as well as provision of airline fare, hotel accomodations, and per diem moneys for the duration of time of court appearances.(1 RT. 26-27, 33). the package was  overnighted to the Denver District court, and its receipt was confirmed by Ryder.(1 RT. 28). John Diaz, an investigator with the District Attorney's office was assigned to counsel and preserve contact with Lorene.(1 RT. 41). Approximately one week before the December trial court date, Diaz contacted the Denver District Court regarding the summons served on her.(1 RT. 43).

On December 15, 2005 the trial was continued to January 31, 2006.[2]

---

[2]  The record does not reflect that either Lorene or the Denver District Court was notified of the continuance.

5.

(2 CT. 344. On December 20, 2005 Diaz received a telephone call from a clerk at the Denver County courthouse informing him that Lorene was present there with an interpreter and wanted to speak with him about her "desires not to want to come to California."(1RT. 44). According to Diaz, Lorene told him she "wasn't coming."(1 RT. 49, 64).

Thereafter, on December 23, 2005 the prosecutor submitted a second request to secure Lorene's attendance at trial on January 31, 2006 under the Uniform Act.(1 CT. 25-27). The option for the engagement of custodial measures under the Uniform Act was not addressed in the petition.(1 CT. 25-27; 1 RT. 32-33). The certificate was granted and paralegal Ryder prepared a second interstate compact package to foward to the Denver County District Court.(1 CT. 28-30; 1 RT. 33). Ryder did not contact the Denver court after sending the package, but the prosecution received an original of an Affidavit of Service of Summons from the court indicating Lorene had been served with the second summons on January 20, 2006.(1 CT. 31-34; 1 RT. 28-30).

Diaz stated he was specifically instructed not to contact the Denver District Court after the first service of summons because the court was "irate" over having to repeat the hearing and summons process.(1 Rt. 48). Diaz also did not make any efforts to contact Lorene after the December 20th phone call because he opined she would interpret his contact as "some type of intimidation."(1 RT. 48-49). Moreover, Diaz did not contact Lorene about the second interstate compact because he believed she might evade service.(1 RT. 49). After the second summons was served, he did not try to contact her through email or enlist the assistance of Denver law enforcement in reaching her.(1 RT. 60-61). Diaz made no personal efforts to secure Lorene's attendance on the second trial date, and did not recommend that she be taken into custody and delivered

6.

to San Diego to secure her appearance.(1 RT. 64-65).

Lorene did not contact anyone about the second summons and did not board the flight to San Diego or appear in court as ordered.(1 RT. 50-51).

On February 1, 2006, the first day of trial, the prosecutor moved to admit the transcript of the preliminary hearing testimony elicited from Lorene asserting that she was unavailable as a witness.(1 CT. 55-56). The prosecutor urged all statutory requirements for procuring her testimony were met, the prosecution had met its burden of demonstrating due diligence, and Lorene was unavailable to testify at trial within the meaning of Evidence Code section 240, subdivision (a)(4), Evidence Code section 1290, and code of Civil Procedure section 1219, subdivision (b).(1 CT. 55-56). The prosecutor represented that there was no further judicial avenue for obtaining Lorene's appearance, urging that Code of Civil Procedur section 1219 prohibited placing Lorene into custody to guarantee her presence because she was a victim of a sexual assault.(1 RT. 6_).

Petitioner's trial counsel vigorously opposed the prosecutor's motion and moved to exclude the preliminary hearing testimony. Petitioner argued that the prosecution had not fully invoked the Uniform Act, as set forth in section 1334.3 to obtain Lorene's presence by custodial measures and thus, the due diligence requirement had not been satisfied. (1 RT. 71-72). He also asserted that the failure to obey a subpoena for a court appearence was not contemplated in Code of Civil Procedur section 1219, which concerns orders of contempt for failure to testify, and that the prosecutor's reliance upon that provision in allowing Lorene to ignoredsubpoenas requiring her presence in court was incorrect.(1 R-T. 12). Trial counsel further argued the prosecutor's and the investig-

--ator's representations regarding Lorene's statements constituted inadmissible hearsay which could not be considered for their truth.(1 RT. 12, 44-45).

The trial court ruled the prosecutor met the reuisite burden of due diligence and found the witness unavailable. It granted the prosecution's motion to present the witness's previous preliminary hearing testimony during the People's case in chief.(2 CT. 348-349; 1 RT. 81).

On February 15, 2006 the jury found petitioner guilty on all counts.(1 CT 195-199; 2 CT. 362-363). Thereafter, the enhancement and strike allegations were found to be true.(2 CT. 202-204, 364-368). Petitioner was  sentenced to a prison term of 105 years to life (2 CT. 374-375). He filed a timely noticed of appeal on July 14, 2007, raising "three" substantive issues. In a published decision issued on October 31, 2007, "the court of Appeal unanimously reversed petitioner's convictions" based upon prejudicial error by the trial court in finding the complaining witness unavailable within the meaning of Evidence Code section 240, and in admitting her preliminary hearing testimony at trial.(Slip Opn. at pp. 7-21).

In its written opinion, the Court of Appeal distuished the circumstances which arise when a witness fails to obey a summons to appear in court, from those which occur when a witness appears as ordered, but refuses to testify.(Slip Opn. at pp. 14-20). It held in the latter circumstance, when the witness is a victim of the sexual assualt to be prosecuted, the witness may be held in contempt of court for refusing to testify against the defendant, but may not be incarcerated for purpose of punishment or to induce the witness into testifying, as set forth in Code of Civil Procedure section 1219, subdivision (b).(Slip Opn. at pp. 17-18). As to the former circumstance it held that where,

8.

as here, the witness disregarded the process of the court and fails to appear altogether, Code of Civil Procedure section 1219, subdivision (b) does not apply, and thus does not prohibit the engagement of custodial measures to secure the witness's presence in court as summoned.(Slip Opn. at 18-20).

The Court of Appeal concluded the prosecution's failure to fully utilize the Uniform Act in this case precluded a finding of due diligence and ultimately, precluded a finding that the witness was unavailable.(Slip Opn. at pp. 20-21). Based upon the materiality of the witness, the Court of Appeal found prejudice to be manifest and reversed the judgment.(Slip Opn. at p. 21).

Petitioner adopts the Statement Of Facts in Appellant's Opening Brief [Court of Appeal case No. D049038], which is not reiterated here.

Additional arguements raised by Petitioner include:

1) THE ADMISSION OF THE OTHER CRIMES EVIDENCE UNDER EVIDENCE CODE SECTION 1108 VIOLATED PETITIONER'S RIGHT TO DUE PROCESS OF LAW BECAUSE IT PERMITTED EVIDENCE OF UNCHARGED SEXUAL OFFENSES TO BE USED TO SHOW PETITION'S DISPOSITION.

2) PETITIONER'S TRIAL WAS PREJUDICIALLY INFECTED BY WITNESS AND JUROR MISCONDUCT WHICH VIOLATED HIS SIXTH AMENDMENT JURY TRIAL RIGHT. REVERSAL IS REQUIRED.

3) THE CUMULATIVE ERRORS UNDERMINED THE FUNDAMENTAL FAIRNESS OF APPELLANT'S TRIAL IN VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS, MANDATING REVERSAL.

## VERIFICATION

I, Henry I. Cogswell declare:

I am the Petitioner in this action. I have read the foregoing Petition For Writ of Habeas Corpus and the facts stated therein are true and correct of my own knowledge, except to matters that are therein stated on my own information and belief, and as to those matters i believe them to be true.

I declare under the penalty of perjury under the laws of the state of california that the forgoing is true and correct and that this declaration was executed on __July 7, 2011_____, at CSATF/State Prison at Corcoran, California.

/s/ _____

HENRY IVAN COGSWELL,(In Pro. Per.).

10.

I.

ARGUMENT....

PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL
RIGHTS TO CONFRONT WITNESSES AGAINST HIM WAS
VIOLATED BY THE STATE COURT'S ERRONEOUS
RULING THAT DUE DILIGENCE TO SECURE THE PRESENCE
OF MS. B. FOR TRIAL WAS DEMONSTRATED, IN FINDING
THAT MS. B. WAS UNAVAILABLE TO TESTIFY, AND ADMI-
TTING THE TRANSCRIPT OF HER PRELIMINARY HEARING
TESTIMONY AGAINST PETITIONER AS THE PRIMARY EVID-
ENCE IN THE PROSECUTIONS'S CASE IN CHIEF WAS ERR-
OR.

A.          State and Federal Confrontation Clauses Allow An Exception
            to the Requirement of Witness Presence at Trial Only in
            Circumstances of Necessity and Only Where A good Faith and
            Reasonable Effort to Accomplish A Face-to-Face Meeting Has
            Taken Place...

The confrontation clauses of both the United States and the California
Constitutions guarantee a criminal defendant the right to confront the wi-
tnesses against him.(Crawford v. Washington (2004) 541 U.S. 36, 42 [124 S.
CT. 1354, 158 L.Ed.2d 177]; People v. Cromer (2001) 24 Cal.4th 889, 892;
U.S. Const., 6th Amend.; Cal. Const. art I, § 15). The Sixth Amendment's
Confrontation Clause provides that, "in all criminal prosecutions, the ac-
cused shall enjoy the right...to be confronted with the witnesses against
him."(Crawford v. Washington, supra, 541 U.S. at p. 42)."The central conc-
ern of the Confrontation Clause is to ensure the reliability of the evide-
nce against a criminal defendant by subjecting it to rigorous testing in
the context of an adversary proceeding before the trier of fact."(Maryland
v. Craig (1990) 497 U.S. 836, 845 [110 S.Ct 3157; 111 L.Ed.2d 666]). "The
right guaranteed by the Cofrontation Clause includes not only a personal
examination, [citation] but also '(1) insures that the witness will give
his statements under oath--thus impressing him/her with the seriousness of

11.

the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus, aiding the jury in assessing his/her credibility."(Id. at pp. 845-846, quoting California v. Green (1970) 399 U.S. 149, 158 [90 S.Ct 1930, 26 L.Ed.2d 489]). "The combined effect of these elements of confrontation--physical presence, oath, cross-examination, and observation of demeanor by the trier of fact serves the purpose of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings."(Ibid.)

The United States Supreme Court has held that a narrow exception to the Confrontation Clause may arise when a witness is unavaailable for trial, but has been subject to cross-examination in a prior judicial proceeding. "It is true that there has traditionally been an exception to the Confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant."(Barber v. Page (1968) 390 U.S. 719, 722 [88 S.Ct. 1318; 20 L.Ed.2d 255]). "This exception has been explained as arising from necessity and has been justified on the ground that the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation --- requirement." (Ibid.) However, "the right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness. A preliminary hearing is ordinarily a much less searching exploration into the merits

12.

of a case than a trial, simply because its function is more limited on determining whether probable cause exists to hold the accused for trial ."(Barber v. Page, supra, 390 U.S. at 719, 725).Thus, "although face-to-face confrontation is not an absolute constitutional requirement, it may be abridged only where there is a "case-specific finding of necessity."-[citations]."(Maryland v. Craig, supra, 497 U.S. at pp. 857-858). In these exceptional circumstances, the previous testimony is admissible only if the  prosecution has made a **good faith effort** to acquire the presence of the witness at trial.(Barber v. Page, supra, 390 U.S. at pp. 724-725).

Similarly in California, the California Supreme Court has held "the confrontation right seeks 'to ensure that the defendant is able to conduct a "personal examination and croos-examination of the witness, in which [the defendant] has an opportunity, not only to test the recollection and sifting the conscience of the witness, but of compelling him/her to stand face to face with the jury in order that they may look at him/her, and judge by his/her demeanor upon the stand and the manner in which he gives his/her testimony whether she is worthy of belief."(People v. Cromer, supra, 24 Cal.4th at pp.896-897, citing People v. Louis (1986) 42 Cal.3d 969,982, quoting Mattox v. United States (1895) 156 U.S. 237, 242-243 [15 S.Ct. 337, 339, 39 L.Ed. 409]).

The California Supreme Court has further recognized the narrow exception wherein the prior testimony of an unavailable witness may be admissible at trial in circumstances of necessity and only in "the absence of any other means of utilizing the witness knowledge."(People v. Rojas (1975) 15 Cal.3d 540, 549, quoting 5 Wigmore on Evidence (3rd ed.) § 1402, p.148). Thus, if a witness is unavailable for trial but has testified at a previous judicial hearing where the witness was subject to cross-examination,

13.

the prior testimony may be admitted at trial.(People v. Smith (2003) 30 Cal.4th 581, 609; People v. Enriquez (1977) 19 Cal.3d 221, 235, disapproved on other grounds in People v. Cromer, supra, 24 Cal.4th at p. 901, fn. 3).

In this regard, the court has adopted the federal standard for a finding of unavailability, holding the prosecution must engage in "a good faith effort" to secure the witness's presence at trial before the witness is deemed unavailable and the prior testimony may be heard.(People v. Enriquez, supra, (1977), supra, at p. 235, quoting Barber v. Page, supra, 390 U.S. at p. 725). The federal constitutional requirement of a "good faith effort" is paralleled in California as the requisite demonstration of "reasonable or due diligence" as set forth in Evidence Code section 240 [California].(People v. Smith, supra, 30 Cal.4th at pp. 609~610).

B.   **The California Legislature Has Codified the Principls of Unavailability and the Requirement of "Due Diligence" in Evidence Code sections 1291 and 240 and Numerous Cases Have Interpreted Their Application in Criminal Proceedings...**

As explained above, a prerequisite to the introduction of the prior testimony under federal law is that the witness be legally unavailable and  have undergone adequate cross-examination at the proceedings sought to be admitted. In California, this requirement is established by statute in the state Evidence Code. As relevant to the instant case, Evidence Code section 1291, subdivision (a)(2) provides that evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the party against whom the evidence is offered had an opportunity to cross-examine the declarant with a similar motive and interest.

Evidence Code section 240, enacted in 1967, defines the term "unava-

14.

ilable as a witness" in relevant part, as follows:

> (a) Except as otherwise provided in subdivision (b), "unavailable as a witness" means that the declarant is any of the following:
>
> 1) Excempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant.
>
> 2) Disqualified from testifying to the matter.
>
> 3) Dead or unable to attend or testify at the hearing because of then existing physical or mental illness or infirmity.
>
> 4) Absent from the hearing and the proponent -of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process.

As pertinent here, Evidence Code section 240, subdivision (a)(5) sets forth two interrelated components for purposes of establishing unavailability: (1) the exercise of due diligence by the proponent of the evidence, in (2) the proponent's use of the court's process to secure the witness's presence.

As to the first requisite factor, the California Supreme Court has held that although due diligence is "incapable of a mechanical definition," it "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character."(People v. Cromer, supra, 24 Cal.4th at p. 904, puoting People v. Linder (1971) 5 Cal.3d 342, 3-46-347; accord People v. Wilson (2005) 36 Cal.4th 309, 341). The relevant considerations are whether the search was begun in a timely manner, the "importance of the witness's testimony, and whether all leads have been competently explored.(Ibid., citing People v. Sanders (1995) 11 Cal.4th 475, 523; people v. Louis, supra, 42 Cal.3d at p. 991; People v. Enriquez, supra, 19 Cal.3d at pp. 236-237; People v. Wilson,

In People v. Linder, supra, 5 Cal.3d at p. 347, the california Supreme Court held that "the totality of efforts of the proponent to achieve presence of the witness must be considered by the court." The Corut opined that factors to consider include "not only the character of the proponent's affirmative efforts but such matters as whether he reasonably believed prior to trial that the witness would appear willingly and therefore did not subpoena him when he was available, whether the search was timely begun, and whether the witness would have been produced if reasonable diligence had been exercised."(Ibid.,citations omitted).

More recently, this Court held that while Evidence Code section 240 defines the term "unavailable as a witness" in a manner that applies to all hearsay exceptions that require declarant unavailability, it should not be interpreted so strictly as to "preclude unlisted variants of unavailability."(People v. Reed (1996) 13 Cal.4th 217, 226). "Rather, courts have given the statutes a realistic construction consistent with their purpose, i.e., to ensure that certain types of hearsay, including former testimony, are admitted only when no preferable version of evidence, in the form of live testimony, is legally and physically available."(Id. at pp. 226-227).

The California Supreme Court recently held that appellante courts will apply independent, de novo review over trial court determinations of due diligence.(People v. Cromer, supra, 24 Cal.4th at p. 901). The court stated, "Appellant courts should independently review a trial court's determination that the prosecution's failed efforts to locate an absent witness are sufficient to justify an exception to the defendant's **constitutionally guaranteed right of confrontation at trial**.(Ibid.)

16.

The court has confirmed, as well, that the prosecution bears the burden of proving, by competent evidence, that a hearsay declarant is unavailable as a witness.(People v. Smith, supra, 30 Cal.4th at p. 609, citing People v. Price (1991) 1 Cal.4th 32, 424; People v. Enriquez, supra, 19 Cal.3d at p. 235). The proof must be made by competent evidence, applying the exclusionary rules such as hearsay, best evidence and opinion to the evidence offered in making the determination.(Ibid.;People v.Williams (1979) 93 Cal.App.2d 169, 171).

The second component of Evidence Code section 240, subdivision (a)(5) is the proponent's use of the "court's process to compel attendance." As relevant to the instant case, the "court's process" includes interstate process under the Uniform Act to Secure the Attendance of Witnesses from without the state in criminal----- cases (Uniform Act), as embodied embodied in California in section 1334, et. seq.,(People v. Blackwood (1983) 138 Cal.App.3d 939, 946).

> **C.** **California Courts and Courts of Other Jurisdictions Have recognized that "The Uniform Act to Secure the Attendance of Witnesses From Without the State in Criminal Cases" Provides An Interstate Court Process Procedure for Securing the Presence of a Witness From Another State Which Must Be Utilized To Establish the Requisite Due Diligence For A Finding Of Unavailability...**

In criminal cases, a witness's presence in another state does not place him beyond the reach of the court's process within the meaning of Evidence Code section 240. The Uniform Act, enacted in 1937 and held to be constitutional in New York v. O'Neill (1959) 359 U.S. 1, 11 [79 S.CT. 564, 3 L.Ed.2d 585], provides an interstate procedure for securing the attendance of a witness who is in another state. The purpose of the Uniform Act is to make uniform law throughout the states for procurement of witnesses beyond state borders.(Cal Penal Code § 1334.6). The procedures set forth in the Uniform Act have been adopt-

ed in all states and territories.(People v. Superior Court (Jans) (1990) 224 Cal.App.3d 1405, 1408-1412; State v. Breeden (Md. 212, 222). As relevant to the instant case, the Uniform Act was in effect in the State of Colorado at the time of trial.(Colo. Rev. Stats section 16-9-202, subd. (1)-(4), enacted 1963).

Where the witness resides out of the state of California, it is the prosecutor's duty to invoke the Uniform Act.(People v. Blackwood, supra, 138 Cal.App.3d at p. 947). When the prosecution knows of the witness's location, and procedures exist to secure the witness's presence in court, Evidence Code section 240 requires those procedures be utilized.(Ibid). Thus, when the prosecution knows of the witnesses location, and fails to attempt to secure process under the Uniform Act, the witness is not unavailable.(Id. at pp. 945-947; In re Terry (1971) 4 Cal.3d 911, 931). To show reasonable diligence, a good faith effort to find the witness, and the use of the Uniform Act to secure the Attendance of the witness, must be demonstrated.(People v. Masters (1982) 134 Cal.App.3d 509, 520-528). In order for the Uniform Act to apply to the proceeding, the person whose attendance is required must be a material witness in the case.(Cal. Pen. Code §§ 1334.2, 1334.3; People v. Cavanaugh (1968) 69 Cal.2d 262, 266).

Where, as here, the witness resides in Colorado, the prosecution must apply to the judge in the court where the action is proceeding. (People v. Cavanaugh, supra, at pp. 266-267; Cal. Pen. Code § 1334.3). Upon such a showing, the judge then issues a certificate for the out-of-state court, averring that the witness is material, and specifying the period of time for which the witness will be required.(Cal. Pen. Code §§ 1334.2, 1334.3; Colo. Rev. Stats. § 16-9-202, subd. (1).) The

18.

certificate may either request that a subpoena be issued to procure the attendance of the witness, or that the witness be taken into c-ustody and delivered to an officer of the state where the trial is pending.(Ibid.; Colo. Rev. Stats. § 16-9-202, subd. (2)-(3).)

If only a subpoena to the witness is requested, the out-of-sta-te judge may simply issue a summons. If, however, the certificate recommends, by facts which constitute prima facie proof for the ne-ed of custody and delivery, that the witness should be taken into custody and delivered to an officer of the state in which the trial is pending in order to secure that witness's attendance, the out-of-state court may order to secure that witness's attendance, the out-of-state court may order that the witness be brought before it to determine whether the witness should be taken into custody and del-ivered to the requesting state.(Cal. Pen. Code § 1334.3; Colo. Rev. Stats. § 16-9-202, subd. (2).) If that court is satis-fied that cu-stody is necessary, then it may order the witness be so detained a-nd delivered to an officer of the requesting state.(Cal. Pen. Code § 1334.3; Colo.Rev. Stats. § 16-9-202, subd. (3).)

If a witness appears solely upon the basis of the issuance of a subpoena by the out-of-state court, then he or she may be paid for the costs of the appearance. If the witness fails without good cau-se to appear and testify as directed in the subpoena, the witness may be punished in accordance with those who disobey suboenas within the state.(Cal. Pen. Code § 1334.3; Colo. Rev. Stats. § 16-9-202, subd. (4).)

The State Court has addressed the requirement of due diligence in the context of the Uniform Act on a very few occasions. In In re Montgomery (1970) 2 Cal.3d 863, the court reversed the petitioner's

convictions upon finding the prosecution failed to exercise a good
faith effort to secure the presence of a witness, who was located
in the state of New York, pursuant to the Uniform Act.  The court
observed that "the ability of the fact finder to evaluate a witness
credibility is severely hampered when such witness is absent and w-
hen his prior testimony is read into evidence.[Citation.] Only if
the necessity, due to the witness unavailability, is clearly demon-
strated may the defendant's right of confrontation be overcome, for
this right is basically a trial right. It includes both the opport-
unity to cross-examine and the occasion for the trier of fact to w-
eigh the credibility of the witness.(Id. at p. 867.) Finding that
the witness's testimony was the only evidence against the petition-
er as to one count, and was critical to the judgment of the other
count, the court held the prejudicial nature of the error was mani-
fest and reversal was required.(Id. at p. 868.)

The following year, in In re Terry, supra, 4 Cal. 3d 911, the
State Court reversed the petitioner's convictions upon finding the
prosecution failed to either utilize the Uniform Act, or make any
attempt to persuade the father of two minor children who were crit-
icall witnesses to travel from Virginia to California, in order to
procure the presence at trial of the children who were critical wi-
tnesses to the prosecution's case against him, and whose prelimina-
ry hearing testimony had been read into evidence over defense obje-
ction.(Id. at pp 928-931).In Terry, the children resided with their
father in the State of Virginia, but were traveling with him in Ca-
lifornia two days before the scheduled date of trial, October 23rd.
(Id. at p. 929). The father, who was served with two subpoenas for
the pending trial date, complained to the District Attorney about

having to remain in California for an extended period of time.(Ibid.)
The District Attorney suggested the case might be resolved without
a trial, but if the case did proceed and the father did not want to b-
ring the children, he could write a letter with his reasons.(Ibid.) T-
he children did not appear as subpoenaed on October 23rd, and the
trial was continued to December 4th.(Ibid.) In November, the prosecut-
or obtained subpoenas for trial, but did not serve them upon the chil-
dren at their home in Virginia. Instead, the prosecutor called the fa-
ther on December 3rd to ask if the boys would be in court. The father
explained he would not bring the children out at any time because of
the embarrassment they suffered and due to their low school grades.(Id.
at pp. 929-930). The trial was again continued to January 28th.(Id. at
p. 930). Again, the prosecutor obtained subpoenas for the children, b-
ut did not serve them in Virginia and instead, telephoned the father
on the date of trial.(Ibid.) The father stated the boys were in school
in Virginia.(Ibid).

   The State Court noted that had the prosecutor/prosecution utilized
the Uniform Act, a summons would have been issued by a Virginia court
only if at the hearing there the judge determined it would not have
caused undue hardship to the witnesses to be compelled to testify.(In
re Terry, supra, 4 Cal.3d at pp. 930-931). While acknowledging the
father's position and considering reports issued by the boys psycholo-
gical problems, the court opined those matters did not prevent the
children from testifying at the preliminary hearing or from traveling
to California in connection with another case, and it could not concl-
usively find that a Virginia court would have necessarily found the
existence of hardship.(Ibid. at p. 931). Although the court recognized

21.

the efforts that were made by the prosecution in the case, it found t-
he failure to use the Uniform Act, and its failure to attempt to **"per-
suade"** the father to bring the children to California, required rever-
sal of the convictions.(Id. at p. 931).

As noted by respondent, California Courts of Appeal have consiste-
ntly held that the provisions set forth in the Uniform Act "must" be
exercised in order to establish due diligenence in procuring the atte-
ndance of out of state witnesses. For example, in People v. Masters,
supra, 134 Cal.App.3d 509, the victim and sole witness to the robbery
charged against appellant moved from California to Arkansas during the
course of several trial continuances.(Id. at pp. 520-521). An investi-
gator for the prosecution located the witness, who was residing with
her parents and looking for work in Arkansas.(Id. at p. 521).
The investigator left several messages for the witness, requesting th-
at she return his call collect, but she did not respond.(Id.) The inv-
estigator then caused a subpoena to be personally served on the witne-
ss, who thereafter called the investigator and reluctantly agreed too
return to California and testify upon learning her expenses would bepp-
aid.(Id. at p. 522).

The case was thereafter continued three times, and when the inves-
tigator tried to reach the witness by telephone to confirm the final
new trial date, her mother told him she moved to another city and that
she did not want to return to California to testify.(People v.Masters,
supra, 134 Cal.App.3d at p. 522). The following day, the witness
personally contacted the investigator and informed him that she had
just started a new job, that her health was too poor to make the trip,
and that she "would not come by any mode of transportation despite
efforts to convince her otherwise."(Ibid.) She further refused to pro-

22.

vide him with her address.(Ibid.)

The court in Masters reviewed the previous appellate decisions which had considered the issue of Unavailability in the context of good faith and the Uniform Act, noting that the cases finding prejudicial error involved the absence of, or minimal, efforts limited to establishing contact with the witness out of state.(People v. Masters, supra, 134 Cal. App.3d. at pp. 524-525, citing People v. Nieto (1968) 268 Cal.App.2d. 231 [address known but telephone contact only], People v. Casarez (1968) 263 Cal.App.2d 130 [telephone contact], People v. Bailey (1969) 273 Cal. App.2d 99 [telegrams sent], People v. Fortman (1970) 4 Cal.App.3d 495 [no effort], People v. Joines (1970) 11 Cal.App.3d 259[no effort].) Recognizing the efforts made by the investigator in the case before it, the Masters court opined that when the witness first reluctantly agreed to travel to California, she was amenable to the Uniform Act and that an adequate showing was not otherwise made to excuse the failure to utilize its provisions for process at that time.(Id. at p. 528). Finding that the testimony of the witness was the sole evidence of the robbery count, the court concluded it was prejudicial error to find her unavailable and admit her preliminary hearing testimony.(Id.)

Although, until the instant matter, courts of this state have not been called upon to decide the issue of the use of custodial measures as set forth in the Uniform Act, it is significant that in each instance where the UniformAct has been considered, courts have held the exercise of its provisions in procuring out of state material witnesses is necessary to satisfy the "due process" and "confrontation rights" of the accused. Notably, where, as here, the testimony of the out of state witness is the primary, or sole evidence against the defendant, the court and appellate courts have found the provisions of the Uniform Act indis-

pensable, notwithstanding witness claims of psychological harm, poor grades, poor health, financial stress, embarrassment, or new employment.

Cases arising from other states which have considered the question of custodial measures, as set forth by respondent's in the state court, instruct that such measures must be utilized where the testimony of the out of state witness is primary to the prosecution's case and where there is good cause to invoke such means in order to secure the presence of an out of state witness.(See OBM at pp. 18-22 [state's Oppening Brief on the Merits]).

First, in grey v. Commonwealth (Va. Ct.App.1993) 16 Va.App. 513, the defendant, Grey, served subpoenas upon two witnesses who were material to the defense, and who resided in New York, pursuant to the Uniform Act. The subpoenas were served the week prior to trial, upon the defense learning of new prosecution witnesses which caused the witnesses testimony to be vital to the defense. The witnesses appeared in the New York court to accept summons, and there informed a public defender of that state that they would appear at thje Virginia trial.(Grey v. Commonwealth, supra, at p. 515). As well, on the day before the trial, the witnesses assured Grey they would be present at the trial, indicated they were already en route to Virginia, and that they had arranged for accommodations there.(Ibid.) On the first day of trial, however, the witnesses failed to appear in court and grey moved for a continuance.(Ibid.) Grey explained to the trial court that although the Uniform Act had been utilized, **the custodial measures provided in the Act had not been requested** since the witnesses had assured they would appear to testify. (Ibid.) grey advised that he knew how to locate the witnesses and secure theme (Id. at p. 519). The trial court denied the continuance, noting the delayed manner in which the defense secured the certificate for the out of state witnesses, and the fact that the witnesses knew about the

24.

trial date, said they would appear, and then did not.(Id. at p. 516).

The Virginia appellate court held the trial court erred in finding Grey had exercised due diligence and in denying the request for a continuance.(Grey v. Commonwealth, supra, at p. 518). Noting that the implementation of custodial measures are not mandatory under the Uniform Act in every instance, the court stated the permissive language of the provision "does not require that a party always request a recommendation to take the witness into custody, especially where, as here, the witnessses have assured numerous officials that they would be present. There was no indication that the witnessses would not be present; in such a situation a party is not required to request that friendly, cooperative out-of-state witnesses be taken into custody as a matter -of course."(Id. at pp. 518-519).

In People v. Thorin (Mich.Ct.App. 1983) 126 Mich.App. 293, witness Herbert Okinen was subpoenaed pursuant to the Uniform Act to testify in defendant's trial on sexual assault charges. Both the prosecutor and defense counsel were made for the witness's travel to Michigan.(Id. at p. 304). Apparently, Okinen's attorney was not certainwhether Okinen would appear at trial and he did not. Finding the prosecutor had exercised due diligence, the court in Thorin held that "given the limited exposure which Okinen had to the initial abduction" the extreme step of taking Okinen into custody under the Uniform Act was not warranted.(Ibid.)

In Bussard v. State of Arkansas (1989) 300 Ark. 174 the defendant Bussard was convicted of capital murder arising from a robbery and murder at a motel in Arkansas. Defendant's sister, Hudson, testified for the prosecution at his first trial, stating that she had taken Bussard into her home following the incident and that she had assisted him

25.

in obtaining medical treatment for a gunshot wound which was later determined to have been caused by a bullet from the murder victim's firearm.(Id. at pp. 177-178). When Bussard's first conviction was reversed, Hudson, who resided in Missouri, was subpoenaed twice by the prosecution pursuant to the Uniform Act to testify at his second trial.(Id. at p. 179.) Hudson appeared personally at the first summons hearing and moved to quash the subpoena.(Id. at pp. 179-180). The trial was continued and Hudson's motion to quash was denied. Thereafter, a second subpoena was issued to the state of Missouri, and Hudson's attorney appeared at the hearing at which she was ordered to appear for trial in Arkansas.(Id. at p. 179). Hudson apparently did not appear at trial.( Ibid.) The Bussard court upheld the trial court's finding that the prosecution exercised due diligence.(Id. at p. 180). It is noteworthy that the Bussard court did not reference the use of custodial means and it is unclear whether the issue was before the appellate or the trial court in the case.

In People v. Arguello (1987) 737 P.2d 436, a Colorado case, the defendant was charged with the sexual assault of a minor child. The defendant's first trial ended in a mistrial on the charge and a new trial motion was granted after his second trial.(Id. at p. 437). The minor testified at both trials.(Ibid.) At the time of the third trial, the minor was seven years old and living with her mother and stepfather in Texas.(Ibid.) The prosecutor represented to the court that the minor's parents "absolutely refused" to bring her back to testify for a third time. Asserting the minor was unavailable to testify, the prosecutor moved to admit the minor's testimony from the second trial.(Id. at pp. 437-438). The trial court agreed the minor was unavailable and admitted her testimony from direct and cross examination.(Id. at p. 438).

The court in Arguello held that the due diligence requirement had
been met.(People v. Arguello, supra, 737 P.2d at pp. 438-439). It noted
that the prosecution had secured the minor's appearance from another
state  through enforceable subpoenas issued pursuant to the Uniform A-
ct for the  first two trials.(id. at p. 439). At the time of the third
trial, the prosecution contacted the custodial parents in Texas and
attempted to secure the child's attendance through voluntary means, as
well as unsuccessfully attempting to  serve Colorado subpoenas.(Ibid.)
Two days before the third trial, the parents formally notified the
prosecution of their refusal to return the child for a third trial,
noting she was "just recovering from nightmares and other detrimental
effects of her two previous experiences in testifying in this matter,"
and they would not allow it to happen again.(Ibid.) Due to the late d-
ate, the prosecution declined to use the Uniform Act to compel the
child's attendance, particularly without any assurance the Texas court
would have issued a summons to compel the child's testimony under the
circumstances. (Ibid.) The court in Arguello found the trial court's
characterization of further attempts at subpoenaing the child to be a
"useless act," and in finding the child unavailable, was not an abuse
of discretion.(Ibid.) It further noted the child had been thoroughly
examined at both trials. (Ibid.)

Finally, in State of Arizona v. Archie (Ariz.Ct.App. 1992) 171 Ar-
iz. 415, an appeal from a conviction of a sexual assault, the court h-
eld the good faith requirement for a finding of unavailability had not
been met because the prosecution had not produced any evidence demons-
trating its avowed efforts to secure the sexual assault victims's pre-
sence at trial, and because the state could have done more to assure
the victim's presence by recommending the victim be taken into custody

27.

under the Uniform Act.(Id. at pp. 415, 417-418). In Archie, the complaining witness moved out of state to Indiana prior to the defendant's second trial.(Id. at p. 415.).†The prosecutor first moved to admit her former testimony in the second trial, asserting the witness could not be located in Indiana. The trial judge denied the motion and continued t the  trial date, finding a likelihood the prosecution would be able to secure the witness's presence by using an out of state subpoena.(Id. at p. 4160. Three weeks before the trial, the prosecutor filed a request for the attendance of the out-of-state witness, and the  trial court signed the certificate.(Ibid.) On the day prior to the trial, however, the prosecutor represented that the witness had been served and provided with airfare and monetary provisions, but that the witness had not contacted the state with any excuse for her absence.(Ibid.) The defense argued that the witness could be secured by custodial means under the Uniform Act, but the trial court ruled it did not believe the State was required to take the witness into physical custody.(Ibid.) The trial court found the witness to be unavailable, finding the prosecution had made a good-faith effort to obtain her presence at trial. (Ibid.)

The court in Archie held there was no competent evidence in the record of any action taken by the Indiana authorities pursuant to the judicial certificate.(State of Arizona v. Archie, supra, 171 Ariz, At p. 417). Thus, there was no evidence the witness could not be produced. (Ibid.) Moreover, the court held if the certificate would have recommended the witness be placed in custody to ensure her attendance, it was more likely she would have appeared. The court stated:

>"Here. the state knew the victim's address, and according
>to the prosecutor, his legal assistant had spoken to the
>victim at least twice since she moved to Indiana. Theref-

> ore because the witness had been located, it would not h-
> ave been futile to recommend that she be taken into cust-
> ody, as it likely would have resulted in her presence at
> trial."

(Ibid.)

Based upon the foregoing California and foreign authorities, petitio-
ner submits that a finding of due diligence may require the Uniform Act
to compel the attendance of out of state witnesses to be "fully utilized"
, including the use of custodial measures, where the location and address
of the witness is known, where the testimony of the witness is the prim-
ary, or the sole evidence of the charges against the defendant, where the
witness may intentionally fail to appear despite the issuance of a
properly executed interstate summons, and where the efforts to secure th-
e witness would not be utterly futile due to time constraints or potent-
ial for the witness to frustrate efforts to compel attendance. (See Peop-
le v. Arguello, supra, 737 P.2d at p. 439). Applying this analysis to
the instant case, petitioner submits it was necessary for the prosecution
to "fully" utilize the Uniform Act, specifically exercising the option
of custodial means, to secure the attendance of Lorene B. in this case.
Here, the prosecution was informed of Lorene B.'s address in Colorado.
Further, it cannot be disputed that Lorene B.'s testimony was the "sole"
evidence that the sexual assaults took place in this case. Clearly, Lor-
ene B. demonstrated by conduct, if not by declaration, that she would not
appear in court despite the service of two properly executed interstate
subpoenas and summons. The record does not reflect any evidence that us-
ing custodial means to compel Lorene B.'s presence at trial would have
frustrated efforts to compel her attendance, or that time constraints
prevented a request for custodial intervention at the time of the issua-
nce of the second certificate in this case. Moreover, unlike the witnes-

ses in Bussard and Arguello, who had testified not only at the defendant-'s preliminary hearing, but also in at least one jury trial, Lorenee-B.'s testimony here arose only from a preliminary hearing proceeding.

**D.** **Code of Civil Procedure section 1219, Subdivision (b) Does Not Apply to The Uniform Act Or To Witnesses Who Refuse To Appear In Obedience Of A Subpoena.**

Code of Civil Procedur section 1219 provides in pertinent part:

"(a) Except as provided in subdivision (b) and (c), when the contempt consists of the omission to perform an act which is yet in the power of the person to perform, he or she may be imprisoned until he or she has performed it, and in that case the act shall be spicified in the warrant of commitment.

(b) Notwithstanding any other law, no court may imprison or otherwise confine or place in custody the victim of a sexual assault for "contempt" **when that contempt consists of refusing to testify** concerning that sexual assault.

(Italics added.)

As noted in the opinion of the Court of Appeal, by its express terms, Code of Civil Procedure section 1219, subdivision (b) addresses the court-'s contempt power and forbids the court's use of its power to place in c-ustody a sexual assault victim who refuses to testify.(Slip Opn. at p.16). The Uniform Act, and specifically its provision for taking a witness into custody to secure their appearence in court "is not" an exercise of the court's contempt power.(Slip Opn. at p. 16). The language of Civil Code of Procedure section 1219, subdivision (b) does not preclude the use of the Uniform Act to secure the presence of sexual assault victims.

As set forth in the opinion of the Court of Appeal, Code of Civil Procdure section 1219, subdivision (b) was enacted in 1984 in response to the detention of a minor child who refused to testify against her stepfa-ther who was accused of sexually molesting her.(Stats. 1984, ch. 1644, § 2; Slip Opn, at p. 17, citing Sen. Bill No. 1678 (1983-1984 Reg. Sess.) §

2). Proponents argued that too many sexual assault victims were testifying as a result of threats were increasing the level of trauma experienced by the victims. (Slip Opn. at p.17, citing Assem. Com. on Crim Law and Public Safty, analysis of Sen. Bill No. 1678 (1983-1984 Reg. Sess.), as amended June 18, 1984, p. 2; Assem. Off. of Research, 3d reading analysis of Sen Bill No. 1678 (1983-1984 Reg. Sess.), as amended June 18, 1984; Sen. Republican Caucus, analysis of Sen. Bill No.. 1678 (1983-1984 Reg. Sess.), p. 2; Sen. Com. on Judiciary, report on Sen. Bill No. 1678 (1983-1984 Reg. Sess.), as amended Apr. 26, 1984, p. 2). The amendment did not affect a trial court's power to find a sexual assault victim in contempt for refusing to testify, and it left in place the court's power to impose sanctions other than imprisonment if a sexual assault victim refused to testify. As noted by the Court of Appeal, Code of Civil Procedure section 128, subdivision (d) was enacted at the same time as section 1219, subdivision (b), staying for three days the imposition of any contempt sanction imposed upon a sexual assault victim for refusing to testify.(Slip Opn. at pp. 17-18).

Disobedience of a judicial summons to appear is not the same as refusing to testify. As noted by the Court of Appeal, the decision to ignore the court's process is a more serious affront to the court than is a refusal to testify.(Slip Opn. at p. 19). Moreover, the law provides that a witness who disobeys a subpoena may be taken into custody and brought before the court.(Slip Opn. at p. 19, citing Penal Code § 881, subd. (b),(c); Penal Code §§ 1331, 1332; Code of Civil Procedure § 1993). Likewise, the Uniform Act is a means to secure the attendance of a witness at trial, and is not intended to punish or coerce a witness who refuses to testify.

In the state court, the Respondent relied on People v. Smith, supra,

31.

30 Cal.4th 581 to demonstrate that a sexual assault victim who refuses to testify may be found unavailable under Evidence Code section 240 even if the witness is present in the courtroom.(OBM at pp. 25-26). In Smith, The California Supreme Court held that former testimony of a witness who is physically available, but who refuses to testify, may be found unavailable by the court only after taking reasonable steps to induce the witness to testify unless it is obvious that such steps would be unavailing.(Id. at p. 624, citing People v. Sul (1981) 122 Cal.App.3rd 355; accord, People v. Francis (1988) 200 Cal.App.3d 579, 584; People v. walker (1983) 145 Cal.App. 3d 886, 894).

In Smith, the witness Mary G., one of the defendant's rape victims, was to testify as to mitigation factors in the death penalty phase of his trial. As a condition of her testimony, Ms. G. wished to address the jury as to her general beliefs in opposition to the death penalty.(People v. Smith, supra, 30 Cal.4th at p. 623). Since Ms. G's views on the death were not relevant nor related to her feelings about the defendant, the court advised her she could not express her views as to the correct punishment.(Id. at pp. 623-624). Based upon this ruling, Ms. G. refused to testify.(Ibid.) The trial court questioned Ms. G. under oath, offering her more time, or alternatively suggesting she could be prosecuted for criminal contempt.(Ibid.) Since she was a sexual assault victim, the court had no authority to incarcerate her.(Code of Civil Pro. § 1219, subd. (b).) The Court held that the trial court's efforts to induce Ms. G. to testify were reasonable.(Ibid.) It further held that a trial court-'s need not "take extreme actions before making a finding of unavailability."(Id. at p. 624). It is noteworthy, however, that in Smith, the Court stated that a "witness who is under subpoena and present in court [has] a duty to testify in accordance with the rules of evidence, a duty

32.

trial courts have the power to enforce."(Ibid.)

Petitioner acknowledges that the California Legislature has enacted laws which aim to reduce the trauma for sexual assault victims in the context of the criminal judicial process and the courtroom, as cited by respondent.(Penal Code, §§ 702, 1103, 1346, 1346.1, 1347, 1347,5.) The legislation, however, does not either expressly or impliedly provide that  sexual assault victims are not obligated to obey subpoenas or judicial summons in the first instance. It cannot be the intent of the Legislature that sexual assault victims are outside of the subpoena process, either as applied by the Uniform Act or by the laws of the county and state of jurisdictioin.

E.  **The Prosecutor Was Required to Request the Implementation of Custodial Measures Provided By the Uniform Act in Order to Establish Due Diligence in This Case.**

In the state court, the Respondent urged that the process utilized by the prosecution in this case was sufficient to demonstrate unavailability because any further efforts to secure her presence in court would have been futile. Respondent urged that Lorene B. made it clear that she was refusing to testify and that securing her attendance before the court in San Diego by custodial means would have been unwarranted, extreme, and useless.(OBM at p. 27-29). Petitioner disagreed and currently disagrees.

Respondent acknowledged that Lorene was uncooperative.(OBM at p. 28). Respondent also -acknowledged she was summoned on two occasions to the Colorado District Court and ordered to appear in San Diego.(OBM at p. 28). There is no dispute that Lorene was the sole witness who could provide evidence that petitioner committed the offenses he was charged with. There is no dispute that the prosecution had Lorene's address in Colorado. There is further no dispute that Lorene ignored both the first and the

33.

second judicial summons instructing her to attend court in San Diego and that she failed to appear for trial as ordered. In fact, it cannot be disputed that after Lorene failed to appear for trial following the first summons, the prosecution was clearly on notice that it was highly probable that without more, Lorene would fail to appear following the second judicial summons as well. Based upon the above authority and the undisputed facts, the custodial measures of the Uniform Act were warranted and necessary for a finding of due diligence in this case.

It is noteworthy that the prosecution here not only failed to fully utilize the custodial measures of the Uniform Act in securing Lorene's attendance in court, but also failed to make any efforts to "persuade" Lorene to appear as ordered. Investigator Diaz conceded that he never tried to contact Lorene, either by email or telephone, after she first failed to appear and contacted him by telephone on December 20, 2005. (1 RT. 44, 48-49, 60-61, 64-65). The record reflects that in fact, once Lorene failed to appear following the first summons, the prosecution did not contact her "at all", but instead, effected a second service of summons for which it must have known, that without more, would likely have the same result. The totality of efforts in this case cannot fairly be characterized as the "persevering application, untiring efforts in good earnest, efforts of substantial character" as expressly required by the California Court to demonstrate due diligence. (People v. Cromer, supra, 24 Cal.4th at p. 904; People v. Wilson, supra, 36 Cal.4th at p. 341; People v. Linder, supra, 5 Cal.3d at pp. 346-347).

The state urged that even if Lorene had appeared in the trial court it is a foregone conclusion that she would have refused to testify. (OBM at p. 29). Petitioner disagreed and currently disagrees. Respondent's cannot know what the outcome of her appearance would have been. It is

34.

within the purview of the trial court to determine whether a witness re-
fuses to testify, and such determination is made only after efforts to
induce the testimony of a reluctant witness have been exhausted, or after
the court, in its examination of the witness, concludes efforts to indu-
ce testimony are futile.(People v. Smith, supra, 30 Cal.4th at p. 624).
Due diligence demands that the prosecution take all reasonable steps
to secure the attendance of its material witnesses at trial. The trial
court, and the California Supreme Court, have no competent evidence as
to whether Lorene would have testified if she had appeared in court,
much less evidence of good cause to fail to appear in court when summoned
to do so.

Moreover, it is not a foregone conclusion that Lorene would have be-
en found to be "unavailable" if she had appeared as ordered, and then
refused to testify. The proper steps to reach that determination never
took place. In this case, once again, Lorene simply ignored the subpoena
and did not appear. No good cause or reason was provided. The trial court
did not have an opportunity to determine whether Lorene would testify,
or make a finding on that issue after taking "reasonable steps" to indu-
ce her to testify. Examples of reasonable steps endorsed by the courts
to induce an available yet unwilling sexual assault witness to testify
have been to appoint an attorney to correctly advise the witness of the
consequences, to prosecute the witness for criminal contempt, impose
financial sanctions, or otherwise attempt to solve the problem before
the trial begins.(People v. Francis, supra, 200 Cal.App.3d at p. 585; see
People v. Walker, supra, 145 Cal.App. 3rd at p. 893-894 [court used
reasonable steps and found them unavailing when witness refused to test-
ify when offered immunity and threatened with contempt.) Defense counsel,

35.

likewise, was not given a meaningful opportunity to participate in the "availability" proceedings.

Finally, the states repeated premise that Lorene "refused to testify" is flawed.(see OBM at pp. 26-31). The record does not reflect competent evidence that Lorene "refused to testify" in this case. As noted above, the proponent of the evidence has the burden of showing by competent evidence that the witness is unavailable.(People v. Smith, supra, 30 Cal. 4th at p. 609). Lorene's signed statements to an interpreter, paraphrased by Investigator Diaz, that she did not want to **deal with this case,** and that she "wasn't coming" were hearsay and cannot be considered for their truth. Even if the comments are taken at their truth, to urge that Lorene "repeatedly indicated a refusal to testify" and therefore, her appearence in court would be a **mere formality** (OBM at p. 31.) reflects an overstated characterization of the evidence.

In sum, Petitioner submits the prosecution was required to "fully" utilize the Uniform Act in securing Lorene's appearence in the trial court. This is not only the appropriate outcome for this case, but a contrary finding would have sweeping effects for future cases. If this honorable Court should find that sexual assault victims may ignore the court's process and fail to appear when properly summoned, **the constitutional rights of the accused will be violated.** the criminal justice system will be compromised, and the court's power of process will be diminished. The custodial measures of the Uniform Act do not punish a witness for refusing to testify. It assures the orderly conduct of the criminal justice system and ensures the constitutional rights of the accused are respected.

Thus, Petitioner requests this court to reverse the conviction.

36.

Petitioner's confrontation concerns were heightened and more diligent efforts by the prosecution was required because Lorene B. was the "sole evidence" of the crime and petitioner faced life.(McCandless v. Vaughn,(1995) 172 F.3d 255,266-270). II.

THE ADMISSION OF THE OTHER CRIMES EVIDENCE
UNDER EVIDENCE CODE "SECTION 1108 VIOLATED
PETITIONER'S RIGHT TO DUE PROCESS BECAUSE
IT PERMITTED EVIDENCE OF "UNCHARGED SEXUAL
OFFENSE "TO BE USED" TO SHOW PETITIONER'S
DISPOSITION

A.   Introduction and Proceedings Below

Prior to the trial, the prosecutor sought to admit evidence of petitioner's other sexual conduct under Evidence Code section 1108 (1 CT. 39-55.) Defense counsel objected to the admission of the evidence on the grounds that the witness, Crystal Ginther, who complained of the conduct recanted the accusations, under oath, in a habeas corpus proceedings following petitioner's prior conviction; that Ginther and Ms. B. were best friends; and the instant charges were not reported to the police until after Ms. B. discussed her sexual conduct with Ginther. Counsel submitted an affidavit, executed by Ginther on August 17, 1999, wherein she stated she was not raped and that she had lied because petitioner was physically abusive against her.[3] (1 CT. 104-106.) Counsel further argued that the admission of the evidence would unduly consume time, confuse the issues, and mislead the jury within the meaning of Evidence Code section 352. (1 CT. 82-96.)

An Evidence Code section 402 hearing was conducted. (2 RT. 116-159.) Ms. Ginther testified about her prior relationship with petit-

------------------

[3]   The affidavit was marked at the hearing as Court's Exhibit "E." (2 RT. 145.)

ioner. (2 RT. 119-126); the circumstances under which he committed sex offenses against her in 1997 (2 RT. 127-135), and about her recanting, in August of 1999, her prior testimony that petitioner had raped her, which led to a felony conviction and prison term. (2 RT. 135-151.) At the hearing, Ginther characterized the affidavit which she had executed as "bullshit" and stated she had only recanted her accusation out of fear of petitioner, and so that things would "look good" for her family's sake. (2 RT. 147-148, 158-159.)

The court ruled the testimony regarding the prior conduct would be admitted. (2 RT. 161-162).) The court opined that Ginther's credibility would be the jury's determination, finding that her testimony at the hearing was "not so incredible" so as to render it inadmissible under Evidence Code section 1108. The court further found the conduct was similar to the instant offenses, and that the evidence was presumptively admissible under that section where nothing in the hearing or arguments, or the case law, was sufficient to rebut the presumption. (2 RT. 162.)

As noted in the Statement of Facts, supra, Ginther testified as to the prior conduct in the prosecutor's case-in-chief largely in accord with her Evidence Code section 402 hearing testimony.

B.   **The Trial Court Violated Petitioner's Fourteenth Amendment Right to Due Pricess in Admitting Evidence of his prior Sexual Conduct to Show Petitioner's Propensity under Evidence Code Section 1108.**

1.   **Violation of due process**

The introduction of other acts of sexual conduct to prove a defendant's propensity to commit a charged offense involving a sexual

crime violates a defendant's state and federal constitutional right to due process and equal protection. The admission of such evidence to demonstrate propensity violates a fundamental principle of American jurisprudence and common law which has been followed in this country for over three centries. (People -v- Alcala (1984) 36 Cal.3d 604, 630-631; People -v- Ewoldt (1994) 7 Cal.4th 380, 394.) The use of such evidence to prove a defendant's propensity to commit a sex crime is also contrary to the fundamental principle of fair play and justice in our society which mandates that people be convicted for what they have done, not who they are. (McKinney -v- Rees (9th Cir. 1993) 993 F.2d 1378, 1384.)

The United States Supreme Court has declined to decide whether due process permits the admission of uncharged crimes solely to show a propensity of the accused to commit the charged offense. (Estelle -v- McGuire (1991) 502 U.S. 62, 75, fn. 5 [112 S.Ct. 475, 116 L.Ed.2d 385] In Spencer -v- Texas (1967) 385 U.S. 554 [17 L.Ed. 2d 606, 87 S.Ct. 648], However, Chief Justice Warren stated his opinion on this issue in a concurring and dissenting opinion:"While this Court has never held that the use of prior convictions to show nothing more than a disposition to commit crime would violate the Due Process Clause of the Fourteenth Amendment, our decisions exercising supervisory power over criminal trials in federal courts, as well as decisions by courts of appeals and of state courts, suggest that evidence of prior crimes introduced for no purpose other than to show criminal disposition would violate the Due Process Clause." (Id. at pp. 572-575 [Warren, C.J., concurring and dissenting]; see also Boyd -v- United States (1892) 142 U.S. 450, 458 [12

S.Ct. 292, 35 L.Ed. 1077], finding that admission of prior crimes committed by defendants so prejudiced their trial as to require reversal].)

The Ninth Circuit has expressly ruled that it violates due process to use character evidence solely to show criminal propensity. (McKinney -v- Rees, supra, 993 F.2d at pp. 1380-1386; see also Henry -v- Estelle (9th Cir. 1993) 993 F.2d 1423, 1427-1428, overruled on other grounds in Duncan -v- Henry (1995) 513 U.S. 364 [115 S.Ct. 887, 130 L.Ed.2d 865].) The Fifth Circuit has also held that admission of a prior conviction rendered a defendant's "trial fundamentally unfair and in violation of the fourteenth amendment" where "the only purpose it served was to show bad character and propensity to commit a crime." (Panzavecchia -v- Wainwright (5th Cir. 1981) 658 F.2d 337, 341.)

Petitioner acknowledges the California Supreme Court's holding in People -v- Falsetta (1999) 21 Cal.4th 903. In Falsetta, the Court rejected a due process challenge to Evidence Code section 1108. The Court recognized that, from at least an historical standpoint,"...the general rule against admitting such [propensity] evidence is one of long-standing application." (Id. at p. 913, citation omitted.) The Court concluded, however, that this long-standing practice does not necessarily reflect a fundamental principle embodied in the United States Constitution. (Id. at p. 914.)

In preserving this issue for federal review, petitioner respectfully submits that the rule against admitting propensity evidence

is reflected in the due process of both the state and federal const-
itutions. This is because the admission of propensity evidence is so
prejudicial as to render a defendant's trial fundamentally unfair.
(See <u>People -v- Vichroy</u> (1999) 76 Cal.App.4th 92, 98.)

     2.   <u>Section 352 Does Not Cure</u>

     The Court in <u>Falsetta</u> held that the trial court's discret-
ion to exclude propensity evidence under section 352 "saves section
1108 from defendant's due process challenge" because "section 352
affords defendants a realistic safeguard in cases falling under sec-
tion 1108." (<u>People -v- Falsetta</u>, <u>supra</u>, 21 Cal.4th at pp. 917-918.)
The fundamental flaw in this analysis, however, is that it is
the trial court, not the jury, which exercises a section 352 analy-
sis to admit or exclude evidence. It is a redundancy to provide
that a trial court has discretion to admit or exclude prejudicial
propensity evidence, when such evidence is, by its nature, highly
prejudicial because the jury can find the defendant guilty of who
he is and what he did in the past, rather than when he is crarged
with in the current prosecution.

     Moreover, it is the trial court, outside of the jury's prese-
nce, which makes the section 352 analysis. Once the trial court has
decided that the propensity evidence is admissible, it is then adm-
itted to the jury without any truly effective limitation on how it
can use the evidence.

     Section 352 is not a "realist safeguard" in protecting a defe-
ndant's due process rights. As occurred in the instant case, where-
in the trial court ruled the evidence was presumptiveble admissible,
and where the court gave slight attention to section 352 considera-

tions, trial courts are more likely to admit other crimes evidence than exclude it. This is especially the case when evidence is offered within the meaning of section 1108, where the prosecution is not required to show that the acts are necessarily similar or are relevant to show intent, motive and other material questions as must be demonstrated under section 1101. As noted by one court,"[O]nce prior convictions are introduced, the trial is, for all practical purposes, completed and the guilty outcome follows as a mere formality." (United States -v- Burkhart (10th Cir. 1972) 458 F.2d 201, 204.)

Section 352 provides,"[T]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See, People -v- Balcom (1994) 7 Cal.4th 414, 426-427.) The two crucial components of section 352 are "discretion," because the trial court's decision is entitled to deference, and "undue prejudice," because the ultimate objective of the section 352 weighing process is a fair trial. (People -v- Harris (1998) 60 Cal.App.4th 727, 736.)

In exercising its discretion in determining whether to admit evidence of prior uncharged misconduct, a court must take extra care and exclude the evidence unless its probative impact clearly outweighs its prejudicial effect. "[B]ecause other crimes evidence is inherently prejudicial, its relevancy is to be 'examined with care.' [¶] [I]t is inadmissible if not relevant to an issue expressly in dispute [citation], if 'merely cumulative with respect to

42.

evidence which the People may use to prove the same issue' [citation], or if more prejudicial than probative under all the circumstances." (People -v- Alcala, supra, 36 Cal.3d at pp. 631-632.)

In People -v- Ewoldt, supra, 7 Cal.4th 380 at pp. 404-406, the California Supreme Court discussed the factors to be considered in determining the admissibility of evidence of uncharged offenses, pursuant to section 352, where the evidence is offered under section 1101, subdivision (b). In People -v- Harris, supra, 60 Cal.App.4th at pp. 737-741, the court applied the Ewoldt criteria in determining whether prior sex crime evidence sought to be introduced under section 1108 passes muster under section 352. Specifically, in Harris, the court found that four separate factors must be balanced against the probative nature of the uncharged conduct evidence. (Ibid.)

First, the trial court should determine whether the proffered evidence in inflammatory in nature, and in particular, whether the uncharged conduct is more inflammatory than that of the charged offenses. (People -v- Harris, supra, 60 Cal.App.4th at pp. 737-738.)

Second, the court must determine whether there is a probability of confusion, particularly "to avoid the possibility that the jury would conclude the defendant has not been punished for his [prior] actions and would want to 'punish' the defendant now." (Id. at p. 738.)

Third, the court must also consider whether the uncharged conduct is remote in time, and whether the defendant has lived a blameless life in the interim. (Id. at p. 739.)

Fourth, the court must examine whether the introduction and refutation of the other offense evidence will necessitate undue consumpt-

ion of time. (Ibid.)

Against these four factors, the trial judge must finally assess the probative value of the uncharged offense. "The court should not permit the admission of other crimes until it has ascertained that the evidence tends logically and by reasonable inference to prove the issue upon which it is offered, that it is offered on an issue material to the prosecution's case, and is not merely cumulative." (People -v- Harris, supra, 60 Cal.App.4th at pp. 739-740.) In particular: the trial judge must assess the similarity between the uncharged and charged misconduce to determine whether the uncharged misconduct evidence is truly probative. (Ibid.) Further, the court must consider the "independent" nature of the evidence. In People -v- Ewoldt, supra, the Court observed that the probative value of the uncharged misconduct is affected by "the extent to which its source is independent of the evidence of the charged offense. For example, if a witness to the uncharged offense provided a detailed report of that incident without being aware of the circumstances of the charged offense, the risk that the witness's account may have been influenced by knowledge of the charged offense, would be eliminated and the probative value of the evidence would be enhanced. The probative value of such evidence would increase further if independent evidence or additional instances of similar misconduct, committed pursuant to the same design or plan, were produced." (People -v- Ewoldt, supra, 7 Cal.4th at pp. 404-405.)

Applying this analytical formula to the facts of the case before it, the court in Harris held that evidence of a particularly brutal uncharged prior rape which occurred in 1972 should have been

excluded under section 352 when offered to prove two current, but relatively minor, incidents in which a mental health nurse sexually preyed upon patients. The court held the evidence of the prior incident was inflammatory, confusing, remote in time, and of limited value, and that its introduction was prejudicial. (<u>People -v- Harris</u>, <u>supra</u>, 60 Cal.App.4th at p. 74.1)

C.   <u>The Evidence Should Have Been Excluded: Reversal is Required</u>

Applying these factors in order to the instant uncharged offenses leads to the same conclusion as in Harrir. First, the prior sex offense evidence was speculative. Here, Ginther had recanted her accusations against petitioner, under oath in a court hearing, in an affidavit executed under penalty of perjury, and to doctors, attorneys and friends. (5 RT. 320-322, 338-344.)

The evidence of the uncharged conduct was also highly inflammatory. Ginther testified that petitioner was physically abusive to her throughout her relationship with him. (5 RT. 289-293, 304-305, 321.) Thus, in addition to discussing sexual assaults, she also painted petitioner as a violent person who struck his companions.

As to the second factor considered by Harris, here the evidence confused the issues before the jury. The person who claimed that petitioner raped her, the person against whom the instant charges were committed, did not appear in court. Instead, the jury heard extended testimony by another person about offenses which were committed nearly a decade earlier. A reasonable juror might

45.

have understandably wondered which offenses the prosecution was act-
ually trying to prove. To be sure, as argued in Issue III, one of
the jurors, Juror 18, expressed his confusion about the case to De-
tective Schaller at the close of the prosecution case. (2 CT. 278,
292-293; 10 RT. 609-612; 11 RT. 626-627.)

As well, significantly, the evidence of the prior acts and the
current charges was not independent. Ms. B. and Ginther were best
friends. (4 RT. 205, 208, 225-226.) Presumably Ms. B. was aware of
petitioner's prior conviction for rape as committed against Ginther.
Ms. B. discussed the conduct which led to the charges with Ginther
right after it happened. (4 RT. 256, 260.) Ms. B., Ginther, and peti-
tioner, discussed what had happened in a chat room. (4 RT. 267-268.)
It was after discussing the event with Ginther that Ms. B. contac-
ted the police. (4 RT. 260, 267-268.) The relationship, interface
and engagement of the three parties with each other in discussions
about the incident diminished the value of the prior testimony, and
rendered it tainted.

Here, the trial court clearly erred by admitting evidence of
petitioner's prior sex offense conviction. The improper evidence
created a substantial risk that petitioner was convicted on the
basis of his sexual misconduct, in violation of federal due process.
(McKinney -v- Rees, supra, 993 F.2d 1378.) This was a particularly
prejudicial ruling here, where the actual complaining witness, Ms.
B. was declared to be unavailable and where her prior preliminary
hearing testimony was read to the jury. Here, the sole witness who

46.

testified before the jury as to petitioner's conduct was person who asserted past criminal conduct against him, Crystal Ginther.

Further, it cannot be said that admission of this evidence was harmless beyond a reasonable doubt. Therefore petitioner's convictions must be reversed. (Chapman -v- California, supra, 386 U.S. at p. 24; cf. United States -v- Bradley (9th Cir. 1993) 5 F.3d 1317, 1321 [erroneous admission of uncharged crime constituted prejudicial error].

In light of the evidence that petitioner had committed other sexual offenses, the jury could not have avoided making the inference, which was argued by the People, that petitioner was predisposed to committing sexual assaults, and find him guilty of the charged offenses in the current case. (See 7 RT. 493.) Thus, even under the standard of prejudice announced in People -v- Watson (1956) 46 Cal.2d 818, 836, it is reasonably probable that a result more favorable to petitioner would have been reached had the jurors not been exposed to this improper and inflammatory evidence. (People -v- Rivera (1985) 41 Cal. 3d 388, 393.) Accordingly, the judgments of conviction must be reversed and at least a new trial ordered.

### III.

PETITIONER'S TRIAL WAS PREJUDICIALLY INFECTED BY WITNESS AND JUROR MISCONDUCT WHICH VIOLATED HIS SIXTH AMENDMENT JURY TRIAL RIGHT. REVERSAL IS REQUIRED.

A.      Introduction and Proceedings Below

Following the verdicts in the case, defense counsel moved the court for a new trial on the basis that prejudicial juror misconduct took place during the trial proceedings and deliberations. (2 CT.

270-276.) Counsel submitted affidavits prepared by two jurors, Juror 9 and Juror 10, in support of the motion.

In the affidavit executed by Juror 9, the juror averred that he and Juror 8 encountered Detective Schaller near the court elevator during a court recess following the detective's trial testimony. Juror 9 stated:

> "Juror #8 mentioned to the detective that he was confused about the case. The police detective said to him that he wished he could sit down with us and tell us more about the case. I got the impression that he had negative things to say about [petitioner]. This was after the testimony he had just given. During the deliberations, Juror #8 mentioned what the police detective said to him. It was decided by the Jurors at that time not to mention this incident to the judge. Juror #8 said during the jury deliberations that the police detective said, 'He wished he could sit down with us and tell us more about the case.' Juror #8 said this before any vote had been taken. I was voting not guilty at the time."

(2 CT. 278.) On a second page of the affidavit, Juror 9 indicated the detective's comment influenced him in changing his vote from not guilty to guilty, and noted that other jurors had changed their votes as well. (2 CT. 279.) Juror 9 believed the jury should not have heard about the detective's comment during the deliberations. (2 CT. 279.)

In the affidavit executed by Juror 10, the juror averred:

> "During the fistr 10 minutes of deliberations, another juror told the jury that the detective had mentioned to him that, "I wish I could have said more.' Thinking that this could impact other jurors, I said that maybe he was just annoyed at coming to court to talk for just 2 minutes. After delivering the verdicts, I asked the jury foreman if we should mention the inappropriate comment made by the detective to the court. He said it was not necessary as it wasn't anything that influenced our deliberations. The statement by the detective indeed hadn't been mentioned since the first few minutes of deliberations.  (2 CT. 281.)

48.

The prosecutor opposed petitioner's motion. (2 CT. 284-291.) In support of the opposition, the prosecutor attached the affidavit of Detective Schaller, in which the detective stated, in pertinent part:

> "...3. At the conclusion of my testimony, I left the courtroom and while waiting for the elevator on the third floor, at least two jurors [...] were also waiting.
> 4. One juror addressed me, mentioning the weather. and I responded in kind regarding the weather.
> 5. That same juror then addressed another juror, but I overheard a comment regarding being confused. I "believed the juror was attempting to engage me in conversation, and not wanting to appear rude, said, 'I'm sorry, I can't talk to you.' That juror said he understood and there was no further conversation between us.
> 6. At no time did I discuss the defendant or the case, nor did I offer to provide any additional information about the case or [Petitioner] personally."

(2 CT. 292-293.)

The trial court conducted hearings on the new trial motion. Jurors 8, 9, and 10, as well as Detective Schaller, appeared for questioning by the court.

1.    <u>Testimony of Juror 8</u>

Juror 8 testified that during a court recess after Detective Schaller appeared as a witness for the prosecution, Juror 8 and Juror 9 met the detective in the court hallway near the elevators. (10 RT. 601-602.) Juror 8 recalled commenting to the detective about the beautiful weather, and about going home early to wash his

car. (10 RT. 603.) The detective responded, "I wish I could say something to you too," or words to that effect. (10 RT. 603.) No words were exchanged between the detective and Juror 9, and Juror 8 did not discuss the exchange with Juror 9. (10 RT. 603-604.)

During deliberations, Juror 8 told the jury foreperson about the conversation. (10 RT. 604, 606-607.) The foreperson told Juror 8, "That has no bearing on anything. Don't worry about it," and "We're not dealing with that." (10 RT. 604-605.)

2.    Testimony of Juror 9

Juror 9 testified that he and Juror 8 were walking toward the elevators when Juror 8 commented to both Juror 9 and Detective Schaller about the beautiful weather. (11 RT. 626.) As Juror 9 pushed the elevator button, he then heard Juror 8 say to the detective that "he was confused about everything that was going on in the case." (11 RT. 626.) According to Juror 9, the juror "expressed himself that he was really confused about all the information that we were receiving and that -- didn't know what to think and make of it."(11 RT. 626-627.)

Detective Schaller responded " that he could -- wish he could sit down with us and tell us more about what's going on or what -- what went on in the case." (11 RT. 627.) According to Juror 9, the detective "mentioned that when he came by -- his time was brief on the stand. That he didn't give out a lot. He didn't have enough -- during his testimony, there wasn't -- it was a brief testimony. And that he wished he could have a sit-down with all of us to--or have an opportunity to sit down with all of us and tell more about the

questioning that he had -- or the information that he had in regards
to the day that he questioned [petitioner].' 911 RT. 627-628.) Acc-
ording to Juror 9, Juror 8 then apparently realized he should not
have made the comment and nothing more was said. (11 RT. 628.)

At the beginning of deliberations, Juror 9 recalled that Juror
8 mentioned the comment made from the detective to the rest of the
jury. (11 RT. 629.) Juror 9 stated, "[Juror 8] announced that the
detective had mentioned that he wished he could sit down with all
of us and tell us more about the case." (11 RT. 629.) Juror 9 said
aloud, "I don't know what you are talking about." (11 RT. 630.)

The jury foreman dismissed the reference and continued with
the jury vote. (11 RT. 630.)

Juror 9 testified he considered reporting  the incident to the
court but did not know the proceedure. (11 RT. 630-631.) Also, the
jurors were asked by the jury foreperson not to report the incident.
(11 RT. 631-632.) As the verdicts were being executed, however,
Juror 10 asked the foreperson whether the comment should be mentio-
ed before the verdicts were to be read. (11 RT. 632.) The foreperson
responded that "it would be best if we just kept quite  about it,"
and that "it didn't have anything to do with -- involve--with the
verdict." (11 RT. 633.) According to Juror 9, other jurors nodded
in agreement. (11 RT. 633.)

After the jurors were excused, Juror 9 left his phone number
with the defense investigator in the event the defense wished to
contact him with questions about the case. (11 RT. 634-635.) A few
days later, the defense investigator contacted Juror 9 and he told

the investigator about the incident. (11 RT. 635-636.) Juror 9 then met with the investigator and defense counsel and they discussed the incident. (11 RT. 637-638.) Juror 9 wrote the affidavit himself, adding a second page when he recalled additional facts. (11 RT. 639-640.) He did not think to bring the incident up to the court because he did not think it was going to be mentioned during the jury deliberations. (11 RT. 640-641.)

3.  Testimony of Juror 10

Juror 10 testified that during the jury deliberations, one jury told the group that "[T]hat detective told me that he sure wished he could have said more." (12 RT. 2755, 2757.) Juror 10 said that he stopped the discussion, saying, "Whoa. Hang on. I don't think you should be telling us this, and he probably should not have--and he certainly should not have sopken to you." (12 RT. 2757.) Juror 10 then said, "He could have meant that he just was kind of angry that he came here and only spoke for three minutes." (12 RT. 2757.) According to Juror 10, there were general nods of agreement. (12 RT. 2757.) He also noticed that at the time of the comment, another juror was "nodding" as though he had witnessed the exchange with the detective. (12 RT. 2757-2758.) The comment was not mentioned again in deliberations. (12 RT. 2758.) Juror 10 felt the incident was inappropriate. (12 RT. 2758.)

After the verdicts were reached and signed and sealed, Juror 10 asked the foreman if the detective's comments should be mentioned. (12 RT. 2758.) The foreman responded that they should not mention the incident, since it did not come up in deliberations and because

the jury had already "dismissed" the detective's testimony about the photographs. (12 RT. 2758.)

Juror 10 stated that he never heard any discussion about what prompted the detective's comment, and was unaware of any juror expressions of confusion to the detective. (12 RT. 2760.) He was unaware of the timing and the context of the detective's comment, although Juror 10 surmised it occurred after the detective's testimony. (12 RT. 2760-2761.)

4.   Testimony of Detective Schaller

Detective Schaller testified that during the court recess following his testimony at trial, he walked to the elevator lobby. (10 RT. 609-610.) There, one of the male jurors said hello and spoke to him about the weather. (10 RT. 610.) The detective testified that, "Very early into this contact I explained to him that I didn't want him to perceive that I was being rude. I explained to him, Listen. You understand I can't talk to you. I wish I could but I can't." (10 RT. 610.) According to Schaller, the juror understood and the conversation was stopped. (10 RT. 610-611.)

Upon being reminded of his affidavit reference to the juror expressing "confusion," Schaller stated, "To the best of my knowledge, it was -- it was something just to -- that effect. It wasn't very specific." (10 RT. 611-612.) Schaller recalled that the juror was speaking about his confusion to another kuror and that he perceived the confusion expressed by the juror concerned the case. (10 RT. 618-619.)

Following the testimony, the court ruled that misconduct occurred, but that it was not prejudicial requiring a new trial. The court

stated:

"... There is more to the role of the court in this motion
for a new trial than finding misconduct. I find misconduct.
The contact between 8 and the detective at the elevator is
misconduct. The extent of the contact is certainly not as
extensive as that expressed by Juror 9 in his testimony
during this motion, and Juror 10 convinces me that the mi-
sconduct--that the misconduct-- that the acts which const-
itute the misconduct were brought to the attention at the
outset by a juror and handled appropriately because the
conduct did not again become the subject of discussion th-
roughout the deliberations.

So, I'm uncertain, and that's why I'm asking out loud what
my next step is having found juror misconduct.

It seems to me that by definition if it's extra judicial
misconduct such as we have here, that is, a juror talking
with a witness outside of the courtroom, that is presumed
prejudicial. But I can't just stop at that point. I have
to go to the next step and examine that event in light of
the entirety of the record. And in examining that event
in the -- within the context of the entirety of the record,
it is not reasonable to presume that that prejudicial mis-
conduct was of such a nature as to effect the verdict or
the outcome in this case. There is no evidence whatsoever
that during deliberations there was a discussion-- and I
can't get into the minds of the jurors because we are pr-
ecluded by case law and statute from doing that. But there
is no evidence that during the discussions that misconduct
information was part and parcel of the deliberation proc-
ess in connection with the verdict.

I mean, you're going to get a great issue to appeal on,
because I have read all of the California cases that deal
with what the court does with a claim for a new trial based
upon juror misconduct. And I hope that I have properly gar-

nered the witnesses, that is, the jurors and the serge-
ant, examined them and given both sides an opportunity
to either examine or give me questions to ask them to
carefully weigh and consider the testimony of those
four witnesses to find that it was misconduct and pre-
sume that it was a prejudicial misconduct.

And then finally-taking it in the context of the entir-
ety of this case and the entirety of this motion and
the entirety of the testimony, it doesn't rise to the
level that it affected the outcome of the verdict. It
was of a more minimal level than evidence that would
justify the granting of a new trial.

Accordingly, the motion for a new trial is denied."
(12 RT. 2776-2778.)

B.  Misconduct Was Established and The Prosecutor Did Not Over-
    come The Presumption of Prejudice, Reversal is Required.

    1.   Standard of Review

    In reviewing a trial court's determination regarding whether
jury misconduct has occurred, a reviewing court generally "accept[s]
the trial court's credibility determinations and findings on quest-
ions of historical fact if supported by substantial evidence.(Peo
ple -v- Nesler (1997) 16 Cal.4th 561, 582.) Whether prejudice has
arisen from juror misconduct is always a mixed question of law and
fact subject to an appellate court's independent determination.
(Ibid.)

    2.   Legal Standard

    A defendant accused of a crime has a constitutional right to a
trial by unbiased, impartial jurors. (U.S. Const.,Amends. VI and
XIV; Cal. Const., art. I, §16; Irvin -v- Dowd (1961) 366 U.S. 717,

54.

722 [81 S.Ct. 1639, 6 L.Ed.2d 751]; In re Hitchings (1993) 6 Cal. 4th 97, 110.) An impartial jury is one in which no member has been improperly influenced (People -v- Nesler, supra, 16 Cal.4th at p. 578; People -v- Holloway (1990) 50 Cal.3d 1098, 1112) and every member is "capable and willing to decide the case solely on the evidence before it." (McDonough Power Equipment, Inc. -v- Greenwood (1984) 464 U.S. 548, 554 [104 S.Ct. 845, 78 L.Ed.2d 663], quoting Smith -v- Phillips (1982) 455 U.S. 209, 217 [102 S.Ct. 940, 71 L.Ed.2d 78].)

If even one member of a jury fails to satisfy this definition of impartiality, a criminal conviction must be reversed. A defendant is "entitled to be tried by 12, not 11, impartial and unprejudiced jurors. "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." [Citations.]" (People -v- Holloway, supra, 50 Cal.3d at p. 1112, disapproved on other grounds in People -v- Stansbury (1995) 9 Cal.4th 824, 830, fn. 1.)

A jury's impartiality may be challenged by evidence of "statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly," but "[n]o evidence is admissible to show the [actual] effect of such statement, conduct, condition, or event upon a juror...or concerning the mental processes by which [the verdict] was determined." (People -v- Nesler, supra, 16 Cal.4th, at p. 403, citing Evid. Code, §1150, subd.(a);

see People -v- Hutchinson (1969) 71 Cal.2d 342, 349-350.) Thus, where a verdict is attached, the focus is on whether there is any "over event" or circumstance, "open to [corroboration by] sight, hearing, and the other senses" (People -v- Hutchinson, supra, 71 Cal.2d at p. 350), which suggests a likelihood that one or more members of the jury was improperly influenced.

When an "overt event" of this kind is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror "consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors, the event is called juror misconduct." (In re Hamilton (1999) 20 Cal.4th 273, 294; see also, People -v- Nesler, supra, 16 Cal.4th 561, 578-579; In re Carpenter (1995) 9 Cal.4th 634, 647; In re Hitchings, supra, 6 Cal.4th 97, 118.)

A finding of juror misconduct rainses a presumption of prejudice. (In re Hitchings, supra, 6 Cal.4th at p. 118.) "This presumption aids parties who are barred by statute from establishing the actual prejudicial effect of the incident under scrutiny [citations omitted] and accommodates the fact that the external circumstances of the incident are often themselves reliable indicators of underlying bias [citation omitted]." (In re Hamilton, supra, Cal.4th at p. 295.) This presumption of prejudice is strong when the misconduct relates to a key issue in the case. (In re Stankewitz (1985) 40 Cal.3d 391, 402.)

The presumption shifts the burden to the prosecution to prove

that no prejudice actually resulted to the defendant. (<u>People -v-</u>
<u>Nesler,</u> <u>supra,</u> 16 Cal.4th at p. 578.) "It is settled that 'unless
the prosecution rebuts that presumption by proof that no prejudice
actually resulted, the defendant is entitled to a new trial."(<u>In</u>
<u>re Stankewitz,</u> <u>supra,</u> 40 Cal.3d. at p. 403; <u>People -v- Pierce</u>
(1979) 24 Cal.3d 199, 207, and cases cited.)

The existence of prejudice is determined "by reference to the
substantial likelihood test, an objective standard." (<u>In re Hami-</u>
<u>lton,</u> <u>supra,</u> 20 Cal.4th at p. 296, citing <u>In re Hitchings,</u> <u>supra,</u>
6 Cal.4th 97, 118; <u>People -v- Marshall</u> (1991) 50 Cal.3d 907, 950-
951.) As the California Supreme Court has stated the test, "[a]ny
presumption of prejudice is rebutted, and the verdict will not be
disturbed, if the entire record in the particular case, including
the nature of the misconduct or other event, and the surrounding
circumstances, indicates there is no reasonable probability of
prejudice, i.e., no sunstantial likelihood that one or more jurors
were actually biased against the defendant." (<u>In re Hamilton,</u>
<u>supra,</u> 20 Cal.4th at p. 296, citing <u>In re Carpenter,</u> <u>supra,</u> 9 Cal.
4th at p. 653; <u>In re Hitchings,</u> <u>supra,</u> 6 Cal.4th at p. 121.)

3.  <u>Juror #8 Committed Prejudicial Misconduct by Speak-</u>
<u>ing to Detective Schaller and then Introducing the</u>
<u>Jury Deliberations. Juror 8's Actual Bias is Manif-</u>
<u>est.</u>

As previously noted, the Sixth Amendment's impartial jury gu-
arantee requires a jury composed of persons""capable and willing
to decide the case solely on the evidence before it." (<u>McDonough</u>
<u>Power Equipment, Inc. -v- Greenwood,</u> <u>supra,</u> 464 U.S. at p. 554,

quoting <u>Smith -v- Phillips, supra,</u> 455 U.S. at p. 217.) This guara-
ntee is also encompassed within the Due Process Clause of the Fifth
and Fourteenth Amendments. (<u>Smith -v- Phillips, supra,</u> 455 U.S. 209
at p. 217; <u>In re Carpenter, supra,</u> 9 Cal.4th at p. 648; accord,
<u>Dyer -v- Calderon</u> (9th Cir. 1997) 113 F.3d 927, 935; <u>Hughes -v-
Borg</u> (9th Cir. 1990) 898 F.2d 695, 700.)

"The requirement that a jury's verdict 'must be based upon the
evidence developed at the trial' goes to the fundamental integrity
of all that is embraced in the constitutional concept of trial by
jury....In the constitutional sense, trial by jury in a criminal
case necessarily implies at the very least that the 'evidence deve-
loped' against a defendant shall come from the witness stand in a
public courtroom where there is full judicial protection of the de-
fendants rights of confrontation, of cross-examination, and of co-
unsel." (<u>Turner -v- Louisiana</u> (1965) 379 U.S. 466, 472-473 [85 S.
Ct. 546, 13 L.Ed.2d 424]; <u>People -v- Nesler, supra,</u> 16 Cal.4th at
p. 578.)

Presentation to or reception by a jury of new evidence from
sources outside the trial evidence constitutes misconduct. (7
Witkin, Cal. Procedure (4th ed. 1997) Trial, §338, pp. 382-383,
and cases there cited.) Juror misconduct, such as the receipt of
information about a party or the case that was not part of the
evidence received at trial, leads to a presumption that the defen-
dant was prejudiced thereby and may establish juror bias.(<u>People
-v- Marshall, supra,</u> 50 Cal.3d at p. 949-951; <u>In re Carpenter,
supra,</u> 9 Cal.4th at pp. 650-655.)

When juror misconduct involves the presentation to the jury of

information about a party or the case from extraneous sources,
the verdict will be set aside if there appears a substantial like-
lihood of juror bias. (People -v- Nesler, supra, 16 Cal.4th at p.
578; In re Carpenter, supra, 9 Cal.4th at p. 653.) Such bias may
be established in either of two ways: (1) if the extraneous mater-
ial, judged objectively, is so prejudicial in and of itself that
it is inherently and substantially likely to have influenced a
juror; or (2) even if the information is not "inherently" prejudi-
cial, if, from the nature of the misconduct and the surrounding
circumstances, the court determines that it is substantially lik-
ely a juror was "actually biased" against the defendant. (People
-v- Nesler, supra, 16 Cal.4th at p. 578-579.)

"Actual bias" in this context is defined as "the existence of
a state of mind on the part of the juror in reference to the case,
or to any of the parties, which will prevent the juror from acting
with entire impartially, and without prejudice to the substantial
rights of any party." (People -v- Nesler, supra, 16 Cal.4th at p.
581, citing Code Civ. Proc., §225, subd. (b)(1)(C).) "The term
'actual bias' may include a state of mind resulting from a juror's
actually being influenced by extraneous information about a party."
(Ibid.; see Weathers -v- Kaiser Foundation Hospitals (1971) 5 Cal.
3d 98, 104 ["the same acts of misconduct may frequently be cited
both as evidence if concealment of bias and as an ojjective fact
likely to have improperly influenced the jury's verdict"].)

If the reviewing court finds a substantial likelihood that a
juror was actually biased, the verdict must be set aside regardless

of how convinced the court might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compels reversal without application of a harmless error standard. (People -v- Nesler, supra, 16 Cal.4th at p. 579.0

Here, the juror misconduct involved the gathering, and presentation to the jury, of information about the case from an extraneous source, that is, the improper contact by Juror 8 with Detective Schaller. A substantial likelihood of juror bias is demonstrated here because Juror 8 made clear to the detective that he was confused about the case, and the detective told the juror that he wished he could tell him more, but that he could not. Here, the nature of the misconduct and the surrounding circumstances make clear that the juror was looking for some guidance about the case, and the detective  responded in such a manner as to convey he would like to give the juror more information but could not. (See People -v- Nesler, supra, 16 Cal.4th at pp. 578-579.) Juror 8 then went into jury deliberations, after hearing the defense case-in-chief, and told the other jurors, prior to the beginning of any discussion and vote by the jurors, that the detective told him that he wished he could say more but could not. Juror 8 clearly had the detective's comment firmly in mind, and there could be no other reason for the juror to reveal the communication other than to provide the jurors with information from the detective which was not presented as part of the trial. Even if Juror 8's revelation about the

contact did not influence the other jurors, the prejudicial nature
of the extrajudicial comment is manifest as to Juror 8 himself.

Although the court believed that Juror 9 was less than credi-
ble in his testimony, having embellished upon his original affida-
vit during the hearing, the court nonetheless found Juror 9's ori-
ginal statement to be consistent with the detective's memory of
the improper contact. (12 RT. 2772.) Both averred in writing, and
testified, that Juror 8's expression of confusion about the case
was the initiating comment which led to the detective's response.
(2 CT. 278, 292-293; 10 RT. 609-612; 11 RT. 626-627.) Significant
here is the fact that Juror 8 did not testify in accordance with
Juror 9 and the detective. Juror 8 completely omitted his own
statement about having been confused, and testified only that he
commented to the detective about the weather. Juror 8's omission
regarding his own contribution and basis for engaging in the conv-
ersation with the detective demonstrated his bias in the case, and
permits a strong inference that Juror 8 acted improperly not only
in acquiring the detective's comment about the case, but also in
allowing the comment to clear his confusion and influence his vote
against petitioner.

The introduction of Detective Schaller's comment into the jury
deliberations by Juror 8 was therefore at least "substantially lik-
ely," if not virtually certain, to demonstrate the comment affected
at least one juror, Juror 8, as to his verdict. This was sufficient
to establish "actual bias," i.e., "a state of mind resulting from

a juror's actually being influenced by extranous information about a party." (People -v- Nesler, supra, 16 Cal.4th at pp. 578-579..) Because the evidence demonstrates "a substantial likelihood that a juror was actually biased, the verdict must be set aside regardless of how convinced the court might be that an unbiased jury would have reached the same verdict,..." (Ibid.) The error is not subject to harmless error analysis, and reversal is required. (Ibid.)

## IV.

THE CUMULATIVE ERRORS UNDERMINED THE FUNDAMENTAL FAIRNESS OF PETITIONER'S TRIAL IN VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS, MANDATING REVERSAL.

Petitioner submits that reversal is required on all of the errors alleged above. Assuming, arguendo, that this court finds each individually harmless, the cumulative effect of the errors demonstrates that a miscarriage of justice occurred. Reversal may be based on grounds of cumulative error, even where no single error standing alone would necessitate such a result. (See People -v- Ramos (1982) 30 Cal.3d 553, 581, revd. on other grounds in California -v- Ramos (1985) 463 U.S. 992 [103 S.Ct. 3446, 77 L.Ed. 2d 1171]; In re Rodriguez (1981) 119 Cal.App.3d 457, 469-470; People -v- Vindiola (1979) 96 Cal.App.3d 370, 388; People -v- Buffum (1953) 40 Cal.2d. 719, 726.) In addition, state law errors which may not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair. (Mak -v- Blodgett (9th Cir. 1992) 970 F.2d 614, 622; People -v- Hill (1998) 17 Cal.4th 800,

844-845.)

Moreover, when an error of federal magnitude combines with a non-constitutional error, both errors should be reviewed together under a Chapman standard. In <u>People -v- Williams (1971)</u> 22 Cal.App. 3d 34, 50, the court summarized the multiple errors committed at the trial level and concluded:

> "Some of the errors reviewed are of constitutional dimension. Although they are not the type calling for automatic reversal, we are not satisfied beyond a reasonable doubt that the totality of error we have analyzed did not contribute to the guilty verdict, or was harmless error. [Citations.]"

(Id. at pp. 58-59.)

Under this authority, petitioner's conviction must be reversed. The court's finding that Ms. B. was unavailable, with the admission of her testimony as taken in the preliminary hearing, the court's admission of the Evidence Code section 1108 evidence by personal testimony of petitioner's former girlfriend, and the improper conduct by Juror 8 in eliciting and then repeating extrajudicial comments from Detective Schaller, demonstrating actual bias on the part of Juror 8, individually and collectively rendered petitioner's trial fundamentally unfair. Reversal on all counts is required.

CONCLUSION

For the foregoing reasons, petitioner respectfully requests this Court to reverse his convictions and remand the matter for a new trial.

Dated: _July 7,_____ (2011)                Respectfully Submitted,

                                             /S/ _Henry Ivan Cogswell_
                                                 Henry Ivan Cogswell,
                                                 Petitioner.

63.

HENRY I. COGSWELL

PLAINTIFF/PETITIONER          )

                             )
                             )
Vs.                          )
                             )
KATHLEEN ALLISON (acting     )
warden)                      )
DEFENDANT/RESPONDANT

CASE NO:_____

**PROOF OF SERVICE BY MAIL**

I, the undersigned, hereby declare:

(1)  I am a citizen of the United States; (2)  I am over the age of 18 years; (3)  I am a resident of Kings County, in California.

My mailing address is Post Office Box 5242 Corcoran, California 93212-5242.

On __July   7__, 20 __11__, I served a true copy or original copy of the following:

### PETITION FOR WRIT OF HABEAS CORPUS

by placing said document(s) in a sealed postage-paid envelope into the CSATF-State Prison at Corcoran mail box for delivery to the United States Post Office at Corcoran, California, addressed as follows:

```
HENRY I. COGSWELL
CDCR# F-34504
CSATF/State Prison At Corcoran
P.O. Box 5242
Corcoran CA. 93212
```

by placing said document(s) in a sealed Interdepartmental envelope into the California CSATF Facility Legal Mailbox for inner-institutional delivery to the below-listed person(s) at the following addresses:

```
U.S. DISTRICT COURT, Room 4290
CLERK OF THE COURT
880 Front Street,
San Diego CA. 92101-8900
```

And that this declaration was executed under the penalty of perjury at Corcoran, California 93212-5242, on __July   7__, 20___.

HENRY I. COGSWELL

PRINTED NAME (DECLARANT)

SIGNATURE (DECLARANT)

64.

# EXHIBIT

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

F I L E D
Stephen M. Kelly, Clerk
OCT 31 2007
Court of Appeal Fourth District

| | |
|---|---|
| THE PEOPLE, | D049038 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN201693) |
| HENRY IVAN COGSWELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Einhorn, Judge. Reversed.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda Cartwright-Ladendorf and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

Henry Ivan Cogswell was found guilty of three counts of forcible rape, one count of rape by a foreign object and one count of forcible oral copulation. It was found true Cogswell was previously convicted of forcible rape within the meaning of Penal Code[1] section 667.61, subdivisions (a), (c), (d), had served a prison term within the meaning of section 667.5, subdivision (a), was previously convicted on a felony within the meaning of section 667.6, subdivision (a), and was previously convicted of a serious felony within the meaning of sections 667, subdivision (a)(1), and 667, subdivisions (b) through (i).

Cogswell was sentenced to a term of 105 years in prison. He appeals, arguing the trial court erred in allowing the prior testimony of an absent witness to be admitted in evidence and in admitting evidence of his prior sexual assaults.

FACTS

A. *Prosecution Case*

1. *Charged Offenses*

On the afternoon of June 9, 2004, Lorene B., her sister and their children went to an apartment in San Marcos to see Lorene's friend Henrieta Cogswell (Henrieta). Appellant is Henrieta's brother. He also lived at the apartment. He told Lorene that Henrieta was not home. Lorene and the others returned to the home of Lorene's sister in Riverside.

Lorene met appellant on several occasions. Crystal G., the mother of appellant's two children, was Lorene's best friend. Lorene was aware Crystal and appellant broke

---

[1]   All further statutory references are to the Penal Code unless otherwise specified.

up. Appellant, Lorene, Crystal and Henrieta were deaf and communicated by sign language.

On the evening of June 9, Lorene, by means of instant messages on her computer, communicated with someone she believed was Henrieta. In fact, the messages were sent by appellant. Later, Lorene also exchanged instant messages understanding she was communicating with appellant. Appellant begged Lorene to see him about a very important matter concerning their children.

Lorene, believing the matter was serious, left Riverside and drove to San Marcos. She arrived at around midnight. Lorene parked her car in a lot at appellant's apartment and got out. Appellant approached her. Lorene asked if Henrieta was there. Appellant stated she was asleep. Appellant kissed Lorene on the mouth. When Lorene asked why he kissed her, appellant pushed her against the car. Lorene asked appellant if he was drunk and asked why he was treating her that way.

Appellant told Lorene they needed to talk and asked her to get into the car. Lorene got into the driver's seat. Appellant sat in the passenger seat. Lorene asked appellant why he kissed her and told him he should not have done so. When Lorene asked appellant what he wanted to talk about, he climbed on top of her and reclined the driver's seat. As Lorene resisted, appellant sexually assaulted her. Eventually appellant returned to the passenger seat, removed his clothes and told Lorene to undress. Afraid of appellant, Lorene removed her pants. Appellant grabbed Lorene and placed her in a straddling position above him. Appellant inserted his penis and finger into her vagina.

Lorene was able to climb into the back seat. Within a few moments appellant followed. Lorene told him she wanted to go home. Appellant told her she could "suck [his] penis." She did not want to. However, Lorene orally copulated appellant believing if she did he would let her go. When Lorene thought appellant fell asleep, she tried to get her clothes and leave. Appellant grabbed her, pinned her down and raped her again.

Lorene passed out. The next morning she awoke still in the car with appellant. Eventually the two dressed. Appellant drove the car to a bank and to a gas station. Appellant then drove back to his apartment complex. He told Lorene not to tell anyone what happened. Appellant climbed into the back seat and Lorene got out of the car. Appellant ordered Lorene to get back in the car. Afraid of appellant, she got in. Appellant raped her again. Appellant got out of the car and Lorene drove back to Riverside.

A few days later, Lorene e-mailed Crystal telling her she wanted to meet because someone raped her. Crystal guessed the attacker was appellant because he mentioned the rape a few days before. Lorene told Crystal it was difficult for her to report the rape because both she and appellant belonged to the small deaf community and because she knew appellant's family. Crystal suggested she, appellant and Lorene discuss the matter in an electronic chat room. They did so. Lorene, unsatisfied with the conversation, reported the sexual assault to the police.

On June 13, 2004, Sheriff's Detective David Schaller contacted appellant. The detective noticed appellant had a large bruise on his leg and scratches on his face, head,

arms, hand, legs and back. Crystal told Lorene that appellant was abusive to her. However, Crystal did not think she ever told Lorene that appellant raped her.

2. *Prior Uncharged Offenses*

In 1996 Crystal met appellant at school in New York and they began a sexual relationship. A few weeks after the relationship began, appellant physically assaulted her. Crystal reported the assault to school authorities, and in November 1996 appellant was expelled. Crystal moved with appellant to his parent's home in New York. His violence toward her increased. Appellant's assaultive behavior was reported to the police. Crystal first moved to Texas, and in February 1997 she moved to San Diego.

In February 1997 Crystal called appellant and told him she was pregnant with his child. Crystal agreed to see appellant. Because she was afraid of him, she asked him to bring someone with him. On February 6 or 7, 1997, appellant came to Crystal's apartment with his cousin Roy. Appellant told Crystal she had the choice of having sex with him or being abused. Crystal asked appellant to go for a walk hoping he would cool off. Appellant agreed. During the walk, appellant demanded Crystal have sex with him and told her to take off her pants. Afraid he would hurt her if she resisted, Crystal removed her pants and appellant raped her.

Crystal and appellant went with Roy to Roy's parent's house in Riverside. The next day, Crystal and appellant drove back to San Diego. During the drive, appellant stopped in a parking lot, hit Crystal in the head and ordered her to have sex with him. Crystal removed her pants and appellant raped her.

On arriving in San Diego, Crystal could not get into her apartment so she and appellant remained in the car. While in the car, appellant again ordered Crystal to have sex with him. Fearful of appellant, she orally copulated him. She then removed her clothes. Appellant raped her. Later that day, appellant raped Crystal again.

Crystal reported the rapes to her prenatal counselor. The counselor reported the crimes to the police and appellant was arrested. Appellant called Crystal from jail and asked her to say she had not been raped but only sexually harassed. At appellant's trial on those charges, Crystal recanted the claim of rape and testified appellant sexually harassed her. Appellant, nonetheless, was convicted of rape. Crystal later, at a habeas corpus proceeding, also falsely denied appellant raped her. Crystal stated she lied because she did not want appellant to go to prison for six years and was worried about her relationship with others in the deaf community.

Crystal continued to see appellant after he was released from prison and had a second child with him. Crystal admitted having falsely accused her stepfather of raping her.

B. *Defense Case*

A social worker, Diana Spencer, interviewed Lorene. During that interview, Lorene told Spencer she was arrested for "park[ing] in the wrong spot." Spencer checked the arrest report and learned Lorene was arrested for driving under the influence. Spencer concluded Lorene did not tell her the truth and was attempting to minimize the incident.

Julio Medina, the father of Lorene's son, testified Lorene falsely accused him of sexually molesting their then-six or seven-year-old son.

Henrieta, appellant's sister, testified that on June 10 to 13, 2004, appellant did not have large bruises, scratches or marks on his body.

## DISCUSSION

A. *Unavailable Witness*

Prosecutrix Lorene did not appear at trial. Appellant argues the trial court erred when it allowed the prosecution to offer in evidence her testimony from a preliminary hearing. Appellant contends that contrary to the finding of the trial court, the prosecution did not show due diligence in attempting to secure Lorene's presence at trial. More particularly, he argues that in seeking Lorene's testimony the prosecution did not fully utilize the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases (§ 1334 et seq.) (Uniform Act).

1. *Background*

By in limine motion filed on February 1, 2006, the prosecution sought to offer at trial the preliminary hearing testimony of Lorene. The prosecution noted it served Lorene in Colorado pursuant to the Uniform Act and arranged for her to fly to San Diego. Lorene, however, told the prosecution she would not testify at appellant's trial and did not use the airline ticket provided her. The prosecution argued it did everything possible under the Uniform Act to secure Lorene's attendance. It asked the trial court to find her unavailable and allow the introduction of her preliminary hearing testimony pursuant to Evidence Code section 240, subdivision (a)(4).

7

Appellant opposed the motion, stating the prosecution failed to show due diligence in securing Lorene's attendance at trial. Appellant argued the prosecution failed to make full efforts under the Uniform Act to secure Lorene's attendance, including asking that the Colorado court, as allowed by the Uniform Act, place her in custody and deliver her to a California officer to assure her attendance at trial.

At a hearing on the motion, the prosecutor offered evidence and observations concerning the efforts made to secure Lorene's testimony at trial. The prosecutor noted that on November 17, 2004, Lorene voluntarily came to California to testify at a preliminary hearing. As the matter approached trial, however, Lorene, living in Colorado, informed the prosecution she would not come to California to testify at appellant's trial. Lorene told the prosecution she had "emotional issues" with the case. The prosecution was forced to dismiss its case, refile and begin formal efforts to secure Lorene's attendance at trial. At arraignment in the new case, the parties stipulated to a bindover and the matter was set for trial on December 20, 2005.

On November 2, 2005, the Superior Court of San Diego County, pursuant to the prosecution's request and as required by the Uniform Act, certified to the Criminal District Court of Colorado that Lorene was a material witness in appellant's prosecution and asked pursuant to the act that she be compelled to attend and testify at his trial in San Diego on December 21, 2005.[2] While the Uniform Act allows the procedure, the

---

2     While the trial date was December 20, 2005, Lorene's attendance was requested for December 21, 2005.

certificate did not request that Lorene be taken into immediate custody and delivered to a California officer to secure her attendance at trial. The prosecutor explained at the in limine hearing that pursuant to Code of Civil Procedure section 1219, subdivision (b), that because Lorene was the victim of a sexual assault, it was precluded from placing her in custody to secure her appearance at trial.

Lorene was summoned to the Colorado court, appeared and was ordered to attend appellant's trial. However, from the court clerk's office in Colorado, Lorene called the San Diego County District Attorney investigator assigned to secure her attendance. She told him she would not appear in California to testify.

On December 15, 2005, the trial date was continued to January 31, 2006.

On December 23, 2005, the San Diego County Superior Court, at the prosecution's request and pursuant to the Uniform Act, again certified to the Criminal District Court of Colorado that Lorene was a material witness in appellant's case and asked that she be compelled to attend the trial set for January 31, 2006. As to this second attempt to secure Lorene's attendance pursuant to the Uniform Act, the prosecution, fearful Lorene would abscond to avoid service, did not contact her and asked the authorities in Colorado to approach her surreptiously. The certificate again did not request that Lorene be taken into immediate custody and delivered to a California officer to secure her attendance at trial.

Pursuant to the California court's certification on January 20, 2006, a summons was served on Lorene by a legal research assistant of the Denver County District Attorney's Office. The affidavit of service indicated Lorene was, as required by the

9

Uniform Act, tendered statutory fees and transportation allowances. Lorene appeared before the court in Colorado on January 20, 2006. The court found she was a necessary witness in appellant's prosecution and ordered her to appear and testify at appellant's trial on January 31, 2006, in California.

Lorene did not use the airline ticket provided her and by the time of trial did not appear in court in California.

The trial court noted a summons was issued by the court in Colorado requiring Lorene appear for appellant's trial in California. The court found Lorene testified at appellant's preliminary hearing and appellant had an adequate opportunity to confront and cross-examine her. The court also found Lorene was unavailable and the prosecution used due diligence in attempting to secure her attendance at trial. The court ruled that her preliminary hearing testimony was admissible at trial.

    2. *Law*

    a. *Confrontation, Hearsay and Unavailable Witnesses*

A defendant has a federal and state constitutional right to confront witnesses. (U.S. Const., Sixth Amend.; Cal. Const., art. I, § 15.) The right, however, is not absolute. If a witness is unavailable at trial and has testified at a previous judicial proceeding against the defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial. (*People v. Wilson* (2005) 36 Cal.4th 309, 340-341.)

Evidence Code section 1291, subdivision (a)(2), states that former testimony is admissible if the declarant is unavailable and "[t]he party against whom the former

testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

Evidence Code section 240, subdivision (a)(4), states that a declarant is "unavailable as a witness" if the declarant is "[a]bsent from the hearing and the court is unable to compel his or her attendance by its process." Evidence Code section 240, subdivision (a)(5), states that a declarant is "unavailable as a witness" if the declarant is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

Reasonable diligence within the meaning of Evidence Code section 240, subdivision (a)(5), means the proponent has made " ' "untiring efforts in good earnest, efforts of a substantial character" ' " to secure the attendance of the witness. (*People v. Wilson, supra,* 36 Cal.4th at p. 341.) Factors relevant to deciding whether such efforts have been made include the timeliness of the effort, the importance of the testimony and whether all reasonable means were used to secure the attendance of the witness. (See *Ibid.*)

When the facts are not in dispute, a reviewing court decides the question of reasonable diligence de novo. (*People v. Cromer* (2001) 24 Cal.4th 889, 900-901.)

b. *Uniform Act*

The Uniform Act is a device for securing the attendance of out-of-state witnesses in criminal cases. As relevant here, if a person in Colorado is a material witness in a

prosecution in California, a California court may issue a certificate so finding. The

certificate is presented to a court in the county in Colorado in which the witness is found.

(§ 1334.3, subd. (a)[3]; Col. Rev. Stats. § 16-9-202, subd. (1)-(3).[4])

---

[3]      Section 1334.3, subdivision (a), states: "If a person in any state, which by its laws has made provision for commanding persons within its borders to attend and testify in criminal prosecutions or grand jury investigations in this state, is a material witness in a prosecution pending in a court of record in this state, or in a grand jury investigation, a judge of such court may issue a certificate under the seal of the court stating these facts and specifying the number of days the witness will be required. This certificate shall be presented to a judge of a court of record in the county of such other state in which the witness is found.

"If the certificate recommends that the witness be taken into immediate custody and delivered to an officer of this state to assure his or her attendance in this state, the judge may direct that the witness be forthwith brought before him or her. If the judge is satisfied of the desirability of the custody and delivery, for which determination the certificate shall be prima facie proof, he or she may order that the witness be forthwith taken into custody and delivered to an officer of this state. This order shall be sufficient authority to the officer to take the witness into custody and hold him or her unless and until he or she may be released by bail, recognizance, or order of the judge issuing the certificate.

"If the witness is subpoenaed to attend and testify in this state, he or she shall be tendered the sum of ten cents ($0.10) for each mile necessarily traveled if the witness elects surface travel or the minimum round trip scheduled airlines fare plus twenty cents ($0.20) a mile for necessary surface travel at either end of the flight if the witness elects air travel, and except as provided in subdivision (b), a per diem of twenty dollars ($20) for each day that he or she is required to travel and attend as a witness. The judge of the court in which the witness is ordered to appear shall order the payment of witness fees authorized by law for each day the witness is required to attend the court plus reimbursement for any additional expenses of the witness which the judge of the court shall find reasonable and necessary. A witness who has appeared in accordance with the provisions of the subpoena shall not be required to remain within this state a longer period of time than the period mentioned in the certificate, unless otherwise ordered by the court. If the witness fails without good cause to attend and testify as directed in the subpoena, he or she shall be punished in the manner provided for the punishment of any witness who disobeys a subpoena issued from a court of record in this state."

[4]      Colorado Revised Statutes section 16-9-202, subdivisions (1)-(3), states: "(1) If a judge of a court of record in any state which by its laws has made provision for commanding persons within that state to attend and testify in this state certifies under the

On presentation of the certificate, the court in Colorado sets a time for hearing and orders the witness to appear at that hearing. If the court determines the witness is material and necessary and that it will not cause undue hardship to the witness to be

---

seal of the court that there is a criminal prosecution pending in such court or that a grand jury investigation has commenced or is about to commence, that a person being within this state is a material witness in such prosecution or grand jury investigation, and that his presence will be required for a specified number of days, upon presentation of the certificate to any judge of a court of record in the county in which such person is, the judge shall fix a time and place for a hearing, and shall make an order directing the witness to appear at a time and place certain for the hearing.

"(2) If at a hearing the judge determines that the witness is material and necessary, that it will not cause undue hardship to the witness to be compelled to attend and testify in the prosecution or a grand jury investigation in the other state, and that the laws of the state in which the prosecution is pending or grand jury investigation has commenced or is about to commence, and of any other state through which the witness may be required to pass by ordinary course of travel, will give to him protection from arrest and the service of civil and criminal process in connection with matters which arose before his entering into that state under the summons, he shall issue a summons, with a copy of the certificate attached, directing the witness to attend and testify in the court where the prosecution is pending or where a grand jury investigation has commenced or is about to commence at a time and place specified in the summons. In any such hearing, the certificate shall be prima facie evidence of all the facts stated therein.

"(3) If said certificate recommends that the witness be taken into immediate custody and delivered to an officer of the requesting state to assure his attendance in the requesting state, the judge may, in lieu of notification of the hearing, direct that the witness be forthwith brought before him for the hearing; and the judge at the hearing being satisfied of the desirability of such custody and delivery, for which determination the certificate shall be prima facie proof of such desirability, in lieu of issuing subpoena or summons, shall order that said witness be forthwith taken into custody and delivered to an officer of the requesting state.

"(4) If the witness, who is summoned as above provided, after being paid or tendered by some properly authorized person the sum of ten cents a mile for each mile by the ordinary traveled route to and from the court where the prosecution is pending and twenty dollars for each day that he is required to travel and attend as a witness, fails without good cause to attend and testify as directed in the summons, he shall be punished in the manner provided for the punishment of any witness who disobeys a summons issued from a court of record in this state."

compelled to attend and testify in California, the court in Colorado issues a subpoena or summons directing the witness to appear for the trial in California. (§ 1334.3, subd. (a); Col. Rev. Stats., 16-9-202, subds. (1)-(2).)

California's certificate may ask that the witness be taken into immediate custody and delivered to a California officer to assure the witness's attendance at trial. In such a case the judge in Colorado may, in lieu of notification of the hearing in Colorado, direct the witness be brought before it. If at the hearing the Colorado court is satisfied of the "desirability of the custody and delivery" in lieu of a summons or subpoena, it may order the witness immediately taken into custody and delivered to a California officer. (§ 1334.3, subd. (a); Col. Rev. Stats. § 16-9-202, subd. (3).)

If the witness fails to appear as directed by the subpoena or summons, the witness "may be punished in the manner provided for the punishment of any witness who disobeys a subpoena issued from a court" of California. (§ 1334.3, subd. (a); Col. Rev. Stats. § 16-9-203, subd. (4).)

When a party knows of the out-of-state location of a witness and does not attempt to secure their presence by means of the Uniform Act, the witness is not unavailable within the meaning of Evidence Code section 240. (*In re Terry* (1971) 4 Cal.3d 911, 931; *People v. Blackwell* (1983) 138 Cal.App.3d 939, 945-947.)

3. *Discussion*

Appellant argues the prosecution failed to exercise due diligence in attempting to secure the testimony of Lorene. Appellant contends that while the prosecution twice sought Lorene's presence at trial through the Uniform Act, it did not attempt to have her

14

taken into custody in Colorado and turned over to a California officer even though she made clear her intention not to appear at appellant's trial. In response, the prosecution argues, as it did below, that Code of Civil Procedure section 1219, subdivision (b), forbids utilization of the custody provisions of the Uniform Act against a sexual assault victim. The prosecution argues, therefore, it did all that was reasonably possible to secure Lorene's testimony and the trial court properly found her unavailable.

Code of Civil Procedure section 1219, subdivision (a), states: "Except as provided in subdivisions (b) and (c),[5] when the contempt consists of the omission to perform an act which is yet in the power of the person to perform, he or she may be imprisoned until he or she has performed it, and in that case the act shall be specified in the warrant of commitment."

Subdivision (b) of that section states: "Notwithstanding any other law, no court may imprison or otherwise confine or place in custody the victim of a sexual assault for contempt when the contempt consists of refusing to testify concerning that sexual assault."

The issue here is whether in seeking the attendance at trial of an out-of-state victim of a sexual assault Code of Civil Procedure section 1219, subdivision (b), forbids a California court from requesting, pursuant to the Uniform Act, that the victim be taken into immediate custody and delivered to a California state officer to assure the victim's

---

5    Section 1219, subdivision (c), places a similiar restriction on the power of the court to confine for contempt in refusing to testify victims of domestic violence.

attendance in this state. We conclude section 1219, subdivision (b), does not so limit the power of a California court to utilize the custody and delivery provisions of the Uniform Act. We conclude that based on its language and history Code of Civil Procedure section 1219, subdivision (b), only restricts the power of a court to use incarceration through its contempt power as a means of securing testimony or punishing a contemptuous refusal to testify. The section does not affect the power of the court to order the victim of sexual assault be brought before it or to seek pursuant to the Uniform Act that a witness be taken into custody and delivered to a California officer to secure their attendance in this state.

We first note that Code of Civil Procedure section 1219, subdivision (b), deals with the court's *contempt* power and forbids the use of that power to place in custody a sexual assault victim who *refuses to testify*. The Uniform Act and its provision for immediately taking a witness into custody to assure their appearance for trial in California is not an exercise of the court's contempt power. Nor does the Uniform Act condition the taking of an out-of-state witness into custody on a refusal to testify or, indeed, on the refusal to do anything. By its express language Code of Civil Procedure section 1219, subdivision (b), does not forbid the utilization of the custody provisions of the Uniform Act to assure the attendance at trial of sexual assault victims.

Still, the Legislature has in Code of Civil Procedure section 1219, subdivision (b), and in other code provisions indicated a strong intent to protect victims of sexual assault from additional psychological trauma. (See, e.g., Stats. 1984, ch. 1644, § 3.) Further, while section 1219, subdivision (b), is a restriction on the court's power to place a person in custody for acts of contempt, and while it deals with actual refusals to testify, neither

16

of which are factors in the application of the custody provisions of the Uniform Act, the act nonetheless provides for placing the victim in a form of custody. Often the need for such custody arises from what is essentially a refusal to testify. That being the case, it is useful to explore more closely the Legislature's intent in enacting section 1219, subdivision (b).

Code of Civil Procedure section 1219, subdivision (b), was enacted in 1984. (Stats. 1984, ch. 1644, § 2.) The new subdivision was added as part of Senate Bill No. 1678 after a trial court placed a 12-year-old girl in juvenile hall for several days when she refused to testify against her allegedly sexually abusive stepfather. (Sen. Bill No. 1678 (1983-1984 Reg. Sess.) § 2.) The concern was that many sexual assault victims testify only after being threatened with contempt and imprisonment. It was argued that such threats heighten the psychological trauma the victim has already experienced. (Assem. Com. on Crim. Law and Public Safety, analysis of Sen. Bill No. 1678 (1983-1984 Reg. Sess.), as amended June 18, 1984, p. 2; Assem. Off. of Research, 3d reading analysis of Sen. Bill No. 1678 (1983-1984 Reg. Sess.), as amended June 18, 1984; Sen. Republican Caucus, analysis of Sen. Bill No. 1678 (1983-1984 Reg. Sess.), p. 2; Sen. Com. on Judiciary, report on Sen. Bill No. 1678 (1983-1984 Reg. Sess.), as amended Apr. 26, 1984, p. 2.)

The act did not affect a trial court's power to find a sexual assault victim in contempt based on a refusal to testify. The act left in place the court's power to find victims in contempt and to impose sanctions other than imprisonment. Indeed, enacted with Code of Civil Procedure section 1219, subdivision (b), was an amendment adding

17

subdivision (d) to Code of Civil Procedure section 128. (Stats. 1984, ch. 1644, § 1.)
That subdivision stays for three days the imposition of any contempt sanction imposed
based on a sexual assault victim's refusal to testify. (See also Assem. Com. on Crim.
Law and Public Safety, analysis of Sen. Bill No. 1678 (1983-1984 Reg. Sess.) § 2; as
amended June 18, 1983, p. 2; Assem. Off. of Research, 3d reading analysis of Sen. Bill
No. 1678 (1983-1984 Reg. Sess.), as amended June 18, 1984; Sen. Republican Caucus,
analysis of Sen. Bill No. 1678 (1983-1984 Reg. Sess.), p. 2; Sen. Com. on Judiciary,
report on Sen. Bill No. 1678 (1983-1984 Reg. Sess.), as amended Apr. 26, 1984, p. 2.)

Code of Civil Procedure Section 1219, subdivision (b), states that a court may not
"imprison or otherwise confine or place in custody" for contempt a sexual assault victim
who refuses to testify. At first this provision appears broad and might suggest the
Legislature meant to forbid any type of custody even that necessary to secure a witness's
attendance at trial. A review of the legislative history of section 1219, subdivision (b),
however, makes clear that the section refers only to sexual assault victims being taken
into custody as the result of a finding of contempt after a refusal to testify.

As originally written, Senate Bill No. 1678 merely stated a court could not
"imprison" the victim for contempt when the contempt arose from a refusal to testify.
(Sen. Bill No. 1678 (1983-1984 Reg. Sess.), as introduced Feb. 9, 1984.) Later, the bill
was amended to add the "or otherwise confine or place in custody" language that now
appears in Code of Civil Procedure section 1219, subdivision (b). (Sen. Amend. to Sen.
Bill No. 1678 (1983-1984 Reg. Sess.), May 10, 1984.) This amendment was made
because it was noted that minors under 16 years of age are not subject to "imprisonment

18

in county jails." (Sen. Com. on Judiciary, report on Sen. Bill No. 1678 (1983-1984 Reg. Sess.), p. 3.) The clear intent, therefore, of the section is not to forbid any type of custody for any reason for a sexual assault victim but rather to forbid confinements of all types because of a finding of contempt arising from a refusal to testify.

The refusal of a witness to appear in obedience of a subpoena and the refusal of a witness to testify once present are different forms of contempt that affect different institutional interests. The affront to a court, while serious in both instances, is more serious when a witness chooses to ignore the court's process. There is nothing in section 1219, subdivision (b), or its history suggesting a sexual assault victim is excused from the obligation to appear when lawfully summoned. Our Supreme Court has concluded that victims of sexual assault have a duty to testify when subpoenaed. (*People v. Smith* (2003) 30 Cal.4th 581, 624.) Inherent in the section and manifest in its history is that failures not only to appear but to testify may be punished. Victims of sexual assaults simply may not be incarcerated as a means of compelling their testimony.

The law provides in a variety of contexts and in a variety of ways for witnesses who disobey subpoenas to be taken into custody and brought before the court. (See § 881, subds. (b), (c); Evid. Code, §§ 1331, 1332; Code Civ. Proc., § 1993; *People v. Palmer* (1989) 207 Cal.App.3d 663, 671; 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 31, Arrest, p. 286; Cal. Criminal Law Practice and Procedure, § 4.1, 4.47, 58.23.) We find nothing in Code of Civil Procedure section 1219, subdivision (b), which precludes use of such means to assure the attendance at trial of sexual assault victims.

19

The custody and delivery provision of the Uniform Act is a device to assure the attendance of a witness at trial and not a punishment for contempt arising from a refusal to testify. That being the case, section 1219, subdivision (b), did not forbid the use of the act's custody and delivery provisions to secure Lorene's attendance at trial.

Having decided that Code of Civil Procedure section 1219, subdivision (b), did not foreclose the prosecution from utilizing the custody provisions of the Uniform Act to secure Lorene's attendance at trial, the ultimate question is whether the failure to do so in this case amounts to a lack of reasonable diligence. We conclude that it does.

Of course, in utilizing the Uniform Act the People need not in every case ask that their witness be taken into custody in order to show reasonable diligence. In some cases maintaining contact with a cooperative out-of-state witness who has shown a clear intention to return to California to testify may be enough. Under other circumstances, e.g., when the witness is reluctant to travel to California but there is no reason to believe the witness will disobey a summons, reasonable diligence may require utilization only of that part of the Uniform Act resulting in an order that a witness appear in California for trial. Under other circumstances reasonable diligence may require the prosecution request the witness be taken into immediate custody and delivered to a California officer.

In this case the prosecution was on notice that it was highly probable Lorene would not return to California even if ordered by a court to do so. By telephone she informed the prosecutor she was not going to appear. With regard to its second request under the Uniform Act, the prosecution took care not to inform Lorene that it was again seeking her attendance. It did so because it was afraid she was so opposed to returning to

California she would avoid service. Had the prosecution understood that Code of Civil Procedure section 1219, subdivision (b), did not forbid use of the custody provisions of the Uniform Act, it would, in all probability, have requested she be taken immediately into custody and delivered to a California officer.

Lorene was an essential witness in this case, her appearance was crucial. The prosecution did not, under the circumstances of this case, use every reasonable means to secure her attendance and, therefore, did not exercise reasonable diligence. The trial court therefore erred in finding that she was unavailable and allowing the use of her preliminary hearing testimony at trial.

Erroneously allowing the use of Lorene's preliminary hearing testimony at trial was by any test prejudicial. Lorene was not simply an important witness, she was an indispensable witness. Had the trial court not erroneously admitted her preliminary hearing testimony, there would have been no admissible evidence that a sexual assault occurred. The judgment must therefore be reversed.

B. *Evidence of Prior Sexual Offenses*

Appellant argues the trial court erred when it admitted pursuant to Evidence Code section 1108, subdivision (a), the testimony of Crystal that appellant sexually assaulted her. Appellant argues the admission of such evidence to show a propensity to commit the charged offenses denied him his right to due process. He argues in any case the trial court erred in admitting the evidence over his objection that the evidence was more prejudicial than probative. While we have reversed the judgment on other grounds, we consider this issue in the event of a retrial.

21

1. *Background*

Prior to trial the prosecution moved, pursuant to Evidence Code section 1108, for the admission of evidence of appellant's sexual offenses against Crystal.  It noted that in 1996 appellant was charged with multiple counts of assault and sexual assault and that in 1997 he pled guilty to one count of forcible rape.  Sentenced to six years in prison, appellant repeatedly contacted Crystal and she eventually recanted her accusations of assault and rape.  Petitions for habeas corpus followed but were denied.  When released, appellant was required to register as a sex offender pursuant to section 290.  In 2003 he was convicted of a failure to register.  As a condition of parole, he was ordered not to have contact with Crystal.  In 2004 the two had another child.

Appellant opposed the prosecution's motion to admit evidence of the prior sexual offenses.  He noted that in 1999 Crystal submitted a declaration and testified at a hearing on appellant's habeas corpus declaration that she had falsely accused appellant of rape.  Appellant also noted that before Lorene made her accusation against him, she and Crystal were best friends.  Appellant argued admitting evidence of appellant's prior sexual offenses would result in undue prejudice to the defense and confuse and mislead the jury.  He requested the evidence be excluded pursuant to Evidence Code section 352.

A hearing was held on the motion.  Crystal testified and reviewed the history of her relationship with appellant.  She stated that from the beginning of the relationship appellant abused and sexually assaulted her.  She stated he sexually assaulted her on several occasions in 1997 in San Diego, and she reported the crimes to the police.  She was aware appellant was charged with those offenses and that he pled guilty to one count

of rape.  Crystal admitted recanting under oath her claims of rape but stated appellant did rape her.  She stated she was afraid when appellant was released from prison he would assault her.  She also stated the deaf community to which both she and appellant belonged was small, and she believed her life and lives of her two sons would be easier if she recanted her allegations.  Crystal stated appellant raped her.

The trial court granted the prosecution's motion and admitted Crystal's testimony.

2. *Discussion*

Evidence Code section 1108, subdivision (a), provides that when a defendant is accused of a sexual offense, evidence of that defendant's commission of another sexual offense is admissible unless the evidence is made inadmissible under the provisions of Evidence Code section 352.  Appellant contends the admission of such evidence to prove a predisposition to commit sexual offenses denies him due process.  It does not.  (*People v. Falsetta* (1999) 21 Cal.4th 903, 911-925; *People v. Quintanilla* (2005) 132 Cal.App.4th 572, 578-579.)

Appellant further argues that whatever the constitutional validity of Evidence Code section 1108, subdivision (a), the trial court abused its discretion when it denied the motion to exclude the evidence as more prejudicial than probative within the meaning of Evidence Code section 352.

In admitting evidence of prior sexual offenses pursuant to Evidence Code section 1108, subdivision (a), the trial court considers the nature, relevance and remoteness of the uncharged offense, the degree of certainty that the prior offense was committed, the likelihood admission of the offense will confuse, mislead or distract the jury from its

23

primary inquiry, the burden of the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to outright admission, such as excluding irrelevant and inflammatory details. (*People v. Falsetta, supra,* 21 Cal.4th at p. 917.)

The trial court has broad discretion in determining whether the probative value of evidence outweighs any potential it may have to prejudice a party or to confuse or mislead the jury. It is only when the exercise of that discretion is "arbitrary, capricious or patently absurd" that we reverse the trial court's decision to admit the evidence. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

The trial court here did not abuse its discretion in admitting Crystal's testimony. The sexual offenses committed against Crystal were reasonably similar to and no more serious than those charged here. While the crimes against Crystal were committed in 1999 and the charged crimes occurred in 2004, for much of that interval appellant was in prison. The lack of additional sexual offenses in that period says nothing about his predisposition to commit such crimes. While it is true Crystal recanted her accusations against appellant, appellant pled guilty to a sexual offense against Crystal and a jury could reasonably decided whether he committed the crime to which he pled guilty. The evidence concerning appellant's conviction of raping Crystal did not create a burden on the defense greater than that which arises in defending against any claim of a relevant uncharged act. The trial court did not abuse its discretion in admitting Crystal's testimony.

DISPOSITION

The judgment is reversed.

CERTIFIED FOR PUBLICATION


_____
BENKE, Acting P. J.

WE CONCUR:

_____
HALLER, J.

_____
AARON, J.

25

# EXHIBIT

F I L E D

Clerk of the Superior Court

MAR 0 4 2011

By: G. NELSON, Deputy

**IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**IN AND FOR THE COUNTY OF SAN DIEGO**

| IN THE MATTER OF THE APPLICATION OF: | ) | HCN 1157 |
| | ) | SCN 201693 |
| | ) | |
| | ) | ORDER DENYING |
| HENRY COGSWELL, | ) | PETITION FOR WRIT |
| | ) | OF HABEAS |
| Petitioner. | ) | CORPUS |

THIS COURT, HAVING READ THE PETITION FOR WRIT OF HABEAS CORPUS, FINDS AS FOLLOWS:

On February 16, 2006 after a jury trial Petitioner was convicted of three counts of Penal Code Section 261(a)(2), forcible rape, one count of Penal Code Section 289(a)(1), forcible sexual penetration and one count of Penal Code Section 288a(c)(2), forcible oral copulation. The jury also found that Petitioner was previously convicted of forcible rape within the meaning of Penal Code Section 667.61(a)(c)(d), had served a prison term pursuant to Penal Code Section 667.5(a), was previously convicted of a felony pursuant to Penal Code Section 667.6(a) and was previously convicted of a serious felony within the meaning of Penal Code Sections 667(a)(1) and 667(b)-(i). On July 14, 2006, after a motion for new trial was heard and denied, the trial court sentence Petitioner to a term of 105 years to life in prison.

Petitioner filed his initial appeal, arguing the trial Court erred in allowing prior testimony of an absent witness to be admitted, in admitting evidence of his prior sexual assaults and in finding that there was no

-1-

prejudice as a result of juror misconduct.   The appellate Court found that the trial Court erred in allowing testimony of the absent witness and reversed the judgment. However, the People petitioned for review and the California Supreme Court reversed the appellate Court decision. The Appellate Court further found that the trial Court properly admitted evidence of prior sexual assaults and that there was no error when the trial Court found there was no prejudice as a result of juror misconduct.

Petitioner now asserts that the use of preliminary hearing testimony by the absent witness violated the confrontation clause.   Petitioner relies on <u>McCandless v. Vaughn</u> (3d Cir. 1999) 172 F.3d 255, 270, a case which found  that the prosecution did not satisfy its Sixth Amendment duty to make reasonable good faith efforts to obtain the witnesses' presence at trial before admitting preliminary examination testimony. However, in Petitioner's case the California Supreme Court ruled in <u>People v. Cogswell</u> (2010) 48 Cal.4th 467, 479, that Lorene (the victim/witness) was unavailable as a witness notwithstanding the prosecution's use of reasonable means to secure her presence at defendant's trial, and that therefore the prosecution could use at that trial the testimony that Lorene had previously given at defendant's preliminary hearing.  As the witness was found to be unavailable at trial in spite of the prosecution's good faith efforts, there is no violation of the Confrontation Clause in this case.

Petitioner further alleges that a general intent crime requires that the defendant intentionally does the act the law declares to be a crime.   He asserts that Penal Code Section 220 is a specific intent crime, whereas Penal Code Section 289 is a general intent offense.  Petitioner was charged with Penal Code Section 289, forcible sexual penetration and not Penal Code Section 220, assault with intent to commit a listed sex crime. Since the evidence showed Petitioner committed the completed sex offense of Penal Code Section 289, a general intent crime, it is difficult to tell what Petitioner's argument is in this regard

The issue Petitioner raises regarding the admissibility of evidence was raised and  were either could have been raised and determined on appeal.  Petitioner's claims regarding general intent and specific intent could have been raised on appeal.  Contentions which could have been raised on appeal or which were raised and rejected on appeal ordinarily cannot be renewed in a petition for habeas corpus because habeas corpus ordinarily cannot serve as a second appeal. <u>In re Dixon</u> (1953) 41 Cal.2d 756, 759; <u>In re Waltreus</u> (1965) 62 Cal.2d 218.  Postappeal collateral attacks will only serve as a second appeal under four very narrow exceptions: constitutional error is clear and strikes at the heart of trial process; lack of fundamental

jurisdiction; the trial court acted in excess of jurisdiction that does not require a redetermination of facts; or there was a change in the law after appeal.  In re Harris (1993) 5 Cal.4th 813.  None of these exceptions apply as to Petitioner's claims.

Petitioner must set forth the facts supporting the allegations in the petition with particularity.  Vague or conclusionary allegations do not warrant habeas relief.  People v. Duvall (1995) 9 Cal.4[th] 464, 474.).  Petitioner's claims are both vague and conclusionary.

Petitioner has failed to make a prima facie showing of specific facts which would entitle him to habeas corpus relief under existing law.  In re Hochberg (1970) 2 Cal.3d 870, 875 fn 4.   As such, the Petition for Writ of Habeas Corpus is hereby denied.

IT IS SO ORDERED.

DATED: _____MArch 4, 2011_____          _____R. G. Maino_____
                                                           RUNSTON G. MAINO
                                                           JUDGE OF THE SUPERIOR COURT

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
- ☐ COUNTY COURTHOUSE, 220 W. BROADWAY, SAN DIEGO, CA 92101-3814
- ☐ HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101-3827
- ☐ FAMILY COURT, 1555 6TH AVE, SAN DIEGO, CA 92101-3294
- ☐ MADGE BRADLEY BLDG., 1409 4TH AVE., SAN DIEGO, CA 92101-3105
- ☐ KEARNY MESA BRANCH, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123-1187
- ☒ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92083-6643
- ☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020-3941
- ☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065-5200
- ☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910-5649
- ☐ JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA 92123-2792
- ☐ JUVENILE COURT, 325 S. MELROSE DR., VISTA, CA 92083-6634

**F I L E D**

Clerk of the Superior Court

**MAR 04 2011**

By: G. NELSON, Deputy

PLAINTIFF(S)/PETITIONER(S)

IN THE MATTER OF THE APPLICATION OF: HENRY COGSWELL

DEFENDANT(S)/RESPONDENT(S)

JUDGE:    Runston G. Maino

DEPT:    26

| CLERK'S CERTIFICATE OF SERVICE BY MAIL (CCP 1013a(4)) | CASE NUMBER HCN1157 (SCN201693) |
|---|---|

I, certify that:  I am not a party to the above-entitled case; that on the date shown below, I served the following document(s):
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

on the parties shown below by placing a true copy in a separate envelope, addressed as shown below; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at:   ☐ San Diego   ☒ Vista   ☐ El Cajon   ☐ Chula Vista   ☐ Ramona, California.

<u>NAME & ADDRESS</u>

Henry I. Cogswell, CDC# F34504
SATF-D2-230
P.O. Box 5242
Corcoran, CA  93212-5242

<u>NAME & ADDRESS</u>

Office of the District Attorney
North County Branch / Appellate Division
325 S. Melrose Drive
Vista, CA  92081

Sent via interoffice mail at MS-N160

CLERK OF THE SUPERIOR COURT

Date: <u>March 4, 2011</u>

by _____, Deputy
G. Nelson

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**FILED**

JUL 11 2011

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**I (a) PLAINTIFFS**

Henry Ivan Cogswell

**DEFENDANTS**

Kathleen Allison, Kamala D Harris

**(b) COUNTY OF RESIDENCE OF FIRST LISTED   Kings**
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

F-34504
State Prison Corcoran
PO BOX 5242
Corcoran, CA 93212

**ATTORNEYS (IF KNOWN)**

'11 CV 1559 MMA WVG

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
**(For Diversity Cases Only)       FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.  DO NOT CITE**
**JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

## 28 U.S.C. 2254

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☒ 443 Housing/Accommodations | ☒ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ Security Act | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appelate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN**
**COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

**DEMAND $**

Check YES only if demanded in complaint:
**JURY DEMAND:** ☐ YES ☐NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE   Docket Number

DATE

7·11·11

SIGNATURE OF ATTORNEY OF RECORD