# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

HENRY IVAN COGSWELL,

Petitioner,

vs.

DR. JEFFREY BEARD, Secretary,

Respondent.[1]

Civil No.   11cv1559-MMA (WVG)

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

This Report and Recommendation is submitted to United States District Judge Michael M. Anello pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

Henry Ivan Cogswell (hereinafter "Petitioner"), is a state prisoner proceeding pro se with a First Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (ECF No. 43.) Petitioner was convicted by a San Diego County Superior Court jury of three counts of forcible rape, one count of rape by a foreign object, and one count of forcible oral copulation. (Lodgment No. 28, Clerk's Tr. ["CT"] at 196-99.) The jury returned true findings on sentence

---

[1]  The Clerk of Court is directed to amend the docket to reflect that Dr. Jeffrey Beard, the Secretary of the California Department of Corrections and Rehabilitation, has been substituted as Respondent in place of his predecessor and former Respondent Matthew Cate. See Fed. R. Civ. P. 25(d) (requiring automatic substitution as a party the successor of a public office).

enhancement allegations that Petitioner was previously convicted of forcible rape and therefore qualified as a habitual sex offender, was on parole at the time he committed the instant offenses, was previously convicted of a serious felony which constituted a "strike" under California's Three Strikes law, and had served a prison term but had not remained free of custody or free of an offense resulting in a violent felony conviction for ten years thereafter. (CT 202-03.) He was sentenced to 105 years-to-life in state prison. (CT 118.)

Petitioner alleges here that his state and federal constitutional rights were violated because: (1) he was unable to confront and cross-examine the victim due to the trial court's erroneous ruling that she was an unavailable witness and that her preliminary hearing testimony could therefore be used in lieu of live testimony; (2) evidence of prior uncharged sex offenses was erroneously admitted; (3) two jurors and a witness committed misconduct by communicating outside the courtroom during the trial; (4) the cumulative effect of the errors undermined the fundamental fairness of the trial; (5) the sentence constitutes cruel and unusual punishment; (6) evidence of Petitioner's prior drug use and parole status was erroneously admitted; (7) trial counsel provided ineffective assistance by failing to request a mistrial based on the admission of evidence of Petitioner's prior drug use and parole status; (8) trial counsel provided ineffective assistance when counsel elicited testimony about Petitioner's prior drug use and parole status; (9) trial counsel provided ineffective assistance when counsel failed to request the jury be instructed on lesser included offenses; (10) the trial court erred in failing to sua sponte instruct the jury on lesser included offenses; and (11) the cumulative effect of the errors amounts to a violation of due process. (First Amended Petition ["FAP"] at 3-4.[2]) Petitioner also requests an evidentiary hearing. (Id. at 4.)

Respondent has filed an Answer ("Ans.") to the Petition along with an incorporated Memorandum of Points and Authorities in support ("Ans. Mem."), and has lodged portions of the state court record. (ECF Nos. 14-15, 53-54.) Respondent contends that federal habeas relief is unavailable because the adjudication by the state court of Petitioner's claims did not involve

---

[2]  When citing to documents filed with the Court's Electronic Case Filing ("ECF") system, the Court will refer to the pages assigned by that system. Because Claims 4 and 11 are identical, they will be discussed together.

1   an objectively unreasonable application of clearly established federal law, and that Claim 10 is

2   procedurally defaulted and does not present a claim that is cognizable on federal habeas.  (Ans.

3   at 2-3; Ans. Mem. at 18-47.)  Petitioner has filed a Traverse.  (ECF No. 59.)

4       For the following reasons, the Court finds that Petitioner is not entitled to habeas relief

5   because the adjudication of his claims by the state court did not involve an objectively

6   unreasonable application of clearly established federal law.  The Court also finds that an

7   evidentiary hearing is unnecessary.  The Court therefore **RECOMMENDS** the Petition be

8   **DENIED** without holding an evidentiary hearing.

9                                      **II.**

10                          **STATE PROCEEDINGS**

11      In a five-count Information filed in the San Diego County Superior Court on October 18,

12  2005, Petitioner was charged with three counts of forcible rape in violation of California Penal

13  Code section 161(a)(2), one count of forcible oral copulation in violation of Penal Code section

14  288a(c)(2), and one count of rape by a foreign object in violation of Penal Code section

15  289(a)(1).  (CT 1-7.)  The Information also alleged that Petitioner had been previously convicted

16  of forcible rape within the meaning of Penal Code section 667.61(a)(c)(d), had served a prior

17  prison term within the meaning of Penal Code section 667.5(a), that he qualified as a habitual

18  sex offender within the meaning of Penal Code section 667.71(a), and that he had committed the

19  offenses while on parole within the meaning of Penal Code section 1203.085(b).  (Id.)

20      The victim was declared an unavailable witness and her preliminary hearing testimony

21  was read to the jury in lieu of her live testimony, over a defense objection, after the prosecutor

22  indicated that the victim had refused to appear at trial and the prosecution had taken all the steps

23  available to secure her appearance, short of ordering her taken into custody and threatening to

24  have her held in contempt, because state law prevented incarcerating or punishing a sexual

25  assault victim for refusing to testify.  On February 15, 2006, Petitioner was convicted on all five

26  counts.  (CT 195-99.)  On February 16, 2006, following a bifurcated trial, the jury returned true

27  findings on the enhancement allegations.  (RT 202-03.)  A motion for a new trial was denied on

28  June 9, 2006, and Petitioner was sentenced on July 14, 2006.  (RT 373-75.)

Petitioner appealed, raising Claims 1-4 presented here.  (Lodgment Nos. 1, 30.)  On October 31, 2007, the state appellate court, in a published opinion, reversed the conviction on the basis that state law does not excuse sexual assault victims from the ordinary duty to testify when subpoenaed, and they may be punished for refusing to testify, thus, in failing to take the victim into custody after she refused to voluntarily appear at trial, the prosecution had not used "every reasonable means" to secure the attendance of "an essential witness" whose "appearance was crucial."  People v. Cogswell, 68 Cal.Rptr.3d 28, 40-41 (Cal.App.Ct. 2007), reversed by People v. Cogswell, 48 Cal.4th 467 (2010).  The California Supreme Court reversed, finding that the prosecution had in fact exercised reasonable diligence in attempting to secure the victim's attendance at trial, in that the prosecutor was in a unique position to determine that taking the victim into custody would not have altered her resolve to refuse to testify, and since state law provides that sexual assault victims cannot be held in contempt and jailed until they agree to testify, the prosecutor reasonably concluded it would have been a waste of time and resources to have her taken into custody.  People v. Cogswell, 48 Cal.4th 467, 478-79 (2010).  The case was remanded for consideration of Petitioner's other claims, which had not been addressed by the appellate court.  Id. at 480.

On remand, the appellate court denied Claim 2-4 on their merits and affirmed the conviction in an unpublished opinion filed on August 12, 2010.  (Lodgment No. 4.)  Petitioner's subsequent petition for review was denied by the California Supreme Court on December 6, 2010.  (Lodgment Nos. 5-6.)  His petition for a writ of certiorari was denied by the United States Supreme Court on June 6, 2011.  Cogswell v. California, 131 S.Ct. 2961 (2011).

Petitioner filed a habeas petition in the superior court on January 18, 2011, raising Claim 1 presented here, along with a claim (not presented here) which involved the difference between a general and specific intent crime.  (Lodgment No. 10.)  The appellate court denied the habeas petition on March 4, 2010, on the basis that the state supreme court had already rejected Claim 1, and because the general/specific intent claim should have been raised on direct appeal.  (Lodgment No. 11.)

/ / /

On July 12, 2011, after Petitioner initiated this federal habeas action, he filed a second habeas petition in the state superior court raising Claims 5-8 and 11. (Lodgment No. 12.) The superior court denied relief on September 21, 2011, on the basis that: (1) the claims should have been raised on direct appeal; (2) they were improperly presented in a successive habeas petition; and (3) Petitioner had failed to make a prima facie showing of specific facts which would entitle him to relief. (Lodgment No. 13.)

Petitioner filed a habeas petition in the state appellate court on December 1, 2011, in which he raised Claims 5-11 presented here. (Lodgment No. 14.) That petition was denied on December 20, 2011, on the basis that: "Petitioner has failed to include *any* documentation supporting his contentions. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)" (Lodgment No. 15) (italics in original). This Court granted Petitioner's motion for stay and abeyance on December 20, 2011, and stayed this action for the purpose of allowing Petitioner to exhaust his state court remedies as to Claims 5-11. (ECF No. 16.)

On February 27, 2012, Petitioner filed another habeas petition in the appellate court in which he again presented Claims 5-11, but in which he also provided record citations in support of the claims. (Lodgment No. 16.) That petition was denied by an order filed on March 22, 2012, in which the state appellate court addressed the merits of Claims 5-8 and 11, but declined to address Claims 9 and 10 (related to the failure to instruct on lesser included offenses) on the basis that they had not been presented to the trial court. (Lodgment No. 17.) On August 10, 2012, Petitioner filed a habeas petition in the state appellate court in which he again presented Claims 9-10, and explained that they had in fact been addressed by the trial court during the trial. (Lodgment No. 20.) That petition was denied on September 6, 2012, on the basis that Claim 10 should have been raised on direct appeal, and because Petitioner had failed to show he was prejudiced as a result of trial counsel's failure to request jury instructions on lesser included offenses as alleged in Claim 9. (Lodgment No. 21.)

Petitioner filed a habeas petition in the state supreme court on November 13, 2012, raising Claims 5-11 presented here. (Lodgment No. 22.) The petition was summarily denied on January 30, 2013, without citation of authority or a statement of reasoning. (Lodgment No. 23.)

### III.

### EVIDENCE ADDUCED AT TRIAL

The preliminary hearing testimony of Lorene B., the victim in all five counts charged against Petitioner, was read to the jury in lieu of her live testimony, after the trial judge ruled that the prosecution had exercised reasonable diligence in attempting to secure her attendance at trial, but that she had refused to appear and was therefore an unavailable witness. (Lodgment No. 29, Reporter's Tr. ["RT"] at 81.) Her direct testimony was read to the jury by the prosecutor, and her cross-examination, which was more than twice as long as her direct testimony, was read to the jury by defense counsel, followed by very brief redirect and re-cross. (RT 202-72.)

Lorene, who is deaf, testified at the preliminary hearing that she was acquainted with Petitioner, who is also deaf, and that she met him though her best friend Crystal G., who is the mother of Petitioner's children and is also deaf. (RT 208-09.) On June 9, 2004, Lorene was living in Colorado (as she was at the time of trial), but was on vacation in California, staying with friends in Riverside. (RT 225-26.) Lorene had known Petitioner for about two years, had seen him five or six times during those two years, and was aware that as of June 2004, Petitioner and Crystal were no longer romantically involved. (RT 226, 272.)

Around 5:00 p.m. on June 9, 2004, Lorene, accompanied by her sister and her sister's children, drove to an apartment in San Diego where Petitioner lived with his sister Henrietta. (RT 202-06.) Lorene said she stopped by to visit Henrietta because she and Henrietta were friends, and in order to give Henrietta a candlestick which Henrietta had used on at least one occasion to conceal less than a quarter-once of marijuana and mail to Lorene. (RT 246-47.) The apartment was small; Petitioner slept in the living room, and the bedrooms were occupied by Henrietta, her boyfriend, and her sister. (RT 230.) Petitioner was alone at the apartment when Lorene arrived, and after a brief conversation, she left with her sister and her sister's children and drove back to Riverside. (RT 203, 227.)

Later that evening, Lorene began to receive "instant messages" on her pager from Petitioner begging her to return to San Diego to talk about Petitioner's children, promising to pay for the gas, and telling her he would meet her in the parking lot of his apartment building.

(RT 203-06, 229.)  Lorene said she believed the matter was urgent, as she knew that Crystal and Petitioner did not get along, so she drove down from Riverside, arriving in San Diego about midnight.  (RT 205-06, 231.)  Lorene parked in the apartment lot, saw Petitioner, waived him over, and asked him in sign language (they both used sign language to communicate throughout the encounter), what he wanted.  (RT 206-07, 210-11.)  Petitioner did not say anything, which made the encounter awkward, and Lorene asked if Henrietta was there.  (RT 207.)  Petitioner said Henrietta was sleeping, and there was another awkward pause.  (Id.)

Petitioner then unexpectedly kissed Lorene on the mouth.  (RT 208, 231.)  She asked him why he had done that, and he pushed himself up against her body and pushed her against her car.  (RT 208.)  Lorene asked if he was drunk; although she did not smell alcohol, she thought he was acting drunk because they had never had a romantic relationship and her best friend was the mother of his children.  (Id.)  Lorene was in a state of shock and pushed Petitioner away; he told her he wanted to talk to her in private, and told her to "get into the car."  (RT 208, 233.)

Lorene sat in the driver's seat with Petitioner in the passenger seat.  (RT 209.)  She felt uncomfortable and "a little paranoid," so she opened the driver's door, and then asked Petitioner why he had kissed her and what he wanted to talk about.  (Id.)  Petitioner lit a cigarette, but immediately extinguished it and apologized based on a look he was given by Lorene.  (Id.)  Petitioner then jumped on Lorene and pushed the top part of her seat down so it was laying flat.  (Id.)  He put his hand down the front of her pants and she could feel his fingers on the outside of her underwear; he bit her breast, kissed her face and neck, and tried to remove her pants.  (RT 210.)  Lorene testified that, "I felt like he was torturing me," and she told him to "take it easy," and pushed him away because "it was nothing I wanted [and] I didn't feel right."  (RT 210-11, 240.)  Petitioner refused to listen, continuously told her "to shut up," and put his hand further down her pants.  (RT 211.)  She said she could not imagine that he could do anything like that to her since she was so close to Crystal, and she told him "you need to respect me."  (Id.)

Petitioner then began taking off his clothes.  (RT 211, 213.)  He asked Lorene to take off her clothes, and she told him, "I don't want to do that."  (RT 211.)  He told her to shut up and that it would be quick.  (Id.)  Lorene said she was frightened and "really scared," and although

she did not want to do so, she took off her clothes because Petitioner "was in her face, and he kept telling me to do that . . . and I thought maybe that would calm him down if I were to do what he asked." (RT 212.) They were both naked and Petitioner pulled her on top of him so that they were face to face in the front passenger seat with her straddling him. (RT 213.) She was uncomfortable, struggling against him; she did not want to be there and they began arguing, with her telling him, "I didn't want to do this and that the three of us are friends and it didn't feel right." (Id.) Petitioner continued to tell her to shut up; he told her that he thought Lorene and Crystal were lovers, and "wanted the three of us to have a three-way." (Id.) She told him no, and she continued to struggle as he inserted his fingers and penis into her vagina. (RT 213-14.) Petitioner was much bigger, and "he was very horny and aroused." (RT 214.)

Lorene managed to extricate herself from Petitioner's grasp and climb into the back seat. (Id.) She said she went to the back seat because she was getting hurt, and in order to avoid him and to stop their encounter. (RT 215.) Petitioner followed her into the back seat, told her, "I know you are gay, but you know you like men." (Id.) She was very tired and needed to use the bathroom, and she told Petitioner that they needed to stop and she needed to go home. (RT 215.) Petitioner said, "Oh, you want to go home? Well, you can suck my penis." (Id.) She then orally copulated him because, "I was thinking, well, you know, maybe if I do that, then I can go home." (RT 215-16.) Petitioner guided her head to his penis and told her, "I'll teach you how to have sex the right way." (RT 216.)

Lorene said that Petitioner fell asleep and lost his erection while she was orally copulating him, and she thought they were done and she could go home, but as she leaned forward to retrieve her clothes from the front seat, Petitioner woke up and pulled her back on top of him. (RT 216-17.) He held her arms above her head "like a wrestling hold," and they struggled as he attempted to insert his penis in her vagina. (RT 217.) He penetrated her vagina with his penis and "was being really fast and really rough . . . like he had no regard for my body." (RT 217-18.) She was struggling, and then she "was out," and the next thing she knew she woke up and it was daylight outside. (RT 218.) She woke up "sitting up in this really weird position with my neck hanging in an awkward angle," with Petitioner laying on the back seat naked. (Id.)

Lorene woke Petitioner, who began talking to himself; she and Petitioner were both disoriented, and as she began putting her clothes on, he got on top of her and tried to go back to sleep. (RT 218-19.) She pushed him off and told him they needed to dress because people could see them, but he went back to sleep. (RT 219.) She dressed, and after a few minutes he woke and put on his clothes. (Id.) When she told him she was going to drive home, he offered to pay for her gas, so he drove them in her car to a gas station, stopping at a bank on the way. (RT 219-20.) When she went to use the restroom at the gas station, Petitioner followed her into the single-occupant bathroom and wanted to have sex again, and she told him no. (RT 220-21.) Petitioner paid for the gas and she drove them back to his apartment. (RT 221.) He asked her to drive to the back parking lot of his apartment building, where he told her "to keep your mouth shut about this," because he did not want Crystal to find out. (Id.)

Lorene testified that she felt she had been raped, and when she asked Petitioner why he had done this to her he kept telling her to shut up. (RT 221-22.) Petitioner exited the car from the front passenger seat but got into the back seat, and Lorene testified that, "I thought, oh, no, not again," so "I got out of the car because enough was enough." (RT 222.) Petitioner was angry and ordered her to get back into the car; she asked him what he wanted and he said he just wanted to talk. (Id.) She got into the back of the car because she was frightened. (Id.) She said it was clear to her that he wanted sex again, and he asked her if she was satisfied. (RT 223.) She said "yes," but he said "well, you're satisfied, but I haven't had enough. I need more." (Id.) Petitioner started pulling her pants off and said "this will be quick," and Lorene told him it was light out and people would see them. (Id.) Petitioner unzipped his pants and inserted his penis in her vagina. (RT 224.) Petitioner ejaculated on the car seat, and told her again not to say anything. (RT 224, 253.) They had a "surface conversation," and Petitioner said, "I love you." (Id.) Lorene said "love you and goodbye" in return because she "just wanted this to be done," and she left. (Id.)

Two days later Lorene had an email conversation with Crystal in which Lorene told Crystal she felt she had been raped, which was the first time Lorene told anyone about what happened. (RT 255-56.) Although Lorene did not mention Petitioner, Crystal asked whether

he was the rapist, and when Lorene told her yes, Crystal recommended she go to the police.  (RT 256, 260.)  The next day, Lorene, Crystal, and Petitioner engaged in an electronic "chat room" discussion in an effort to work things out because Lorene did not want Petitioner to go to jail, and because she "thought maybe there would be a rehab program or something."  (RT 256, 267-68.)  Lorene contacted the police the next day.  (RT 260, 267-68.)  Lorene said Crystal became bitter about the incident and their friendship ended about two weeks later.  (RT 259-60.)

Crystal G. testified at trial, with the aid of an American Sign Language interpreter, that she first met Petitioner in 1996 when they were both students at Gallaudet College.  (RT 287.)  Although they did not have a dating relationship at college, they had sex together.  (RT 288-89.)  Crystal said that within two weeks of getting to know each other, Petitioner began physically abusing her.  (RT 289.)  She reported the abuse to the police on November 1, 1996, and he was expelled from Gallaudet.  (RT 289-90.)  Crystal dropped out of Gallaudet shortly thereafter, about a week before her final exams, due in part to injuries she received from Petitioner.  (RT 290-92.)  She went to live with Petitioner at his parents' house in New York after being assured by Petitioner that if she came there "things would be better."  (RT 292.)  Things were not better in New York, and the violence increased.  (RT 292-93.)  Crystal said that Petitioner hit her every day in New York, sometimes with his belt, and that she felt isolated.  (Id.)

In January of 1997, Crystal left New York after someone other than herself reported Petitioner's abuse to the police; she went to stay with her father in Texas for a short time, and moved to San Diego in February of 1997.  (RT 293-94.)  When she was in San Diego she informed Petitioner that she was pregnant with his child, and he came to visit her in early February of 1997.  (RT 294-95.)  Crystal said she was afraid of Petitioner, and insisted that he not visit her alone, so he brought his cousin Roy with him.  (RT 295, 297.)

When Petitioner arrived at her apartment in San Diego, he told Crystal she had a choice, either have sex with him or be abused.  (RT 299.)  She suggested they go for a walk around her apartment complex "so he could cool off."  (Id.)  During their walk, Petitioner asked her if she wanted to have sex, and she told him no.  (Id.)  They were outside in the open near the side of the apartment complex when Petitioner "commanded" her to take off her pants.  (RT 299-300.)

She took off her pants because she was afraid Petitioner would hurt her, and they had intercourse.  (RT 300.)  Crystal, Petitioner and Roy then drove to Riverside in Roy's truck to visit Roy's parents, where Petitioner was staying; Crystal spent that night in Roy's parents' living room while Petitioner slept in the attic.  (RT 301-02.)

The next day, Crystal and Petitioner visited Petitioner's grandparents in Riverside, after which Petitioner drove himself and Crystal back to San Diego.  (RT 302-03.)  On the trip back, Petitioner said he was tired and pulled into a church parking lot in Sun City, California, where they slept and had sex.  (RT 303.)  Crystal testified that when they were in the church parking lot Petitioner hurt her, told her to remove her pants, and forced her to get on top of him and have sex in the front seat of the car.  (RT 304-05.)

They woke up in the parking lot early the next morning and drove to San Diego.  (RT 309.)  When they arrived in the parking lot of Crystal's apartment building, Petitioner "really wanted to have sex," but Crystal told him she did not want to do it and was not in the mood.  (RT 311.)  While they were still in the car and the sun was coming up, Petitioner ordered her to take her clothes off and told her to orally copulate him, which she did even though she did not want to, because she was afraid he would hurt her if she did not.  (RT 311-12.)  Later that day they drove back to Riverside to attend a basketball game, and when they returned to Crystal's apartment that evening, they had sex in her bathroom because Petitioner "told me to."  (RT 313-15.)  They went to see a doctor about her pregnancy the next day, and she told a prenatal counselor that Petitioner had abused her and raped her and forced her to have sex.  (RT 315-16.)  The counselor notified the police, and Petitioner was arrested based on a statement Crystal gave to the police stating that Petitioner had raped her.  (RT 316.)  At the preliminary hearing on those charges, she denied that she told the police that Petitioner had raped her, and used the term "sexual harassment" at the preliminary hearing to describe Petitioner's conduct because he had asked her to use that term rather than the word rape.[3]  (RT 317-19.)

---

[3]  On March 18, 1997, Petitioner was charged with four counts of forcible rape and four counts of battery of a former significant other arising from his encounter with Crystal on February 9-11, 1997.  (Lodgment No. 28, Supp. Clerk's Tr. at 2-4.)  On August 13, 1997, he entered a guilty plea to one count of forcible rape and was sentenced to six years in prison.  (Id. at 6-9.)  He violated the terms of his parole on two occasions, by failing to register as a sex offender and smoking marijuana.  (RT 347; CT

After Petitioner was convicted of forcible rape and sent to prison, Crystal recanted and told the prosecution investigator that she had lied and that Petitioner had not raped her. (RT 320.) Crystal testified in the instant case that she had in fact been raped by Petitioner, and that she had falsely recanted in her own case because she did not like that Petitioner was sentenced to six years in prison, as she had expected he would be sentenced to about a year, and because she was concerned about how rapists are treated in prison. (RT 320-21.) She was also concerned because they have a deaf son together and are a deaf family, and as the deaf community is very small, her accusations would negatively influence her relationships with her friends and Petitioner's relatives. (RT 321.) She admitted she had executed a declaration under penalty of perjury in support of Petitioner's state habeas petition in relation to his conviction for raping her, in which she falsely stated that he had not raped her. (RT 322.)

Crystal stated that she had visited Petitioner about 25 times while he was incarcerated after being convicted of raping her, and began seeing him again in secret after he had been released although a condition of his parole was that they not have contact. (RT 346-48.) In a non-responsive answer, Crystal said Petitioner had violated his parole and "went to jail again for drugs," and that she became pregnant with their second child after his release. (RT 346.) Defense counsel's objection was sustained, and the jury was instructed to disregard Crystal's testimony about Petitioner's drug use and his return to prison. (RT 347.)

Crystal testified that she met Lorene B. when Crystal was in high school, and they became casual acquaintances, and later became friends after they met again in 1997 when they both gave birth. (RT 322-24.) Lorene moved to Colorado but came to visit Crystal in San Diego a few times in 2004. (RT 324-25.) Sometime in June of 2004, Lorene sent Crystal an instant message saying she thought she had been raped. (RT 326.) Crystal asked Lorene if it was Petitioner who had raped her, or suggested to her that she thought it might have been Petitioner, because Crystal and Petitioner had argued about rape just the day before, after Petitioner had brought the subject up "out of the blue." (RT 326-29.) Crystal asked Lorene why she had not called the police if she had been raped. (RT 329.) Lorene told her that reporting it to the police

---

43.)

was hard because of the connection between the family and the deaf community, and that it would have been easier for her to report it if the rapist had been someone other than Petitioner. (RT 329-30.)  Crystal said she did not speak to Lorene much after that incident, and Crystal broke off her relationship with Petitioner on Valentine's Day of 2004.  (RT 334, 355-56.)

Detective David Schaller, an investigator for the San Marcos Sheriff's Department, testified that Lorene is a small woman, standing five-feet, one-inch tall, and weighing about 110 pounds.  (RT 357.)  Schaller interviewed Petitioner on June 13, 2004, in response to Lorene's rape allegation, and noticed that Petitioner had scratches on his arms, head, face, legs and back, and a large bruise on his leg; photographs of Petitioner's body taken at that time were introduced into evidence.  (RT 357-62.)  The People rested.  (RT 363.)

Raymond Trybus, the Executive Director of Deaf Community Services of San Diego, testified regarding the nature of the deaf community and the ability of deaf persons, who number about 500,000 in the United States, to become educated and communicate with each other and with non-deaf persons.  (RT 400-19.)  He said it was generally believed throughout most of history that deaf persons could not be educated, and that Gallaudet University, which was established by Abraham Lincoln in 1865, was the first opportunity for college-level education for the deaf.  (RT 402-05.)  He said that American Sign Language is not the same as English, as it has its own grammar and structure, and there is a long-running debate whether it is better to educate deaf persons through the use of a sign language, or with a spoken language like English through lip reading and speech reading.  (RT 403-15.)  He said that nearly all deaf people who graduate college still read English at a fourth grade level, which precludes their use and understanding of non-literal, idiomatic expressions, such as baseball metaphors in business settings, because ninety percent of learning how to communicate in a spoken language such as English is through talking and hearing.  (Id.)

Diane Spencer testified that she is a social worker and had interviewed Lorene on one occasion in connection to Lorene's arrest for driving under the influence of alcohol.  (RT 420-21.)  Spencer said that Lorene told her that the incident arose because she was "parked in the wrong spot," but the police report indicated that she had fallen asleep at the wheel because she

was drunk.  (RT 421-22.)  Spencer concluded that Lorene was deceitful and had not told her the truth about the incident.  (RT 422.)  Julio Medina testified that Lorene is the mother of his child, and that she had once falsely accused him of molesting their child, and had repeated the false allegation to "a lot" of people.  (RT 441.)

Henrietta Cogswell, Petitioner's sister, testified that in June of 2004, Petitioner was staying with her in her two-bedroom, two-bathroom apartment, which she shared with her three cats and a Rottweiler dog.  (RT 446-47.)  She testified that on the days following the incident with Lorene, she did not see any fresh scratches or bruises on Petitioner, and that the scratches and bruises which Petitioner exhibited in the photographs introduced into evidence by Detective Schaller, which were taken about three days after Petitioner's encounter with Lorene, were caused by her dogs and cats.  (RT 447-51.)

The defense rested and there was no rebuttal.  The jury asked to have Lorene's testimony read to them during deliberations, and returned guilty verdicts on all counts after deliberating for one full day.  (CT 360-62.)  Petitioner was found guilty of three counts of forcible rape, one count of forcible oral copulation, and one count of forcible sexual penetration by a foreign object (to wit, his finger).  (CT 362-63.)  A bifurcated jury trial which lasted about half an hour was held on the sentence enhancement allegations.  (RT 575-89.)  After deliberating for about an hour, the jury returned true findings that Petitioner had been previously convicted of forcible rape and therefore qualified as a habitual sex offender, that he had not remained free of custody or free of a felony conviction for ten years following the prison term he had served for the prior forcible rape conviction, and that he had suffered a prior serious felony conviction which constituted a "strike" within the meaning of California's Three Strikes law.  (RT 592-94.)

About six weeks after the trial, defense counsel filed a motion for a new trial based on juror misconduct, supported by the declarations of Juror No. 9 and Juror No. 10.  (CT 270-80.)  Juror No. 9 said that he and Juror No. 8 ran into Detective Schaller at the elevators during a recess, where Juror No. 8 mentioned to the detective that he was confused about the case.  (CT 278.)  Schaller told them that "he wished he could sit down with us and tell us more about the case," leaving Juror No. 9 with the impression that Schaller had negative things to say about

Petitioner.  (Id.)  Juror No. 9 also said that Juror No. 8 brought up Schaller's comment during deliberations, prior to any vote having been taken, and the jurors agreed not to mention it to the trial judge.  (Id.)  Juror No. 9 stated in his declaration that, "I think the comment the police detective made had an influence in changing my vote from not guilty to guilty." (CT 279.)

Juror No. 10 provided a declaration stating that in the first ten minutes of deliberations another juror said that Schaller had said, "I wish I could have said more." (CT 281.)  Juror No. 10 said he thought Schaller's statement could impact the other jurors, so he pointed out that it was more likely that Schaller was just annoyed at coming to court to testify for two minutes. (Id.) After the verdicts were delivered, he asked the foreman if they should notify the trial judge, but the foreman stated that it was not necessary, as the comment had not been mentioned after the first few minutes of deliberations and had not influenced their deliberations.  (Id.)

The trial judge held a hearing on the new trial motion at which Juror Nos. 8, 9 and 10 testified, along with Detective Schaller.  Juror No. 8 testified that as he and Juror No. 9 were leaving for the day they ran into Schaller at the elevators outside the courtroom.  (RT 601-02.) Juror No. 8 testified that he initiated the contact with Schaller by saying it was a beautiful day, that they were going home early, and he (Juror No. 8) will get to wash his car. (RT 603.)  When asked what Schaller said, Juror No. 8 testified, "I don't remember exactly, but it was like, I wish I could say something to you too." (Id.)  Juror No. 8 and Juror No. 9 then got into the elevator with nothing else said.  (Id.)  Juror No. 8 told the jury foreman during deliberations what had transpired, but the foreman said, "That has no bearing on anything.  Don't worry about it." (RT 604.)  Juror No. 8 expected Juror No. 9 to say something, but he remained silent.  (RT 605.)

Detective Schaller testified at the new trial motion that during a break in the proceedings immediately after he testified, he was standing by the elevators just outside the courtroom when he was addressed by one of the jurors.  (RT 609-10.)  The juror attempted to exchange pleasantries by speaking about the weather, and Schaller "explained to him that I didn't want him to perceive that I was being rude.  I explained to him, listen.  You understand I can't talk to you.  I wish I could but I can't." (RT 610.)  The juror "immediately said that he understood that," and the juror "cut it off right there." (RT 610-11.)  Schaller explained that he told the juror

that he wished he could talk to the juror because he thought he was being rude by not speaking to the juror.  (RT 617.)  He said in hindsight he probably should have reported the contact to the trial judge, but he did not do so because at the time he made the assumption that the exchange was insignificant.  (RT 612-13.)

Juror No. 9 testified that, "Juror No. 8, myself and the detective were walking towards the elevators for recess," when Juror No. 8 made a comment about the weather.  (RT 626.)  As Juror No. 9 went to press the elevator button, Juror No. 8 mentioned to Schaller that he "was confused about everything that was going on in the case."  (Id.)  Juror No. 9 said he did not think it was a proper comment to make, but did not say anything at the time.  (RT 627.)  Schaller replied that "he wished he could have a sit-down with all of us and tell us more about the questioning that he had - - or the information that he had in regards to the day that he had questioned [Petitioner]."  (RT 628.)  Juror No. 9 thought that Juror No. 8 then realized that he should not have spoken to Schaller, and nothing else was said by anyone.  (Id.)  Juror No. 9 said that at the beginning of deliberations, before a vote had been taken, Juror No. 8 told the entire jury that Schaller had said that "he wished he could sit down with all of us and tell us more about the case."  (RT 629.)  Juror No. 9 testified that he was surprised when Juror No. 8 told the jury about the comment, as he hoped it would not come out, so Juror No. 9 told the jury, "I don't know what you are talking about," and the foreman "kind of just played it off and . . . tried to dismiss it and continue with - - with the vote."  (RT 630.)  Juror No. 9 said he did not report it to the trial judge because the foreman said it was not necessary to do so, and that the incident was not mentioned again until the foreman was signing the verdict forms when Juror No. 10 asked the foreman if they should report Schaller's comment to the trial judge, but everyone agreed it did not need to be reported.  (RT 632-33.)

Juror No. 10 testified that during deliberations another juror said, "That detective told me that he sure wished he could have said more."  (RT 2757.)  Juror No. 10 said he was the first one to comment, and said, "Whoa. Hang on. I don't think you should be telling us this, and he probably should not have - And he certainly should not have spoken to you."  (Id.)  Juror No. 10 then told the jurors, "He could have meant that he just was kind of angry that he came here

and only spoke for three minutes," which was met by a general nod of approval by some of the other jurors.  (Id.)  The topic was not mentioned again until after the deliberations were over and the verdicts were sealed, at which time Juror No. 10 asked the jury foreman if they should mention the incident.  (RT 2758.)  The foreman "basically kind of brushed it off like no. That didn't really matter. It never came up. You know, we already - we already dismissed that particular - you know, the pictures and what he had basically been testifying to."  (Id.)

The trial judge found that the contact between Detective Schaller and Juror No. 8 at the elevator amounted to misconduct, that the misconduct was brought to the attention of the jurors at the outset of deliberations, and that it was handled appropriately by the jury because it did not arise again during their deliberations.  (RT 2776-77.)  The trial judge denied the motion for a new trial based on a finding that the misconduct did not "rise to the level that it affected the outcome of the verdict."  (RT 2777-78.)  Petitioner was then sentenced to separate terms of 25 years-to-life on counts one, two, four and five, doubled as a result of the finding that he was a habitual sex offender, with counts one and five ordered to run consecutive and counts two and four concurrent.  (RT 2787-89.)  A five-year consecutive term was added for the strike prior, for a total of 105 years-to-life, with sentences on the other enhancements stayed.  (Id.)

## IV.

## PETITIONER'S CLAIMS

(1)     Petitioner's right to confront and cross-examine a witness against him as guaranteed by the State and Federal Constitutions was denied by the trial court's erroneous ruling that the prosecution had exercised due diligence in attempting to secure the attendance at trial of the complaining witness, who was therefore erroneously found to be an unavailable witness, and by the subsequent use of her preliminary hearing testimony as the primary evidence against him.  (FAP at 3, 13-39.)

(2)     Petitioner's Fourteenth Amendment right to due process was violated by the introduction of Crystal's testimony regarding uncharged sexual offenses.  (FAP at 3, 39-49.)

(3)     Petitioner's Sixth Amendment right to trial by unbiased, impartial jurors was violated due to witness and juror misconduct arising from the interaction between the jurors and

the trial witness outside the courtroom.  (FAP at 3, 49-65.)

(4)     The cumulative effect of the trial errors undermined the fundamental fairness of the trial in violation of the Fifth, Sixth and Fourteenth Amendments.  (FAP at 3-4, 65-66.)

(5)     Petitioner's sentence constitutes cruel and unusual punishment under the State and Federal Constitutions.  (FAP at 4, 67-71.)

(6)     Petitioner's right to a fair trial and to due process under the Fifth and Fourteenth Amendments was violated by the introduction of evidence of his past arrest and incarceration for drug use, and that he had been on parole.  (FAP at 4, 71-76.)

(7)     Petitioner received ineffective assistance of counsel when his trial counsel failed to request a mistrial due to introduction of evidence regarding his past drug use and parole status.  (FAP at 4, 76-77.)

(8)     Petitioner received ineffective assistance of counsel when his trial counsel elicited information about Petitioner's prior drug use and parole status.  (FAP at 4, 78-79.)

(9)     Petitioner received ineffective assistance of counsel when his trial counsel failed to request a jury instruction on lesser included offenses.  (FAP at 4, 79-83.)

(10)    The trial court erred in failing to instruct the jury sua sponte on lesser included offenses.  (FAP at 4, 83-84.)

(11)    The cumulative effect of the errors produced a fundamentally unfair trial in violation of due process.  (FAP at 4, 84-85.)

## V.

## DISCUSSION

For the following reasons, the Court finds that the adjudication by the state court of Petitioner's claims did not involve an objectively unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The Court also finds that an evidentiary hearing is unnecessary because Petitioner's claims can be adequately addressed based on the current state of the record.  The Court therefore **RECOMMENDS** the Petition be **DENIED** without holding an evidentiary hearing.

/ / /

**A.     Standard of Review**

Title 28, United States Code, § 2254(a), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. A decision may also involve an unreasonable application "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United

1   States Supreme] Court's decisions . . ." Williams, 529 U.S. at 412.  In order to satisfy section

2   2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which

3   the state court's adjudication of his claims rest, assuming it rests upon a determination of the

4   facts, are objectively unreasonable.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

5   **B.    Claim 1**

6        Petitioner alleges in his first claim that his right to confront and cross-examine the victim,

7   Lorene B., as protected by the State and Federal Constitutions, was denied by the trial court's

8   erroneous ruling that the prosecution had exercised due diligence in attempting to secure her

9   attendance at trial, which then permitted her preliminary hearing testimony to be read to the jury

10  in lieu of her live testimony because she was an unavailable witness.[4]  (FAP at 3, 13-39.)

11       Respondent contends that the state supreme court's reasoned denial of this claim on the

12  merits did not involve an objectively unreasonable application of clearly established federal law.

13  (Ans. Mem. at 18-27.)  Claim 1 was denied on the merits by the California Supreme Court in a

14  published opinion on direct appeal:

15           Defendant was accused of sexually assaulting Lorene B., a Colorado
16       resident, while she was vacationing in California.  Lorene returned to California
         to testify at defendant's preliminary hearing, where she was thoroughly
17       cross-examined by defense counsel.  Based on that testimony, defendant was held
         to answer on the charged sexual offenses.

18
19           Because Lorene had previously been cooperative, the prosecution had not
         subpoenaed her to testify at defendant's California trial.  On the date of trial,
20       Lorene told the prosecution she would not testify against defendant.  Without
         Lorene's testimony at trial, the prosecution could proceed against defendant only
21       if it could use, as evidence of defendant's guilt, the testimony that Lorene had
         previously given at the preliminary hearing.
22

23
_____

24       [4] Many of Petitioner's claims allege violations of state and federal legal principles.  As discussed
    in connection to Claim 2 below, the Court will not address Petitioner's state law claims because he has
25  not alleged facts which demonstrate that the state court made errors so serious that they rise to the level
    of a federal constitutional violation on their own.  See Lewis v. Jeffers, 497 U.S. 764, 780 (1990)
26  ("federal habeas corpus does not lie for errors of state law."), citing Donnelly v. DeChristoforo, 416 U.S.
    637, 643 (1974) (holding that absent a specific federal constitutional violation, federal habeas review
27  of a state trial error is limited to whether the error "so infected the trial with unfairness as to make the
    resulting conviction a denial of due process.")
28

Because the prosecution could not show that it had used reasonable diligence in securing Lorene's attendance at defendant's trial (Evid. Code, § 240, subd. (a)(5)), and because without such a showing it could not use at trial the testimony that Lorene had given at the preliminary hearing, it asked the trial court to dismiss the case.  A new complaint against defendant was then filed.  The parties stipulated that defendant could be held to answer on the complaint and that the complaint could be deemed the information.  The case was set for trial on December 20, 2005.

On November 2, 2005, the prosecution asked the San Diego Superior Court that, in accordance with the Uniform Act, a request be made to the Denver District Court in Colorado for the issuance of a subpoena to Lorene.  The court did so.  As required under the Uniform Act, the subpoena request was accompanied by a round-trip airplane ticket from Denver to San Diego, plus a daily allowance for food and hotel expenses.

In mid-December 2005, the San Diego Superior Court vacated the December 20 trial date, and set a new trial date for January 31, 2006.  On December 20, in a telephone call to the prosecution in California, Lorene said she would not testify at defendant's trial.  Thereafter, the prosecution made no further efforts to contact Lorene, fearing that she would view this as " intimidation," and that if she were told about the new January 31, 2006, trial date *before* she had been subpoenaed she would try to evade service of the subpoena.  Instead, the prosecution again asked the San Diego Superior Court to have the Denver, Colorado court subpoena Lorene to appear as a material witness at defendant's San Diego trial, rescheduled for January 31, 2006.  Again, the request was accompanied by a round-trip airplane ticket to San Diego and a daily allowance for food and hotel expenses.  The prosecution did not request, as permitted under the Uniform Act, that Lorene be taken into custody and brought to San Diego to testify.

The Denver, Colorado, court issued the subpoena, and the Denver District Attorney then confirmed that the subpoena was served on Lorene on January 20, 2006, and that Lorene was given the requisite plane ticket and witness fees.

When on February 1, 2006, the first day of defendant's trial in San Diego, Lorene did not appear, the prosecution asked the trial court that, because Lorene was "unavailable as a witness" (Evid. Code, § 1291, subd. (a)) notwithstanding the prosecution's use of reasonable diligence in attempting to secure her presence (*id.*, § 240, subd. (a)(5)), the prosecution be allowed to use as evidence at defendant's trial Lorene's previously given preliminary hearing testimony.  The prosecutor explained: "(Lorene) has stated to me and to my investigator . . . that she has had as much of this matter as she can possibly handle.  (¶)  She's had contact from the family members of the defendant, from her prior friends.  Given the small nature of the deaf community, [FN1: Both defendant and Lorene are deaf] she lives in Colorado to escape what she has lived through here.  And she has emotional issues with coming back here to court.  She informed me prior to

yesterday at the last trial call that she would not be here." Defendant objected, unsuccessfully, that the prosecution had not used reasonable diligence to secure Lorene's attendance as a witness because of its failure to ask a Colorado court to order that, as allowed under the Uniform Act, Lorene be taken into custody and brought to San Diego to testify at defendant's trial. [¶ . . . ¶]

On appeal, defendant reiterated the argument he had made in the trial court that to show reasonable diligence in securing Lorene's presence at trial, the prosecution should have invoked the Uniform Act's custody-and-delivery provision. The Attorney General responded that the prosecution could not resort to that provision because Code of Civil Procedure section 1219's subdivision (b) (hereafter section 1219(b)) prohibits the confinement of a sexual assault victim who refuses to testify about the arrest. That provision states: "Notwithstanding any other law, no court may imprison or otherwise confine or place in custody the victim of a sexual assault . . . for contempt when the contempt consists of refusing to testify concerning that sexual assault. . . ." (*Ibid.*) [FN2: As discussed later, the Attorney General no longer argues that this provision barred the prosecutor from asking that Lorene be taken into custody under the provisions of the Uniform Act.]

The Court of Appeal reversed defendant's convictions, holding that section 1219(b) "does not . . . limit the power of a California court to utilize the custody and delivery provisions of the Uniform Act." The purpose of section 1219(b), the Court of Appeal stated, is to forbid the confinement of a sexual assault victim based on "a *finding of contempt* arising from a refusal to testify." (Italics added.) But, the court explained, the "custody and delivery provision of the Uniform Act is a device to assure the attendance of a witness at trial and not a punishment for contempt arising from a refusal to testify." Thus, the Court of Appeal held, section 1219(b) "did not forbid the use of the act's custody and delivery provisions to secure Lorene's attendance at trial."

The Court of Appeal further stated that because "the prosecution was on notice that it was highly probable Lorene would not return to California even if ordered by a court to do so," the prosecution did not use "every reasonable means to secure her attendance and, therefore, did not exercise reasonable diligence" in securing Lorene's presence at defendant's California trial. Therefore, the Court of Appeal concluded, the trial court erred in declaring Lorene unavailable as a witness and in allowing the prosecution to use at defendant's trial Lorene's preliminary hearing testimony. This error, the Court of Appeal held, was prejudicial, because without the use of that testimony at defendant's trial there was no evidence of his guilt.

We here consider the interaction among four statutes: the Uniform Act, which allows a prosecutor or a defendant in a criminal case to request that an out-of-state witness be subpoenaed and be taken into custody and transported to the prosecuting state in which trial is pending; Evidence Code sections 240 and 1292, which permit the use of prior testimony by an unavailable declarant; and Code of Civil Procedure section 1219(b), which prohibits the confinement of a

sexual assault victim for contempt based on a refusal to testify about the assault. A brief review of each follows.

### A.     The Uniform Act

The Uniform Act was initially approved by the National Conference of Commissioners on Uniform State Laws in 1931. The commissioners approved a revised version of the act in 1936, which California adopted in 1937. There are slight differences between the version of the Uniform Act adopted in Colorado (Colo. Rev. Stat. § 16–9–201 et seq.)—the state where sexual assault victim Lorene was living at the time of the trial in this case—and the version adopted in California (Pen. Code, § 1334 et seq.), but none is pertinent here.

Under the Uniform Act, as adopted in California, when a person located in a sister state that has also adopted the Uniform Act is a "material witness" in a "prosecution pending in" California, the judge of the court in which the prosecution is pending "may issue a certificate . . . specifying the number of days the witness will be required," which "shall be presented to a judge of a court of record in the county of such other state in which the witness is found." (Pen. Code, § 1334.3, subd. (a); see also Colo. Rev. Stat. § 16–9–203(1).) A witness who travels by airplane is compensated for the flight, and a small allowance is provided to cover the witness's expenses. (Pen. Code, § 1334.3, subd. (a); see also Colo. Rev. Stat. § 16–9–203(2).) The witness is paid statutory witness fees, is reimbursed "for any additional expenses of the witness which the judge . . . shall find reasonable and necessary" (Pen. Code, § 1334.3; the Colo. law does not contain this requirement), and may not be arrested or served with legal documents while present in the state where the witness is testifying (Pen. Code, § 1334.4; see also Colo. Rev. Stat. § 16–9–202(2)).

Under the Uniform Act, a sister state court that receives a certificate described in the preceding paragraph must direct the witness named on the certificate to appear at a hearing. (Pen. Code, § 1334.2; see also Colo. Rev. Stat. § 16–9–202(1).) If at that hearing the sister state court "determines that the witness is material and necessary, that it will not cause undue hardship to the witness to be compelled to attend and testify" (Pen. Code, § 1334.2), that "the laws of the state in which the prosecution is pending" will give the witness protection from arrest while the witness is present, and that the witness will be paid the fees mentioned in the previous paragraph, the court "shall issue a subpoena . . . directing the witness to attend and testify in the court where the prosecution is pending" (*ibid.*; see also Colo. Rev. Stat. § 16–9–202(2)).

At issue here is a provision of the Uniform Act that permits a party in a criminal case to ask the trial court to "recommend( ) that the witness be taken into immediate custody and delivered to an officer of this state to assure his or her attendance in this state" (Pen. Code, § 1334.3, subd. (a); see also Colo. Rev. Stat. § 16–9–202(3)), and that gives the court in the state where the witness is located the power to act upon that recommendation. This provision of the Uniform Act

mirrors statutes in California and in most states allowing a trial court to order the confinement of material witnesses to ensure their presence at trial. (See Pen. Code §§ 879, 881, 882; Studnicki, *Material Witness Detention: Justice Served or Denied?* (1994) 40 Wayne L.Rev. 1533.)

B.    Evidence Code sections 240 and 1291

Hearsay evidence, which is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated" (Evid. Code, § 1200), is generally inadmissible in California (*id.*, subd. (b)).  But there are several statutory exceptions.  Pertinent here is the one that allows admission at trial of a person's former testimony if that person is "unavailable as a witness" and "(t)he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has" at trial.  (*Id.*, § 1291, subd. (a).)  A witness is considered to be unavailable if "the proponent of his or her statement has exercised *reasonable diligence* but has been unable to procure his or her attendance by the court's process."  (*Id.*, § 240, subd. (a)(5), italics added.)

C.    Code of Civil Procedure section 1219

Code of Civil Procedure section 1219, originally enacted in 1872, provides that when a person has been found in contempt of court for refusal to perform an act that the person is capable of performing, the court may order the person jailed until that act is performed. (*In re Mark A.* (2007) 156 Cal.App.4th 1124, 1143 (68 Cal.Rptr.3d 106).)  Subdivision (b), added to section 1219 in 1984, stated at the time of defendant's trial in this case: "Notwithstanding any other law, no court may imprison or otherwise confine or place in custody the victim of a sexual assault for contempt when the contempt consists of refusing to testify concerning that sexual assault."  (Stats. 1993, ch. 219, § 69.7, p. 1587.) (After defendant's trial, the Legislature in 2008 amended section 1219(b) to include victims of domestic violence.)

In this court, the Attorney General has abandoned the argument he made in the Court of Appeal that section 1219(b) *prohibited* the prosecution from invoking the Uniform Act's custody-and-delivery provision.  He now accepts the Court of Appeal's holding that section 1219(b), which prohibits the jailing of sexual assault victims for *contempt of court* based on their refusal to testify, does not preclude the prosecution from using the Uniform Act's custody-and-delivery provision.  The Attorney General now argues that even though the prosecution in this *case could* have invoked that provision of the Uniform Act, it was not *required* to do so in order to show in this case the sexual assault victim's unavailability as a witness at defendant's trial.  We agree, as discussed below.

In requiring that prior testimony be admissible at trial only when the person

who previously testified has later become unavailable to testify, the Legislature sought to ensure that "only when necessary" is prior testimony to be substituted for live testimony, which is generally "the preferred form of evidence." (*People v. Reed* (1996) 13 Cal.4th 217, 225 (52 Cal.Rptr.2d 106, 914 P.2d 184).)  Live testimony compels a witness "to stand face to face with the jury" so it "may look at him and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." (*Mattox v. United States* (1895) 156 U.S. 237, 242–243 (39 L.Ed. 409, 15 S.Ct. 337).)  But that assessment by the jury "'is severely hampered'" when the "'witness is absent and when his prior testimony is read into evidence. (Citation.) Only if the necessity . . . is clearly demonstrated may the defendant's right of confrontation be overcome. . . .'" (*People v. Louis* (1986) 42 Cal.3d 969, 983 (232 Cal.Rptr. 110, 728 P.2d 180).)  Such necessity is shown, for instance, if a witness is unavailable to testify at trial notwithstanding a party's use of "reasonable diligence" in attempting to secure the presence of the witness.  (Evid. Code, § 240, subd. (a)(5).)

Reasonable diligence, often called "due diligence" in case law, "'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.'" (*People v. Cromer* (2001) 24 Cal.4th 889, 904 (103 Cal.Rptr.2d 23, 15 P.3d 243).)  Here, the Court of Appeal faulted the prosecution for not doing enough to obtain Colorado resident Lorene's presence as a material witness at defendant's trial.  What the prosecution should have done, the Court of Appeal said, was to invoke the Uniform Act's provision that would have permitted the prosecution to ask a Colorado court to have Lorene taken into custody and transported to California as a witness for the prosecution.

As there is no published California case involving the Uniform Act's provision on custody and delivery of a material witness, the parties here rely on decisions from other states that have considered the issue.  Three of these cases— *Gray v. Commonwealth* (1993) 16 Va.App. 513 (431 S.E.2d 86), *People v. Thorin* (1983) 126 Mich.App. 293 (336 N.W.2d 913), and *People v. Arguello* (Colo.Ct.App. 1987) 737 P.2d 436)—generally support the Attorney General's view that to establish an out-of-state witness's unavailability at trial, a party is not required to invoke the Uniform Act's custody-and-delivery provision.  A fourth case—*State v. Archie* (Ct.App. 1992) 171 Ariz. 415 (831 P.2d 414)—generally supports defendant's contrary view.  In all four, however, the facts are quite different from the case before us.  None of them resolves the issue before us here:  Did the prosecution have to invoke the Uniform Act's custody-and-delivery provision before it could establish its use of due diligence in securing sexual assault victim Lorene's presence at defendant's trial?  Our answer is "no," as explained below.

To have a material witness who has committed no crime taken into custody, for the sole purpose of ensuring the witness's appearance at a trial, is a measure so drastic that it should be used sparingly. (See, e.g., *State v. Reid* (1976) 114 Ariz. 16 (559 P.2d 136, 145) ("Confinement of a witness, even for a few days, not charged with a crime, is a harsh and oppressive measure which we believe is

justified only in the most extreme circumstances.").) Confinement would be particularly problematic when, as in this case, the witness is a sexual assault victim.

Although any crime victim may be traumatized by the experience, sexual assault victims are particularly likely to be traumatized because of the nature of the offense. To relive and to recount in a public courtroom the often personally embarrassing intimate details of a sexual assault far overshadows the usual discomforts of giving testimony as a witness. And the defense may, through rigorous cross-examination, try to portray the victim as a willing participant. (See generally, Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom* (1977) 77 Colum. L.Rev. 1.) Also, seeing the attacker again—this time in the courtroom—is for many sexual assault victims a visual reminder of the harrowing experience suffered, adding to their distress and discomfort on the witness stand. (See Ellison, The Adversarial Process and the Vulnerable Witness (2001) pp. 16–17.) It comes as no surprise, therefore, that often a victim of sexual assault is hesitant to report the crime. Even fewer such crimes would be reported if sexual assault victims could be jailed for refusing to testify against the assailant.

Recognizing these concerns, the California Legislature in 1984 amended Code of Civil Procedure section 1219 to add subdivision (b). (Sen. Bill No. 1678 (1983–1984 Reg. Sess.) § 2.) That provision, as mentioned earlier, prohibits a trial court from jailing for contempt a sexual assault victim who refuses to testify against the attacker. As the author of that legislation explained to his fellow senators: "The purpose of (section 1219(b)) is not only to protect victims of sexual assault from further victimization resulting from imprisonment or threats of imprisonment by our judicial system, but also to begin to create a supportive environment in which more victims might come forward to report and prosecute (perpetrators of) sexual assault." (Sen. McCorquodale, Floor Statement, Sen. Bill No. 1678 (1983-1984 Reg. Sess.) May 1, 1984.) Enactment of section 1219 (b) reflects the Legislature's view that sexual assault victims generally should not be jailed for refusing to testify against the assailant.

In this case, the prosecution acted reasonably when it chose not to request—even though permitted under the Uniform Act's custody-and-delivery provision—to have sexual assault victim Lorene taken into custody and transported from Colorado to California to testify at defendant's trial. As mentioned earlier, Lorene's refusal to testify at defendant's first scheduled trial led to a dismissal of the case against defendant. Thereafter, the prosecution refiled the charges against defendant. Lorene again told the prosecution she would not testify against defendant, and she ignored a subpoena ordering her to appear at defendant's trial. It is highly unlikely that had Lorene been taken into custody, she would have become a cooperative witness. Moreover, if she had been transported against her will to California and then refused to testify, the trial court could not have held her in contempt and jailed her until she agreed to testify, because that remedy (ordinarily available when a witness refuses to testify) is not available when the witness who refuses to testify is a sexual assault victim.

1    (§ 1219(b).)  Having spoken directly to Lorene, the prosecutor was in the best
2    position to assess the strength of her determination not to testify at defendant's
     trial.  Based on that assessment, the prosecutor could reasonably conclude that
3    invoking the Uniform Act's custody-and-delivery provision would not have
4    altered Lorene's decision not to testify again about the sexual assault, and thus it
     would have been a waste of time and resources.
5
6         In holding that the prosecution in this sexual assault case did not use
     reasonable diligence in securing Lorene's presence at defendant's California trial,
7    the Court of Appeal pointed to the prosecution's failure to invoke the Uniform
     Act's custody-and-delivery provision.  In the court's words: "Lorene was an
8    essential witness in this case, her appearance was crucial.  The prosecution did
     not, under the circumstances of this case, use every reasonable means to secure
9    her attendance and, therefore, did not exercise reasonable diligence."  But
10   confinement of a sexual assault victim to ensure her presence at the assailant's
     trial would, for reasons we discussed earlier, not be a reasonable means of
11   securing the witness's presence.

12        Pertinent here is our decision in *People v. Smith* (2003) 30 Cal.4th 581 (134
     Cal.Rptr.2d 1, 69 P.3d 302).  In that case, the trial court ruled that a sexual assault
13   victim's refusal to testify at the defendant's trial made her unavailable as a
14   witness.  We rejected the defendant's argument that to get the victim to testify the
     trial court should have threatened to fine her.  We said: "Trial courts 'do not have
15   to take extreme actions before making a finding of unavailability.'"  (*Id*. at p.
     624.)  In this sexual assault case, the prosecution's resort to the Uniform Act's
16   custody-and-delivery provision to ensure victim Lorene's presence at defendant's
     trial would have been an action far more extreme than the fine at issue in *Smith*.
17   Thus, the Court of Appeal here erred in reversing the trial court's ruling that
18   Lorene was unavailable as a witness notwithstanding the prosecution's use of
     reasonable means to secure her presence at defendant's trial, and that therefore the
19   prosecution could use at that trial the testimony that Lorene had previously given
     at defendant's preliminary hearing.
20
     People v. Cogswell, 48 Cal.4th at 471-79.
21
22        "The Sixth Amendment's Confrontation Clause provides that, '(i)n all criminal

23   prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

     him.'  We have held that this bedrock procedural guarantee applies to both federal and state
24
     prosecutions."  Crawford v. Washington, 541 U.S. 36, 42 (2004), citing Pointer v. Texas, 380
25
26   U.S. 400, 406 (1965).  The Confrontation Clause "guarantees the defendant a face-to-face

27   meeting with witnesses appearing before the trier of fact."  Coy v. Iowa, 487 U.S. 1012, 1016

     (1988).  The physical confrontation "enhances the accuracy of factfinding by reducing the risk
28
     that a witness will wrongfully implicate an innocent person."  Maryland v. Craig, 497 U.S. 836,

846 (1990).  The introduction of prior testimonial statements of a witness violates a criminal defendant's federal Confrontation Clause rights unless: (1) the person who made the statements is unavailable to testify; and (2) there was a prior "meaningful" opportunity for cross-examination.  Crawford, 541 U.S. at 68.

### 1.    Unavailability

The Supreme Court has noted that: "[A] witness is not 'unavailable' for purposes of the [unavailability] exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial."  Ohio v. Roberts, 448 U.S. 56, 74 (1980), overruled on other grounds by Crawford, 541 U.S. at 60.  "The lengths to which the prosecution must go to produce a witness is a question of reasonableness . . . [and] the ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness."  Roberts, 448 U.S. at 74.

A review of the record supports the state supreme court's finding that the prosecutor was in a unique position to determine whether taking Lorene into custody was a reasonable step to take towards securing her trial testimony.  The prosecution arranged for Lorene to be served in Colorado with a summons, which she attempted to evade, and provided her with an airline ticket and travel expenses, but she refused to appear at the time the trial was first scheduled, December 20, 2005.  (RT 5-6, 26-28, 49, 65; CT 55.)  The trial was continued to January 31, 2006, and Lorene was served with a second summons and was provided with another airline ticket and travel expenses.  (RT 6, 28-31, 49-50.)  Lorene appeared in the Colorado court as a result of being served with the second summons, and was ordered to appear at trial in San Diego; she told the Colorado court that she would do so, but, in violation of the order issued in Colorado, she did not use her airline ticket and did not come to San Diego.  (RT 6; CT 31-36, 46, 51.)  Lorene informed the prosecution that she had been contacted by Petitioner's family members and her prior friends, that "given the small nature of the deaf community she lives in Colorado to escape what she has lived through" in San Diego, and that she "has had as much of this matter as she can possibly handle."  (RT 6.)  The prosecutor said that is was clear that Lorene would not voluntarily testify, and because California law precluded taking a sexual assault victim into

custody in order to force her appearance, there were no other avenues available to the prosecution.  (RT 6, 44.)

As set forth above, the state supreme court found that the prosecution made a reasonable determination that Lorene would not voluntarily appear at trial and testify, and appropriately decided not to attempt to compel her attendance by taking her into custody.  The record supports the state court's finding that the prosecutor reasonably concluded that Lorene's refusal to testify was sincere and intractable, in that Lorene attempted to evade service of the summons, she disobeyed an order given to her by the Colorado court, and she told the prosecution team that she would not testify because she had taken all she could take, and did not want to return to San Diego due to concerns regarding her position in the deaf community.

The decision of the California Supreme Court that it was reasonable for the prosecutor not to resort to the drastic measure of taking Lorene into custody, when the record supports a finding that taking her into custody probably would not have resulted in her testifying, is not an objectively unreasonable application of clearly established federal law which provides that reasonableness is the touchstone of the inquiry.  Roberts, 448 U.S. at 74 ("the ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.")  Even if Petitioner could show that it would have been reasonable for the prosecutor to have sought to take Lorene into custody, the state court's conclusion that the prosecutor's ultimate decision was appropriate is still entitled to deference as long as it, too, is objectively reasonable, as it is here.  Renico v. Lett, 559 U.S. 766, 777-78 (2010).

## 2.     Opportunity for Cross-Examination

Petitioner also contends that he did not have a meaningful opportunity to cross-examine Lorene because: (a) she was not cross-examined in front of Petitioner's jury, and the nature of her allegations of sexual assault required the jury to make a determination of her credibility; and (b) additional impeachment evidence was obtained in the months of trial preparation after the preliminary hearing which were not presented to the jury.  (Traverse at 6-7.)  The state supreme court did not specifically address this aspect of the claim, other than noting that Lorene "was thoroughly cross-examined by defense counsel" at the preliminary hearing.  Cogswell, 48

Cal.4th at 471. This Court must therefore conduct an independent review of the record in order to determine whether the state court adjudication was contrary to, or involved an unreasonable application of, clearly established federal law. Johnson v. Williams, 568 U.S. ___, 133 S.Ct. 1088, 1094-96 (2013); Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 784-85 (2011).

Lorene's direct testimony at the preliminary hearing was read to the jury by the prosecutor (RT 202-24), and her cross-examination, which was more than twice as long as her direct testimony, was read to the jury by Petitioner's defense counsel (RT 224-70), followed by very brief redirect and re-cross-examination. (RT 271-72.) In opposition to the prosecution's pre-trial motion to declare Lorene an unavailable witness, defense counsel argued that:

> Since the preliminary examination, defense counsel obtained records and information regarding the complaining witness pursuant to Welfare and Institutions Code section 827 and California Rules of Court, Rule 1423. Defense counsel learned complainant had made false allegations of child molestation against the father of her child during the course of a dependancy proceedings. At the time of those proceedings, minor's counsel reported that all of complainant's family members have criminal records and continue to participate in the underworld of our society.
>
> Upon reviewing documents, defense counsel learned that in or about July, 2001, Riverside County Sheriff's Office investigated complainant for felony fraud and identity theft. On July 19, 2001, a search warrant was served at complainant's home. Complainant's minor child, Zeniko Acosta-Grant, having been abandoned with no provisions for his car and support, was taken into protective custody. Complainant was implicated in the criminal activities going on in the home in that incident. Police officers stated that Lorene [B.] would be wanted for questioning whenever she surfaces.
>
> Additional witnesses have been discovered who might testify against complainant's character with respect to events unknown at the time of the preliminary examination. In view of these newly discovered facts, which have come to light since the preliminary hearing, insufficient cross examination of the complainant at the preliminary hearing denied defendant meaningful and adequate cross-examination under Crawford and [People] v. Gibbs [255 Cal.App.2d 739 (1967) (holding that a defendant's opportunity to cross-examine was not complete and adequate where defense counsel was appointed five minutes before the preliminary hearing, had only partial knowledge of the facts, and cross-examination consisted of one page of transcript following a two-page direct examination of a crucial witness)].

(CT 116.)

Defense counsel indicated at trial that an investigation into an identity theft ring in Riverside included the residence where Lorene was living at the time, and that she was implicated in an investigation of felony check fraud. (RT 76-78.) Defense counsel requested

leave to call three social workers to testify that in their opinion Lorene lacked candor when she was interviewed in connection to a child dependancy proceeding.  (RT 84-86.)  Defense counsel also proffered questions to be asked of Lorene if she were available for cross-examination.  (CT 124.)  The questions involve Lorene's alleged false claim of Black Hawk Indian ancestry in order to obtain illegal Native American benefits, whether she was involved with the identity theft ring, whether her child had been removed from her home for failure to protect him from physical and mental pain, and regarding her honesty and level of cooperation in seven Child Protective Services Cases between 1998 and 2005, including transporting marijuana across state lines through the mail, using drugs in the presence of her child, and whether she moved out of California in order to avoid having to follow family court orders.  (Id.)

The record clearly reflects that Lorene's credibility was in fact challenged at Petitioner's trial.  She admitted on cross-examination at the preliminary hearing that she had used Henrietta's candlestick to conceal and transport marijuana through the mail.  (RT 246-47.)  The father of Lorene's child testified at Petitioner's trial that Lorene had falsely accused him of molesting their child, and that she had repeated the false allegation to "a lot" of people.  (RT 441.)  The defense also called a social worker who interviewed Lorene in connection to child dependancy proceedings and who testified that she thought Lorene was deceitful.  (RT 422.)

Thus, the only subject on which the defense was not able to cross-examine Lorene was the information they had received that she may have been involved in the identity theft activity which took place at her shared residence, and the allegation that she had falsely procured Native American benefits.  Petitioner has not established, here or in the state court, that Lorene was in fact involved in that criminal activity.  Even if he could do so, although it would be powerful evidence that Lorene was not an honest person, it would be to a large extent cumulative to the trial evidence attacking her character and credibility.  Moreover, even if the allegations were true, and Lorene's credibility was further weakened by evidence of criminal behavior, it would not have affected the evidence tending to prove that Petitioner had raped Lorene which was independent of Lorene's own testimony, including Crystal's testimony that Petitioner had raped her in a similar manner as he had raped Lorene, and Crystal's testimony that she immediately

thought of Petitioner when Lorene told her she had been raped because Petitioner had raised the topic of rape out of the blue the day after Lorene was raped. The state supreme court's finding that defense counsel had thoroughly cross-examined Lorene at the preliminary hearing and the cross-examination was "meaningful" enough to satisfy his federal confrontation rights was not an unreasonable application of clearly established federal law. See Crawford, 541 U.S. at 68 (holding that where testimonial evidence is at issue, the Confrontation Clause demands a meaningful prior opportunity to cross-examine an unavailable witness).

### 3.     Evidentiary Hearing

Petitioner requests an evidentiary hearing in order to allow his trial counsel to present evidence regarding how counsel would have cross-examined Lorene had counsel been given that opportunity, and thereby permit this Court to make its own determination regarding whether Petitioner was prejudiced by the lack of an opportunity to cross-examine Lorene at trial. (Traverse at 8.) An evidentiary hearing is not necessary where, as here, the federal claim can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis for habeas relief. Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994). Furthermore, this Court must make its § 2254(d) determination based solely on the evidence presented to the state court. Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011). Petitioner can only proceed to develop additional evidence in federal court if § 2254(d) is satisfied, which it has not been here, or, possibly, if there is new evidence which transforms an already-exhausted claim into a new claim which has not been adjudicated on the merits in the state court, in which case § 2254(d) arguably would not apply. Id. at 1401 n.10; Stokley v. Ryan, 659 F.3d 802, 808-09 (9th Cir. 2011). Petitioner has not come forward with any new evidence which would transform Claim 1 into a new claim which has not been adjudicated on the merits in state court.

### 4.     Conclusion

The Court finds that the adjudication of Claim 1 by the state supreme court was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the

state court proceedings.  The Court also finds that an evidentiary hearing is not necessary to resolve this claim.  The Court recommends habeas relief be denied as to Claim 1.

## C.    Claim 2

Petitioner alleges in Claim 2 that his Fourteenth Amendment right to due process was violated by Crystal's testimony regarding uncharged sexual offenses committed against her by Petitioner, which he contends was introduced to show his propensity to commit the charged offenses. (FAP at 3, 39-49.) Respondent answers that the evidence in question was relevant and admissible as propensity evidence, and that the state appellate court reasonably applied federal law in denying the claim.  (Ans. Mem. at 27-31.)

Petitioner presented this claim to the state appellate court on direct appeal. (Lodgment No. 1 at 28-37.)  The appellate court denied the claim in a reasoned opinion. (Lodgment No. 4, People v. Cogswell, No. D049038 (Cal.App.Ct. Aug. 12, 2010).) Petitioner thereafter presented the claim to the state supreme court, which summarily denied it without citation or statement of reasoning. (Lodgment Nos. 5-6.)  This Court will apply the provisions of 28 U.S.C. § 2254(d) to the appellate court opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.")  The state appellate court denied this claim, stating:

> Cogswell argues the trial court erred when it admitted pursuant to Evidence Code section 1108, subdivision (a), the testimony of Crystal that Cogswell sexually assaulted her. Cogswell argues the admission of such evidence to show a propensity to commit the charged offenses denied him his right to due process. He argues in any case the trial court erred in admitting the evidence over his objection that the evidence was more prejudicial than probative.

> Prior to trial, the prosecution moved, pursuant to Evidence Code section 1108, for the admission of evidence of Cogswell's sexual offenses against Crystal. It noted that in 1996 Cogswell was charged with multiple counts of assault and sexual assault and that in 1997 he pled guilty to one count of forcible rape. Sentenced to six years in prison, Cogswell repeatedly contacted Crystal and she eventually recanted her accusations of assault and rape.  Petitions for habeas corpus followed but were denied.  When released, Cogswell was required to register as a sex offender pursuant to section 290.  In 2003 he was convicted of a failure to register.  As a condition of parole, he was ordered not to have contact with Crystal.  In 2004 the two had another child.

Cogswell opposed the prosecution's motion to admit evidence of the prior sexual offenses.  He noted that in 1999 Crystal submitted a declaration and testified at a hearing on Cogswell's habeas corpus declaration that she had falsely accused Cogswell of rape.  Cogswell also noted that before Lorene made her accusation against him, she and Crystal were best friends.  Cogswell argued admitting evidence of Cogswell's prior sexual offenses would result in undue prejudice to the defense and confuse and mislead the jury.  He requested the evidence be excluded pursuant to Evidence Code section 352.

A hearing was held on the motion.  Crystal testified and reviewed the history of her relationship with Cogswell.  She stated that from the beginning of the relationship Cogswell abused and sexually assaulted her.  She stated he sexually assaulted her on several occasions in 1997 in San Diego, and she reported the crimes to the police.  She was aware Cogswell was charged with those offenses and that he pled guilty to one count of rape.  Crystal admitted recanting under oath her claims of rape but stated Cogswell did rape her.  She stated she was afraid when Cogswell was released from prison he would assault her.  She also stated the deaf community to which both she and Cogswell belonged was small, and she believed her life and lives of her two sons would be easier if she recanted her allegations. Crystal stated Cogswell raped her.  [¶]  The trial court granted the prosecution's motion and admitted Crystal's testimony.

Evidence Code section 1108, subdivision (a), provides that when a defendant is accused of a sexual offense, evidence of that defendant's commission of another sexual offense is admissible unless the evidence is made inadmissible under the provisions of Evidence Code section 352.  Cogswell contends the admission of such evidence to prove a predisposition to commit sexual offenses denies him due process.  It does not. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911-925; *People v. Quintanilla* (2005) 132 Cal.App.4th 572, 578-579.)

Cogswell further argues that whatever the constitutional validity of Evidence Code section 1108, subdivision (a), the trial court abused its discretion when it denied the motion to exclude the evidence as more prejudicial than probative within the meaning of Evidence Code section 352.

In admitting evidence of prior sexual offenses pursuant to Evidence Code section 1108, subdivision (a), the trial court considers the nature, relevance and remoteness of the uncharged offense, the degree of certainty that the prior offense was committed, the likelihood admission of the offense will confuse, mislead or distract the jury from its primary inquiry, the burden of the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to outright admission, such as excluding irrelevant and inflammatory details. (*People v. Falsetta, supra*, 21 Cal.4th at p. 917.)

The trial court has broad discretion in determining whether the probative value of evidence outweighs any potential it may have to prejudice a party or to confuse or mislead the jury.  It is only when the exercise of that discretion is "arbitrary, capricious or patently absurd" that we reverse the trial court's decision to admit the evidence. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

The trial court here did not abuse its discretion in admitting Crystal's testimony. The sexual offenses committed against Crystal were reasonably similar to and no more serious than those charged here.  While the crimes against Crystal were committed in 1999 and the charged crimes occurred in 2004, for much of that interval Cogswell was in prison.  The lack of additional sexual offenses in that period says nothing about his predisposition to commit such crimes.   While it is true Crystal recanted her accusations against Cogswell, Cogswell pled guilty to a sexual offense against Crystal and a jury could reasonably decide whether he committed the crime to which he pled guilty.    The evidence concerning Cogswell's conviction of raping Crystal did not create a burden on the defense greater than that which arises in defending against any claim of a relevant uncharged act.  The trial court did not abuse its discretion in admitting Crystal's testimony.

(Lodgment No. 4, <u>People v. Cogswell</u>, No. D049038, slip op. at 8-11.)

The United States Supreme Court has held that an inquiry into whether the evidence was "incorrectly admitted pursuant to California law . . . is no part of a federal court's habeas review of a state conviction."  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991).  The Court left open the issue as to "whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."  <u>Id.</u> at 75 n.5.  The Ninth Circuit has read <u>McGuire</u> as providing that there are circumstances under which a federal habeas petitioner can establish a federal due process violation by showing that the admission of evidence was so prejudicial that it rendered the trial fundamentally unfair.  See <u>Johnson v. Sublett</u>, 63 F.3d 926, 930 (9th Cir. 1995) ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process."), citing <u>McGuire</u>, 502 U.S. at 67-69; <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20 (9th Cir. 1991) ("The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point."); <u>see also</u> <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009) (granting habeas relief under AEDPA based on state court's limitation on cross-examination of the victim and the refusal to permit introduction of impeachment evidence, but stating that the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.")

Petitioner contends that Crystal's testimony went beyond informing the jury that he had

committed bad acts, but told the jury that he had in fact been convicted of a crime in relation to his conduct toward her, rendering her testimony more than normally prejudicial and his trial fundamentally unfair. (Traverse at 9-10.) In Alberni v. McDaniel, 458 F.3d 860 (9th Cir. 2006), the Ninth Circuit recognized that every circuit, in cases decided before AEDPA was enacted, has acknowledged that improper introduction of evidence may violate federal due process if it renders a trial fundamentally unfair. Id. at 865-66. However, the Alberni Court held that because the Supreme Court in McGuire specifically reserved ruling on the issue regarding whether introduction of propensity evidence can give rise to a federal due process violation, and has denied certiorari at least four times on the issue since McGuire was decided, the right "has not been clearly established by the Supreme Court, as required by AEDPA." Id. at 866-67; see also Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (holding that the state court could not have unreasonably applied federal law if no clear Supreme Court precedent exists).

Thus, the state court's denial of Petitioner's claim that the introduction of Crystal's testimony regarding his prior sexual offenses amounted to a violation of federal due process because it unfairly permitted the jury to infer that he had a propensity to commit crimes similar to the ones with which he was charged, was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Richter, 131 S.Ct. at 786-87; Williams, 529 U.S. at 405-07; Lockyer, 538 U.S. at 75-76; Wright, 552 U.S at 125-26; Holley, 568 F.3d at 1101; Alberni, 458 F.3d at 867. An evidentiary hearing is not necessary where, as here, the federal claim can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis for habeas relief. Campbell, 18 F.3d at 679. Moreover, this Court must make its § 2254(d) determination based solely on the evidence presented to the state court. Pinholster, 131 S.Ct. at 1398. Petitioner can only proceed to develop additional evidence in federal court if § 2254(d) is satisfied, which it has not been here, or, possibly, if there is new evidence which transforms an already-exhausted claim into a new claim which has not been adjudicated on the merits in the state court, in which case § 2254(d) arguably would not apply. Id. at 1401 n.10; Stokley, 659 F.3d at 808-09. Petitioner has not come forward with any new evidence which would transform Claim 2 into a new claim which has not been adjudicated on

the merits in state court.  Thus, an evidentiary hearing is neither necessary nor warranted.

Accordingly, the Court finds that the state court adjudication of Claim 2 was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The Court recommends habeas relief be denied as to Claim 2.

**D.    Claim 3**

Petitioner contends in Claim 3 that his Sixth Amendment right to trial by unbiased, impartial jurors was violated due to witness and juror misconduct arising from the interaction between a trial witness and two jurors outside the courtroom.  (FAP at 3, 49-65.)  Respondent answers that the appellate court's rejection of the claim, on the basis that the record supported the trial judge's finding that the contact was inconsequential, is an objectively reasonable application of clearly established federal law.  (Ans. Mem. at 31-36.)

Petitioner presented this claim to the state appellate court on direct appeal.  (Lodgment No. 1 at 37-51.)  The appellate court denied the claim in a reasoned opinion.  (Lodgment No. 4.)  The claim was thereafter summarily denied by the state supreme court.  (Lodgment Nos. 5-6.)  This Court will apply the provisions of 28 U.S.C. § 2254(d) to the appellate court opinion.  Ylst, 501 U.S. at 803-06.  The appellate court denied the claim, stating:

> 1. *Background*
>
> The prosecution called David Schaller, a detective employed by the San Diego County Sheriff's Department.  Schaller testified he interviewed Cogswell on the day Cogswell was arrested and observed a number of bruises and scratches on Cogswell's arms, legs, back and head.  Schaller further identified a number of photographs of Cogswell taken on the day of his arrest which show the scratches and bruises Schaller observed. On cross-examination, Schaller conceded that when the photographs of Cogswell were being taken, Cogswell was calm, polite and cooperative.
>
> Following Detective Schaller's relatively brief testimony, the trial court excused the jurors for the remainder of that day and directed them to return the following morning.  There is no dispute among the parties that while Detective Schaller was in the hallway outside the courtroom near an elevator, juror No. 8, in the presence of juror No. 9, started a conversation with Detective Schaller.  However, there is a great deal of conflict in the record with respect to precisely what transpired between juror No. 8 and Detective Schaller.

/ / /

### a. *Juror No. 8*

In testimony he gave to the trial court during a series of hearings held on Cogswell's motion for a new trial, juror No. 8 stated that he greeted the detective and said, "It's a beautiful day. We're going home early. I get to wash my car." According to juror No. 8, Detective Schaller responded: "I wish I could say something to you too" and then they both got in the elevator. According to juror No. 8, he and Detective Schaller did not say anything further to each other. A few days later when the jury began deliberations, juror No. 8 told the foreman about his exchange with the detective and the foreman told him the exchange had no bearing on the case and not to worry about it.

### b. *Detective Schaller*

Detective Schaller was also examined by the trial court with respect to his contact with juror No. 8. Detective Schaller recalled that juror No. 8 made some casual remark about the weather and that "(v)ery early into this contact I explained to him that I didn't want him to perceive that I was being rude. I explained to him(.) Listen. You understand I can't talk to you. I wish I could but I can't." According to Detective Schaller, juror No. 8 "immediately said that he understood that. And he was, you know-he seemed okay. I was trying to, you know, be cordial with the guy but let him know at the same time that I couldn't talk to him. (¶) And as soon as I did tell him that, he-he, you know, cut it off right there." Detective Schaller recalled that after he was done talking with juror No. 8, he overheard juror No. 8 tell another juror who was present that he was confused about the case. Detective Schaller denied telling juror No. 8 that he wished could tell him more about the case or that the lawyers had cut him short.

Detective Schaller testified that he had been a witness at other trials and he understood that he was not supposed to have any contact with jurors and he further understood that in the event such contact occurred he had a duty to report the contact to the court. He testified that he failed to report his contact with juror No. 8 to the court because he assumed the contact was not very significant.

### c. *Juror No. 9*

Juror No. 9 provided a handwritten affidavit in support of Cogswell's motion for a new trial. In the affidavit, juror No. 9 provided a markedly different version of juror No. 8's conversation with Detective Schaller than the versions provided by juror No. 8 and Detective Schaller. According to juror No. 9's affidavit, juror No. 8 told Detective Schaller he was confused about the case and Detective Schaller said that he wished he could sit down with the jurors and tell them more about the case. Juror No. 9 got the impression that Detective Schaller had negative things to say about Cogswell.

According to juror No. 9's affidavit, juror No. 8 told other jurors about what Detective Schaller had told him. In his affidavit, juror No. 9 stated that the other jurors decided not to tell the judge about the incident. According to juror No.

9's affidavit, at the time juror No. 8 brought up his contact with Detective Schaller with the other jurors, he was inclined to vote not guilty. However, juror No. 9 believed that the detective's comments influenced his decision to vote guilty.

Juror No. 9's affidavit was executed on March 29, 2006. More than two months later, on June 2, 2006, juror No. 9 was examined by the trial court and in a number of respects he embellished what he stated in his affidavit. Unlike his affidavit, at the hearing juror No. 9 stated the contact began with a general statement about the weather. According to juror No. 9's testimony, he remembered that just as he was about to press the elevator button, juror No. 8 told Detective Schaller that he was "confused about everything that was going on in the case." According to juror No. 9's testimony, juror No. 8 "expressed himself that he was really confused about all the information that we were receiving and that-(he) didn't know what to think and make out of it." Juror No. 9's recollection of hitting the elevator button just as juror No. 8 started telling the detective about his confusion and the extent of juror No. 8's confusion did not appear in juror No. 9's earlier handwritten affidavit. When asked about the fact that his testimony was more detailed than his earlier handwritten note, juror No. 9 told the trial court that his later testimony was a more accurate reflection of his memory.

After juror No. 9 heard the conversation between juror No. 8 and the detective, he made no attempt to contact the court and advise the court about what happened. He explained that he failed to do so because he "didn't know how to go about" telling the court and because "I thought no other comment was going to be made about it."

Juror No. 9 testified that when jury deliberations began, juror No. 8 brought up his contact with Detective Schaller. However, juror No. 9's description of his reaction to that development is somewhat at odds with his description of the contact. According to juror No. 9, when juror No. 8 mentioned his contact with Detective Schaller to the other jurors, juror No. [9] was "kind of surprised he had mentioned it, and I was hoping that it wouldn't have come out. And I just said, you know, I don't know what you're talking about at that time." According to juror No. 9, "the jury foreman just kind of played it off and said, you know . . . (s)omething to the point of it doesn't matter." According to juror No. 9, juror No. 8's contact with Detective Schaller did not come up again during deliberations.

Juror No. 9 testified he did not thereafter tell the court about the comment because "(w)e were asked not-we weren't going to-the jury foreman didn't think he needed to be informed-anybody needed to be informed about it. And everybody agreed to that."

d. *Juror No. 10*

Juror No. 10 provided an affidavit to Cogswell in support of Cogswell's motion for a new trial. In his affidavit, juror No. 10 stated that at the beginning of deliberations, another juror stated that Detective Schaller had told him "I wish I could have said more." Juror No. 10 responded by stating that maybe the detective was annoyed that he came to court and his testimony only lasted two

minutes.  After the jury had reached a verdict, juror No. 10 asked the foreman whether they should mention the detective's comment to the court and the foreman declined to do so because the comment had not influenced their deliberations.  [¶]  When called as a witness, juror No. 10 added to his account that when he told juror No. 8 he thought the detective was just angry because he had been called to testify but only spoke a short time, a number of other jurors nodded in agreement and one juror in particular nodded as if he had witnessed the exchange.

The trial court denied Cogswell's motion for new trial.  The trial court stated: "The contact between 8 and the detective at the elevator is misconduct. The extent of the contact is certainly not as extensive as that expressed by juror number 9 in his testimony during this motion, and number 10 convinces me that . . . the acts which constitute the misconduct were brought to the attention at the outset by a juror and handled appropriately because the conduct did not again become the subject of discussion throughout the deliberations."  Given its view of the evidence, the trial court concluded: "(T)aking it in the context of the entirety of this case and the entirety of this motion and the entirety of the testimony, it doesn't rise to the level that [it] affected the outcome of the verdict. It was of a more minimal level than evidence that would justify the granting of the new trial."

2.  *Discussion*

"We review independently the trial court's denial of a new trial motion based on alleged juror misconduct. (Citation.) However, we will '"accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence."'  (Citation.)"  (*People v. Gamache* (2010) 48 Cal.4th 347, 396-397.)  Our independent review of the record, including in particular the trial court's factual findings, convinces us the trial court acted properly in denying Cogswell's motion for a new trial.

We begin by recognizing that there is no dispute that, in speaking to Detective Schaller, the jurors were guilty of misconduct.  (*People v. Williams* (1988) 44 Cal.3d 1127, 1156; *In re Hitchings* (1993) 6 Cal.4th 97, 119; see also *People v. Pierce* (1979) 24 Cal.3d 199, 207; *In re Hamilton* (1999) 20 Cal.4th 273, 294.)  Such misconduct by a juror raises a rebuttable presumption of prejudice.  (*In re Hitchings, supra*, 6 Cal.4th at p. 119; *In re Hamilton, supra*, 20 Cal.4th at p. 295.)

However, "(t)his presumption of prejudice '"may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party (resulting from the misconduct). . . ."'"  (Citations.)"  (*In re Hitchings, supra*, 6 Cal.4th at p. 119.) "The standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' (citation) and of society's strong competing interest in the stability of criminal verdicts (citations).  It is 'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' (Citation.) Moreover, the jury is a 'fundamentally human' institution; the unavoidable fact

that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution. (Citation.) '(T)he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. . . . (Jurors) are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection. . . .' (Citation.)" (*In re Hamilton, supra*, 20 Cal.4th at p. 296.)

In considering whether the prosecution met its burden, we are largely governed by the trial court's credibility findings. (*People v. Gamache, supra*, 48 Cal.4th at pp. 396-397.) As we have noted, in resolving the conflicting accounts of juror No. 8, Detective Schaller and juror No. 9, the trial court accepted juror No. 8's and Detective Schaller's account of the brief exchange they had, in which Detective Schaller simply attempted to avoid talking to the jurors about the case without appearing rude. This version of events is not only supported by the affidavits and testimony of juror No. 8 and Detective Schaller, it is also consistent with other circumstances in the record. First, we note that at the time of trial Detective Schaller had been a law enforcement officer for more than 14 years and he was certainly aware jurors are not allowed to receive any information about a case outside of court. It is also consistent with the fact that none of the participants in the conversation chose to report it to the court either at the time it happened or during the course of deliberations.

In accepting juror No. 8's and Detective Schaller's version of what occurred, the trial court expressly rejected juror No. 9's version of events. This finding is also fully supported by the record. As the trial court noted, the embellishments juror No. 9 added to his version of events when called to testify undermined his credibility. Moreover, there was a direct conflict between juror No. 9's portrayal of what occurred at the elevator and his conduct both before and after deliberations commenced. While juror No. 9 testified the conversation he witnessed was fairly intense, he did not attempt to report it to the court and when juror No. 8 mentioned it to the other jurors, juror No. 9 was surprised that it was brought up and attempted to minimize its importance. In sum, the trial court's credibility findings are supported by substantial evidence in the record and accordingly are binding on us. (*People v. Gamache, supra*, 48 Cal.4th at pp. 396-397.)

Accepting, as we must, the trial court's determination of what occurred, we agree with the trial court Cogswell was not prejudiced by the brief contact Detective Schaller had with the jurors. Such largely innocuous contact between jurors and witnesses are to be expected in busy and oftentimes overcrowded courthouses. Unless we are to require that jurors be sequestered in all cases, we must rely on the good judgment and good faith of witnesses and jurors and expect that, when such contact occurs, they will strictly limit any information the jurors receive. Here, the record shows Detective Schaller did not in fact share any information about the case with the jurors, and although subject to dispute, did not imply that he had any such information, and that the jurors treated the contact as inconsequential. Under these circumstances, the trial court did not abuse its discretion in denying Cogswell's motion for a new trial.

(Lodgment No. 4, People v. Cogswell, No. D049038, slip op. at 11-19.)

/ / /

Clearly established federal law provides that: "The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors." Estrada v. Scribner, 512 F.3d 1227, 1239 (9th Cir. 2008), citing McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984) and Smith v. Phillips, 455 U.S. 209, 217 (1982). "Under Supreme Court precedent, the remedy for allegations of juror misconduct is a prompt hearing in which the trial court determines the circumstances of what transpired, the impact on the jurors, and whether or not the misconduct was prejudicial." Bell v. Uribe, 729 F.3d 1052, 1061 (9th Cir. 2013), citing Smith, 455 U.S. at 216-17.

A juror misconduct claim presents a mixed question of law and fact, and is reviewed under 28 U.S.C. § 2254(d)(1) rather than § 2254(d)(2). Tong Xiong v. Felker, 681 F.3d 1067, 1074 (9th Cir. 2012). When juror misconduct has been shown, there is a presumption of prejudice, and the burden in the state court falls on the prosecution to overcome that presumption by making a strong contrary showing. Id. at 1078. A federal habeas court reviewing the state court determination that no prejudice arose from the misconduct, must determine "whether the California Court of Appeal unreasonably applied that presumption of prejudice in finding the misconduct was harmless." Id.

As quoted above, the state appellate court determined that the record provided adequate support for the trial judge's finding that Petitioner was not prejudiced by the juror misconduct. That is an objectively reasonable conclusion to draw from the record. Detective Schaller, who had a great deal of experience testifying at trials, subjectively deemed the incident irrelevant and minor. The jury as a whole did not find Detective Schaller's comment significant, and it was not mentioned again after the beginning of deliberations and was deemed irrelevant to all jurors other than perhaps Juror No. 9. The finding by the state court that Juror No. 9 had embellished and lacked credibility to the extent his testimony conflicted with the other jurors and Detective Schaller is supported by the record.

Accordingly, the state court's determination that Petitioner was not prejudiced by the

misconduct, did not involve an objectively unreasonable application of clearly established federal law. Andrade, 538 U.S. at 75-76; Williams, 529 U.S. at 412; Felker, 681 F.3d at 1078. An evidentiary hearing is neither necessary nor warranted. Pinholster, 131 S.Ct. at 1398, 1401 n.10; Stokley, 659 F.3d at 808-09; Campbell, 18 F.3d at 679. The Court recommends habeas relief be denied as to Claim 3.

**E.      Claim 4**

Petitioner contends in Claim 4 that he cumulative effect of the trial errors undermined the fundamental fairness of the trial in violation of the Fifth, Sixth and Fourteenth Amendments. (FAP at 3-4, 65-66.) This Claim will be considered below as Claim 11, which is identical.

**F.      Claim 5**

Petitioner alleges in Claim 5 that his 105 years-to-life sentence constitutes cruel and unusual punishment under the State and Federal Constitutions. (FAP at 4, 67-71.) Respondent answers that the state appellate court's adjudication of this claim was consistent with clearly established federal law which provides that only sentences which are grossly disproportionate to the offense will violate the Eighth Amendment. (Ans. Mem. at 37-40.)

The last reasoned state court decision addressing Claim 5 is the appellate court decision denying the habeas petition in which the claim was presented. (Lodgment No. 17, In re Cogswell, No. D061461, order (Cal.Sup.Ct. Mar. 22, 2012).) That court stated:

> First, he contends that his sentence is cruel and unusual punishment because his punishment is more severe than other, more serious offenses such as murder. However, petitioner ignores the fact that he is being punished for multiple sex crimes in this case, and as a recidivist offender, not for a single offense. He has failed to state a prima facie case that his sentence is cruel and unusual punishment. (See, e.g., *People v. Crooks* (1997) 55 Cal.App.4th 797, 807 (rejecting argument that punishment for rape and burglary was unduly harsh when compared with punishments for unlawful killings other than first degree murder); *People v. Wallace* (1993) 14 Cal.App.4th 651, 667 (sentence of 283 years eight months for various sex offenses not cruel and unusual punishment).)

(Id. at 1.)

In Harmelin v. Michigan, 501 U.S. 957 (1991), the United States Supreme Court upheld a sentence of life without parole for possession of cocaine against an Eighth Amendment challenge. The Court stated that a comparison between the gravity of the offense and the

1    severity of the sentence must be made first in order to determine whether it is one of the "rare"

2    cases which leads to an inference of gross disproportionality.  Id. at 1005.  Because the state

3    court here applied the correct clearly established federal law to this claim, in order for Petitioner

4    to be entitled to relief, he must demonstrate that it was objectively unreasonable for the appellate

5    court to determine that this is not one of the rare cases which leads to an inference of gross

6    disproportionality between the sentence and the offenses.   Andrade, 538 U.S. at 75-76;

7    Harmelin, 501 U.S. at 1005.

8        Petitioner has made no showing of disproportionality.  As the appellate court noted, far

9    less serious crimes have resulted in life sentences in California.  In fact, the United States

10   Supreme Court has upheld life sentences for recidivists with such nonviolent felonies as the theft

11   of golf clubs, see Ewing v. California, 538 U.S. 11, 28 (2003), and obtaining money by false

12   pretenses, see Rummel v. Estelle, 445 U.S. 263, 284 (1980).

13       Petitioner here was convicted of five serious felony sex offenses in the instant action,

14   including three counts of forcible rape, and the jury found that he had been previously convicted

15   of forcible rape.  "In weighing the gravity of [Petitioner's] offense, [this Court] must place on

16   the scales not only his current felony, but also his long history of felony recidivism.  Any other

17   approach would fail to accord proper deference to the policy judgments that find expression in

18   the legislature's choice of sanctions."  Ewing, 538 U.S. at 29.  Although Petitioner's history of

19   recidivism is limited to his sexual offenses against Crystal G., his current and past offenses are

20   serious enough to support a life sentence.  Id.; compare Rummel, 445 U.S. at 284 (life sentence

21   upheld for conviction of obtaining money under false pretenses, with prior convictions for

22   presenting a credit card with intent to defraud and passing a forged check) with Solem v. Helm,

23   463 U.S. 277, 296-97 (1983) (holding that a sentence of life without the possibility of parole was

24   disproportionate to a crime of writing a check on a nonexistent account, as it was "one of the

25   most passive felonies a person could commit," and where the prior offenses "were all relatively

26   minor.")  In light of the highly deferential standard applicable here, there is no basis for a finding

27   that the state court was unreasonable in its determination that this is not one of the rare cases

28   where a sentence is grossly disproportionate to the convictions and recidivism.

The Court finds that the state court's adjudication of Claim 5 was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. <u>Richter</u>, 131 S.Ct. at 786-87; <u>Ewing</u>, 538 U.S. at 28; <u>Andrade</u>, 538 U.S. at 75-76; <u>Miller-El</u>, 537 U.S. at 340; <u>Williams</u>, 529 U.S. at 412; <u>Harmelin</u>, 501 U.S. at 1005; <u>Rummel</u>, 445 U.S. at 284.  Because this claim can be denied on the merits solely with reference to the state court record, and because Petitioner's allegations, even if true, do not provide a basis for federal habeas relief, an evidentiary hearing is unnecessary.  <u>Campbell</u>, 18 F.3d at 679.  The Court therefore recommends habeas relief be denied as to Claim 5.

**G.    Claim 6**

Petitioner alleges in Claim 6 that his right to a fair trial and to due process under the Fifth and Fourteenth Amendments was violated by the introduction of evidence of his parole status, as well as his past arrest and incarceration for drug use.  (FAP at 4, 71-76.)  Respondent answers that the state court reasonably found that no due process violation had occurred on the basis that the trial judge appropriately admonished the jury to disregard the evidence.  (Ans. Mem. at 40-43.)

Petitioner refers to the following testimony by Crystal on cross-examination:

Q.    After Henry's release, you began to see him again, didn't you?

A.    Yes.

Q    And you had to keep that secret, didn't you?

A.    Yes.

Q.    You became pregnant with a second child, Roxy; correct?

A.    Yes.

Q.    And Henry?

A.    Not - - not right after.  The six years in prison.  It was - - he went to jail again for drugs.  And when he got out is when I became pregnant.

[Defense Counsel]:  Objection.  Nonresponsive.  Motion to strike.

(RT 346.)

After a sidebar, the trial judge granted the motion to strike and instructed the jurors: "Ladies and gentlemen of the jury, you are ordered to disregard the witness's last answer and treat it as though you had never heard it." (RT 347.)  Defense counsel then continued his cross-examination of Crystal:

> Q.  Miss [Crystal], you became pregnant with your second child Roxy; isn't that true?
>
> A.  Roxy.  Yes.
>
> Q.  And Henry is Roxy's father; correct?
>
> A.  Yes.
>
> Q.  And Henry got in trouble for seeing you after his release; isn't that true?
>
> A.  Yes.
>
> Q.  Because it was forbidden that Henry and you see each other; correct?
>
> A.  That was after the six years in prison and then for the drugs and then for - - yes, we saw each other after that - - after those two instants - - periods of time.
>
> [Defense Counsel]:  Same objection.  Motion to strike.
>
> The Court:  The portion concerning drugs will be stricken, and the jury is admonished to disregard that and not to consider drugs for any purpose in this case.  This case is not about any accusation or charges involving drugs, and it plays no part whatsoever in this trial.
>
> Q.  Miss [Crystal], you and Henry were not supposed to see each other after his release from prison; correct?
>
> A.  That's correct.
>
> Q.  And Henry got in trouble because you and Henry were still seeing each other after he got out of prison; correct?
>
> A.  Yes.
>
> Q.  Henry got in trouble because his supervisor told you and him that you were not to see each other; correct?
>
> A.  Who is the supervisor?  Are you talking about a parole?  Is that who you mean by supervisor?
>
> Q.  Right.  You - - you - - that's what - - as a condition, he was not supposed to see you; correct?

1      A.      That's correct.

2      Q.      Henry got in trouble with parole because he wasn't supposed to see
               you; correct?

3

4      A.      Yes.  Correct.

(RT 347-49.)

5

6          Petitioner argues that the trial judge's admonition to the jury not to consider the evidence

7  was not effective for several reasons: (a) because the admonition itself mentions drugs three

8  times, calling attention to the prejudicial information; (b) because it is naive to believe a jury can

9  ignore prejudicial evidence they have heard, especially evidence of a criminal defendant's prior

10 criminal history; and (c) because the admonition did not instruct the jury to ignore evidence of

   his parole status.  (FAP at 71-76; Lodgment No. 22 at 21-22.)

11

12         The last reasoned state court decision addressing Claim 6 is the appellate court decision

13 denying the habeas petition in which the claim was presented, which stated:

14             Next, petitioner contends that the jury heard prejudicial information about
               him having been in prison for drugs in the past and that he had been on parole, and
15             that trial counsel was ineffective by failing to seek a mistrial due to the jury
               hearing this information.  However, according to petitioner, the trial court
16             admonished the jury to disregard the information, and a limiting instruction was
               provided.  Petitioner has failed to demonstrate prejudice, especially in light of the
17             evidence against him.  (*People v. Cogswell* (Aug. 12, 2010, D049038) (nonpub.
               opn.); *Strickland v. Washington* (1984) 446 U.S. 668, 687.)
18

19 (Lodgment No. 17, In re Cogswell, No. D061461, order at 2.)

20         Petitioner has failed to demonstrate a federal due process violation because he has not

21 shown that the introduction of this evidence was so prejudicial that it rendered the trial

22 fundamentally unfair.  See Sublett, 63 F.3d at 930 ("The admission of evidence does not provide

23 a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due

   process."), citing McGuire, 502 U.S. at 67-69.  In any case, because the issue regarding whether

24 admission of prejudicial evidence at a state trial can rise to the level of a due process violation

25 is an open one, Petitioner is unable to obtain relief under the AEDPA standard, which this Court

26 must apply to this claim.  Holley, 568 F.3d at 1101 (stating that the Supreme Court "has not yet

27 made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

28

1    process violation sufficient to warrant issuance of the writ.")

2          Furthermore, assuming Petitioner could demonstrate that a federal constitutional error

3    occurred as a result of admission of Crystal's testimony, and assuming Petitioner could

4    demonstrate it was objectively unreasonable for the state supreme court to conclude otherwise,

5    this Court is still required to determine whether the error was harmless under the standard

6    announced in Brecht v. Abrahamson, 507 U.S. 619 (1993).  See Fry v. Pliler, 551 U.S. 112, 119-

7    22 (2007) (holding that "whether or not the state appellate court recognized the error and

8    reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard of

9    Chapman," harmless error analysis under Brecht is still required, even after a showing that the

10   state court opinion was contrary to or involved an unreasonable application of clearly established

11   federal law.)  The Brecht standard provides that habeas relief is not available "unless the error

12   resulted in 'substantial and injurious effect or influence in determining the jury's verdict,' . . .

13   or unless the judge 'is in grave doubt' about the harmlessness of the error."  Medina v. Hornung,

14   386 F.3d 872, 877 (9th Cir. 2004), quoting Brecht, 507 U.S. at 637 and O'Neal v. McAninch,

15   513 U.S. 432, 436 (1995).

16         As discussed immediately below with respect to Claim 7, it appears that defense counsel

17   asked Crystal the questions which elicited the objected-to testimony in a strategic attempt to

18   show that she was willing to see Petitioner and have another child with him after he was released

19   from prison in order to attack the credibility of her allegations that Petitioner had abused and

20   raped her throughout their relationship.  It is very unlikely that Crystal's brief mention that

21   Petitioner had served prison time and violated his parole for drug use had an impact on the

22   verdict, particularly in light of the trial judge's repeated instruction that the jury was not to

23   consider that evidence.  Although Petitioner challenges the validity of this Court's presumption

24   that the jury followed their admonition, he has not indicated any extenuating circumstances

25   invalidating that presumption.  See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) (the Court

26   "presumes that jurors, conscious of the gravity of their task, attend closely the particular

27   language of the trial court's instructions in a criminal case and strive to understand, make sense

28   of, and follow the instructions given them.")  This Court is not "in grave doubt" about whether

1  any error in the admission of evidence of Petitioner's drug use or parole status prejudiced him.

2  See Medina, 386 F.3d at 877 ("The relevant inquiry is whether the tainted evidence actually

3  harmed the appellant."); Brecht, 507 U.S. at 637; O'Neal, 513 U.S. at 436.

4      Accordingly, the state court's adjudication of Claim 6 did not involve an objectively

5  unreasonable application of clearly established federal law, and any error was clearly harmless.

6  An evidentiary hearing is neither necessary nor warranted.  Pinholster, 131 S.Ct. at 1398, 1401

7  n.10; Stokley, 659 F.3d at 808-09; Campbell, 18 F.3d at 679.  The Court recommends habeas

8  relief be denied as to Claim 6.

9  **H.  Claims 7 and 8**

10      Petitioner alleges in Claim 7 that he received ineffective assistance of counsel when his

11  trial counsel failed to request a mistrial due to introduction of evidence regarding his past drug

12  arrest and parole status.  (FAP at 4, 76-77.)  He alleges in Claim 8 that he received ineffective

13  assistance of counsel when his trial counsel elicited information about Petitioner's prior due

14  arrest and parole status.  (FAP at 4, 78-79.)  Respondent contends that the adjudication of these

15  claims by the state court, on the basis that Petitioner had not demonstrated prejudice as a result

16  of his counsel's actions, is an objectively reasonable application of clearly established federal

17  law.  (Ans. Mem. at 40-43.)

18      The last reasoned state court decision addressing Claim 6 is the appellate court decision

19  denying the habeas petition in which the claim was presented, which stated:

20

21      Next, petitioner contends that the jury heard prejudicial information about him having been in prison for drugs in the past and that he had been on parole, and that trial counsel was ineffective by failing to seek a mistrial due to the jury

22  hearing this information.  However, according to petitioner, the trial court admonished the jury to disregard the information, and a limiting instruction was

23  provided.  Petitioner has failed to demonstrate prejudice, especially in light of the evidence against him.  (*People v. Cogswell* (Aug. 12, 2010, D049038) (nonpub.

24  opn.); *Strickland v. Washington* (1984) 446 U.S. 668, 687.)

25  (Lodgment No. 17, In re Cogswell, No. D061461, order at 2.)

26      For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must

27  demonstrate two things.  First, he must show that counsel's performance was deficient.

28  Strickland v. Washington, 466 U.S. 668, 687 (1984).  "This requires showing that counsel made

errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id.  Second, he must show counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." Id.  To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error.  Id. at 694.  A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome." Id.  Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel.  Id. at 687.

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. ___, 130 S.Ct. 1473, 1485 (2010).  "The standards created by Strickland and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." Richter, 131 S.Ct. at 788 (citations omitted).  These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." Pinholster, 131 S.Ct. at 1398.  Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction.  Richter, 131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979).  "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." Strickland, 466 U.S. at 687.

Crystal testified on direct examination that Petitioner abused her before she became pregnant with his first child, raped and abused her when she was pregnant with that child, and that he pressured her to falsely recant her trial testimony and to use the term "sexual harassment" rather than rape at his trial for raping her.  It was sound trial strategy for defense counsel to attempt to impeach that testimony by eliciting testimony from Crystal that she had repeatedly visited Petitioner while he was incarcerated, continued to see him after he was released from custody, and thereafter became pregnant with a second child by him despite the fact that contact between them violated the conditions of his parole.  Crystal gave the unsolicited and non-responsive answers to which Petitioner now objects in response to questions asked by defense counsel in an attempt to impeach her.  Petitioner has not overcome the strong presumption that

counsel's actions in this regard can be considered sound trial strategy, and has not demonstrated that counsel was deficient in the manner in which he pursued that strategy.  See Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.") Neither has Petitioner shown that trial counsel was deficient in failing to move for a mistrial on the basis of Crystal's unresponsive references to Petitioner's drug use because he has not shown that her statements provided a basis for a mistrial.  See People v. Dement, 53 Cal.4th 1, 39 (2011) ("A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction."); see also People v. Ayala, 23 Cal.4th 225, 282 (2000) ("A motion for mistrial should be granted only when a party's chances of receiving a fair trial have been irreparably damaged.") (internal quotation marks omitted).

Even assuming counsel performed deficiently in the manner in which he pursued the strategy of impeaching Crystal's testimony, and that his errors caused the jury to hear Crystal's testimony that Petitioner had been convicted of a crime in relation to his physical or sexual abuse of her, had gone to prison, had been placed on parole, and had violated his parole due to drug use, Petitioner has not demonstrated that he was prejudiced.  A motion to strike Crystal's non-responsive answers was granted and the jurors were instructed not to consider the evidence. This Court must presume the jurors followed that instruction, and Petitioner has failed to demonstrate otherwise.  Francis, 471 U.S. at 324 n.9.  In any case, evidence that Petitioner had been in prison and had violated parole for drug use was overshadowed by the testimony provided by Crystal and Lorene regarding his physical and sexual abuse of them.  Petitioner has not shown a reasonable probability that the introduction of evidence of his past drug use or parole status undermined confidence in the outcome of his trial.  Strickland, 466 U.S. at 687.

Accordingly, the state court's determination that Petitioner was not prejudiced by defense counsel's elicitation of evidence of his past drug use and parole status, and was not prejudiced by the failure to request a mistrial, did not involve an objectively unreasonable application of clearly established federal law.  Richter, 131 S.Ct. at 788; Pinholster, 131 S.Ct. at 1398; Padilla, 130 S.Ct. at 1485; Strickland, 466 U.S. at 687.  An evidentiary hearing is neither necessary nor

1   warranted.  <u>Pinholster</u>, 131 S.Ct. at 1398, 1401 n.10; <u>Stokley</u>, 659 F.3d at 808-09; <u>Campbell</u>, 18

2   F.3d at 679.  The Court recommends habeas relief be denied as to Claims 7 and 8.

3   / / /

4   **I.      Claim 9**

5          Petitioner alleges in Claim 9 that he received ineffective assistance of counsel when his

6   trial counsel failed to request a jury instruction on lesser included offenses.  (FAP at 4, 79-83.)

7   Respondent answers that the state court reasonably found the claim to be without merit, that it

8   is unclear what instructions Petitioner contends should have been given, and that he does not

9   have a recognized federal constitutional right to a jury instruction on a lesser included offense.

10  (Ans. Mem. at 43-46.)

11         The following exchange took place regarding proposed jury instructions:

12  The Court:      Anything else before we take a quick break and set
                    up for preinstructing and then closing?

13

14  Prosecutor:    Yes, your Honor.  [¶]  I had asked [defense counsel]
                    Thursday whether or not he intended to ask this Court
                    for attempt as lessers, and he had said yes.  So I have
15                  provided those jury instructions and verdict forms for
                    the Court.  Now I think it's my understanding that
16                  he's not requesting them.

17  The Court:      Okay.   [Defense counsel], on the verdict forms
                    you've had an opportunity to review them.  What's
18                  your pleasure?

19  Defense Counsel:     Yes, I did, your Honor.  And let me just - -

20  The Court:      There's been a proposed instruction for attempted
                    forcible rape, attempted forcible sexual penetration,
21                  attempted forcible oral copulation, and two verdict
                    forms for attempted forcible rape for Counts 4 and 5.
22                  [¶]  What do you want to do on those?

23  Defense Counsel:     I was not going to request the attempts.

24  The Court:      I don't think it's a sua sponte requirement on the
                    Court's part in the absence of a request by counsel.
25                  So they're deemed withdrawn.

26  (RT 465-66.)

27         The last reasoned state court decision addressing Claim 9 is the appellate court decision

28  denying the habeas petition in which the claim was presented, which stated:

> "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  (Cal. Const., art. VI, § 13.)  Cogswell challenged only the admissibility of an unavailable witness's prior testimony and juror misconduct on appeal.  Any claim of instructional error should have been raised on direct appeal.  Cogswell does not explain how the jury was instructed and he has not shown that but for any error of trial counsel he would have achieved a better result.  Nor has Cogswell established a miscarriage of justice to warrant relief on habeas corpus.

(Lodgment No. 21, In re Cogswell, No. D062465, order at 1-2 (Cal.Ct.App. Sept. 6, 2012).)

Petitioner must overcome a strong presumption that defense counsel's decision not to request the lesser included offense instructions was a strategic choice.  Strickland, 466 U.S. at 689.  Petitioner argues that there "could be no satisfactory explanation" why defense counsel withdrew the requested instructions, implying that the instructions could have only helped and could not have hurt his case, particularly in light of the fact that there is no indication by the trial judge that the instructions would have been refused if they had been requested, and in light of Petitioner's contention that they were required by law to be given.  (FAP at 79-83.)  Petitioner contends that defense counsel's "all or nothing" trial strategy, providing the jury with the choice of finding him guilty or acquitting him, was not a sound strategy.  (Id. at 82.)

Respondent answers that defense counsel made a strategic choice "to go for a complete defense" because counsel's "argument disclosed weaknesses in the credibility of both of the prosecution's key witnesses, Lorene B. and Crystal [G.]," and that the lesser included offense instructions "were obviously distracting and inconsistent with the adopted defense theory."  (Ans. Mem. at 46.)  Respondent also argues that the state court reasonably found that Petitioner was not prejudiced by defense counsel's failure to request the instructions, because Petitioner has not, and cannot, show that such instructions would have affected the outcome of his trial.  (Id.)

Petitioner was charged with three counts of forcible rape, one count of forcible oral copulation in violation, and one count of rape by a foreign object in violation of Penal Code section 289(a)(1).  (CT 1-7.)  As set forth in detail above in Section III of this Report, the

evidence presented at trial supported findings that Petitioner not only attempted the acts of rape, forced oral copulation, and rape by a foreign object (his finger) of Lorene, but he actually completed those acts. As there was no evidence whatsoever that Petitioner attempted but did not complete those acts, defense counsel's choice to avoid arguing to the jury that Petitioner attempted but did not complete those acts was sound, particularly in light of the strong evidence available to attack the credibility of Lorene and Crystal. Petitioner has not overcome the strong presumption that trial counsel's choice to withdraw the request for instructions on lesser included offenses was strategic.

Petitioner has also failed to demonstrate that it was objectively unreasonable for the state court to find that "he has not shown that but for any error of trial counsel he would have achieved a better result." (Lodgment No. 21, In re Cogswell, No. D062465, order at 2.) The jury was presented with Lorene's testimony that Petitioner forced her to engage in sexual acts which were completed, and with testimony that he had likewise forced Crystal to engage in unwanted sexual acts on more than one occasion. The jury was also provided with testimony that Petitioner had forced Crystal to have sex in a car in a manner similar to which he had raped Lorene in her car. In light of the direct evidence that Petitioner completed those sexual acts, and in light of the lack of evidence that Petitioner attempted but did not complete the sexual acts with which he was charged, Petitioner has not shown a reasonable probability that the result of the proceeding would have been different absent defense counsel's failure to request instructions on attempted rape, attempted oral copulation, and attempted rape with a foreign object. Strickland, 466 U.S. at 694, 687 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial.")

Accordingly, the state court's determination that Petitioner was not prejudiced by defense counsel's failure to request instructions on lesser included offenses did not involve an objectively unreasonable application of clearly established federal law. Richter, 131 S.Ct. at 788; Pinholster, 131 S.Ct. at 1398; Padilla, 130 S.Ct. at 1485; Strickland, 466 U.S. at 687. An evidentiary hearing is neither necessary nor warranted. Pinholster, 131 S.Ct. at 1398, 1401 n.10;

1  Stokley, 659 F.3d at 808-09; Campbell, 18 F.3d at 679.  The Court recommends habeas relief

2  be denied as to Claim 9.

3  / / /

4  **J.      Claim 10**

5         Petitioner alleges in Claim 10 that the trial court erred in failing to instruct the jury sua

6  sponte on lesser included offenses.  (FAP at 4, 83-84.)  Respondent contends that this Claim is

7  procedurally defaulted, that the state court reasonably found that it lacks merit, and that it does

8  not present a cognizable federal claim.  (Ans. Mem. at 43-46.)

9         The last reasoned state court decision addressing Claim 9 is the appellate court decision

10  denying the habeas petition in which the claim was presented, which stated:

11

12         "No judgment shall be set aside, or new trial granted, in any cause, on the
       ground of misdirection of the jury . . . unless, after an examination of the entire
       cause, including the evidence, the court shall be of the opinion that the error

13     complained of has resulted in a miscarriage of justice."  (Cal. Const., art. VI,
       § 13.)  Cogswell challenged only the admissibility of an unavailable witness's

14     prior testimony and juror misconduct on appeal.  Any claim of instructional error
       should have been raised on direct appeal.  Cogswell does not explain how the jury
       was instructed and he has not shown that but for any error of trial counsel he

15     would have achieved a better result.  Nor has Cogswell established a miscarriage
       of justice to warrant relief on habeas corpus.

16

17  (Lodgment No. 21, In re Cogswell, No. D062465, order at 1-2.)

18         Respondent first contends this claim is procedurally defaulted because Petitioner failed

19  to raise the claim on direct appeal.  (Ans. Mem at 45.)  Respondent contends that California's

20  rule requiring such claims to be raised on direct appeal is an independent and adequate ground

21  for denying federal habeas relief, and that Petitioner has the burden of demonstrating that the

22  rule is not independent or adequate, or that the default should be excused by showing cause and

23  prejudice or the existence of a fundamental miscarriage of justice.  (Id.)  The Court need not

24  make a determination whether the claim is procedurally defaulted or whether Petitioner could

25  make a showing sufficient to excuse the default, however, because Claim 10 is without merit.

26  The Ninth Circuit has indicated that: "Procedural bar issues are not infrequently more complex

27  than the merits issues presented by the appeal, so it may well make sense in some instances to

28  proceed to the merits if the result will be the same."  Franklin v. Johnson, 290 F.3d 1223, 1232

(9th Cir. 2002), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.")

"[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." Windham v. Merkle, 163 F.3d 1092, 1105-06 (9th Cir. 1998); see also Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984) ("Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."), quoting James v. Reese, 546 F.2d 325, 327 (9th Cir. 1976). Nevertheless, the Ninth Circuit has recognized that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established United States Supreme Court precedent. Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (emphasis added). "This general statement may not apply to every habeas corpus review, because the criminal defendant is also entitled to adequate instruction on his or her theory of defense." Bashor, 730 F.2d at 1240; see also Bradley v. Duncan, 315 F.3d 1091, 1098-1101 (9th Cir. 2002) (finding federal due process violation in a post-AEDPA habeas case where defendant's request for instruction on the only theory of defense was denied.)

Petitioner has not demonstrated that the instructions on the lesser included offenses of attempted rape, attempted forced oral copulation, or attempted rape by a foreign object were necessary to his theory of defense. In fact, the opposite is true. Petitioner's defense was based on the lack of credibility of Lorene and Crystal, not on a theory that he attempted but did not complete the charged sex acts. Because instruction on the lesser included offenses was not consistent with Petitioner's defense and was not supported by the evidence, no due process violation arose from the failure to instruct the jury on the lesser included offense. Bradley, 315 F.3d at 1098-1101; Solis, 219 F.3d at 929; Bashor, 730 F.2d at 1240; Reese, 546 F.2d at 327.

In addition to the possibility of demonstrating a due process violation based on the failure to instruct on a theory of the defense, clearly established federal law provides that in order to establish a violation of his federal due process rights by the failure to give a requested jury

instruction, Petitioner must demonstrate that the instruction should have been given, and that its omission "so infected the entire trial that the resulting conviction violates due process." Henderson v. Kibbe, 431 U.S. 145, 154 (1977) , quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  Where failure to give an instruction is in issue, the burden on the petitioner is "especially heavy."  Kibbe, 431 U.S. 154.  Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637; California v. Roy, 519 U.S. 2, 5 (1996).

Petitioner has not carried his "heavy burden" of showing that the instruction should have been given, because there was insufficient evidence for a reasonable jury to find the elements of the lesser included offense, and he has not shown that the omission of the instructions infected the entire trial with unfairness.  Additionally, even assuming an instructional error occurred, the Court finds that Petitioner has failed to establish that such an error was harmful.  As the appellate court pointed out, it is clear that the failure to instruct in this regard could not have had any adverse effect whatsoever on the jury's decision, much less the "substantial and injurious effect" required to show the error was harmful.  Brecht, 507 U.S. at 637; Roy, 519 U.S. at 5.

In sum, the Court finds that: (a) Petitioner has not identified an instructional error, (b) assuming an instruction error occurred, Petitioner has not demonstrated the error so infected the entire trial that the resulting conviction violated due process, and (c) even assuming an instructional error caused a due process violation, any such error was harmless.  Henderson, 431 U.S. at 154-56; Brecht, 507 U.S. at 637; Roy, 519 U.S. at 5.  The Court therefore finds that the state court's adjudication of this claim is not contrary to clearly established federal law, is not an objectively unreasonable application of that law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Early, 537 U.S. at 11; Williams, 529 U.S. at  405-07.  Habeas relief is therefore unavailable as to this claim.  See Richter, 131 S.Ct. at 786-87 ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and

1   comprehended in existing law beyond any possibility for fairminded disagreement.")

2   / / /

3   / / /

4   **K.      Claim 11**

5          Petitioner alleges in Claim 11, as he does in Claim 4, that the cumulative effect of the

6   errors produced a fundamentally unfair trial in violation of due process.  (FAP at 4, 84-85.)

7   Respondent answers that the state court reasonably concluded that the principle of cumulative

8   error only applies when multiple errors occur at trial, and it does not apply here because there

9   were no trial errors to accumulate.  (Ans. Mem. at 46-47.)

10         The last reasoned state court decision addressing Claim 11 is the appellate court decision

11   denying the habeas petition in which the claim was presented, which stated:

12

13              Finally, petitioner contends that the cumulative effect of the alleged errors
            violated his rights to due process.  Because petitioner has not shown error, this
            contention must necessarily fail.  (*People v. Coryell* (2003) 110 Cal.Appl.4th

14              1299, 1309.)

15   (Lodgment No. 17, In re Cogswell, No. D061461, order at 2.)

16         "The Supreme Court has clearly established that the combined effect of multiple trial

17   court errors violates due process where it renders the resulting trial fundamentally unfair." Parle

18   v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi, 410 U.S. 284,

19   298 (1973).  Where no single trial error in isolation is sufficiently prejudicial to warrant habeas

20   relief, "the cumulative effect of multiple errors may still prejudice a defendant." United States

21   v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).  Where "there are a number of errors at trial,

22   'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the

23   overall effect of all the errors in the context of the evidence introduced at trial against the

24   defendant." Id., quoting United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988).  "Where

25   the government's case is weak, a defendant is more likely to be prejudiced by the effect of

26   cumulative errors." Frederick, 78 F.3d at 1381.

27         As set forth above, Petitioner has not demonstrated that any constitutional errors occurred

28   at his trial.  Moreover, this is not a case where the prosecution's case was weak.  Rather, there

was direct testimony from Petitioner's victims. It is therefore unlikely that Petitioner could have been prejudiced by the accumulation of errors which individually did not prejudice him. Frederick, 78 F.3d at 1381. The adjudication of this claim by the appellate court on the basis that "any assumed errors that the trial court may have committed, whether considered individually or together, do not require reversal," is neither contrary to, nor involved an unreasonable application of clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Richter, 131 S.Ct. at 786-87; Andrade, 538 U.S. at 75-76; Miller-El, 537 U.S. at 340; Williams, 529 U.S. at 412; Frederick, 78 F.3d at 1381. Because Petitioner's allegations, even if true, do not provide a basis for federal habeas relief, an evidentiary hearing is unnecessary to the resolution of this claim. Campbell, 18 F.3d at 679. The Court therefore recommends denying habeas relief as to Claim 11.

## VI.

## CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying Petitioner's Motion to Amend the Petition and denying the Petition.

**IT IS ORDERED** that no later than **February 21 , 2014**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **March 21, 2014.** The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  January 22, 2014

1

2

Hon. William V. Gallo
3     U.S. Magistrate Judge

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28